# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA

In re:

**THE COLONIAL BANCGROUP, INC.,**

**Debtor.**

**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Colonial Bank,**

**Appellant**

**v.**

**THE COLONIAL BANCGROUP, INC., et al.,**

**Appellees.**

**Case No. 2:11-cv-0133 (MHT)**

**Bankruptcy Appeal**

---

**BRIEF OF THE COLONIAL BANCGROUP, INC. AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN OPPOSITION TO THE APPEAL OF THE FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR COLONIAL BANK**

C. Edward Dobbs
Rufus T. Dorsey, IV
J. David Freedman
**PARKER, HUDSON, RAINER & DOBBS LLP**
1500 Marquis Two Tower
285 Peachtree Center Avenue, N.E.
Atlanta, Georgia 30303
Telephone: 404-523-5300
Facsimile: 404-522-8409

*Attorneys for the Debtor and
Debtor in Possession*

Alan R. Glickman
Brian D. Pfeiffer
Brian T. Kohn
**SCHULTE ROTH & ZABEL LLP**
919 Third Avenue
New York, New York 10022
Telephone: 212-756-2000
Facsimile: 212-593-5955

Robert B. Rubin
Marc P. Solomon
**BURR FORMAN LLP**
420 North 20th Street, Suite 3400
Birmingham, Alabama 35203
Telephone: 205-251-3000
Facsimile: 205-244-5733

*Attorneys for the Official Committee
of Unsecured Creditors*

Dated: April 26, 2011

# TABLE OF CONTENTS

STATEMENT OF THE CASE.................................................................................1

    A.    Nature of the Case ........................................................................ 1

    B.    Statement Of Facts ....................................................................... 6

    C.    The Proceedings Below ............................................................... 10

        1.    The FDIC's Original Stay Relief Motion ...............................10

        2.    The FDIC's Amended Stay Relief Motion ..............................11

        3.    The FDIC's Renewed Stay Relief Motion ..............................12

        4.    The Debtor's Motion to Use Cash Collateral ........................12

    D.    The Disposition Of The FDIC's Motion ...................................... 13

        1.    The Opinion on the Renewed Stay Relief Motion .................13

            (a)    BB&T's Assumption of the Debtor Deposits ............... 14

            (b)    Section 9.5 of the Purchase and Assumption Agreement ........................... 15

            (c)    The FDIC's Purported Policy Argument ..................... 17

        2.    Order Granting Debtor's Motion to Use Cash Collateral.....................18

ARGUMENT ...................................................................................................18

I.    NEITHER THE FDIC NOR COLONIAL BANK IS LIABLE TO THE DEBTOR FOR THE DEBTOR DEPOSITS, AND THUS THE MUTUALITY REQUIREMENT FOR SETOFF IS NOT SATISFIED. ...................................................................18

    A.    Bankruptcy Law Requirements For Setoff ................................... 19

    B.    Requirements of Non-Bankruptcy Law Cited By FDIC For Setoff ............................ 20

II.    THE BANKRUPTCY COURT CORRECTLY HELD THAT EVEN IF THE FDIC COULD TAKE BACK THE DEBTOR DEPOSITS UNDER SECTION 9.5 OF THE P&A AGREEMENT, IT WOULD THEREBY INCUR POST-PETITION DEBT INELIGIBLE FOR SETOFF UNDER 11 U.S.C. § 553...................................................22

    A.    Section 553 of the Bankruptcy Code Prohibits the Setoff of a Post-Petition Debt Against a Pre-Petition Claim. ........................................................ 23

    B.    The FDIC's Proposal to Assume Debtor Deposit Liabilities Would Result in the Post-Petition Incurrence of Debt. ............................................................ 23

    C.    A Recent Decision in the Lehman Brothers Bankruptcy Case Is Directly on Point, Denying a Bank's Attempt to Set Off a Post-Petition Deposit Liability Against Its Pre-Petition Claim........................................................... 26

    D.    The Bankruptcy Court Correctly Held that the Inclusion of Language in Section 553(a)(3) Prohibiting Setoff of Post-Petition Debt Would Be Superfluous. ................. 28

    E.    The FDIC's Position Is Not Supported by the Legislative History of Section 553(a)... 32

III.   THE FDIC CANNOT RELY ON THE P&A AGREEMENT'S DEFINITION OF
       ASSUMED DEPOSITS TO SATISFY THE TIMING AND MUTUALITY
       REQUIREMENTS OF SECTION 553(a). ........................................................................35

   A.   The FDIC's Transfer and BB&T's Assumption of the Debtor Deposits Pursuant to the
        P&A Agreement Destroyed Mutuality ........................................................................... 36

        1.   The Undisputed Record Establishes That BB&T Has Retained Liability for the
             Debtor Deposits Since Prior to the Petition Date. ..................................................36

        2.   The FDIC's Own Conduct Demonstrates That It Understood That the Debtor
             Deposits Were Transferred to and Assumed by BB&T. ......................................38

   B.   The FDIC May Not Satisfy the Requirements of Section 553(a) by Invoking the
        Definition of Assumed Deposits. ................................................................................. 39

   C.   That Purchase and Assumptions Agreements Are Negotiated on an Expedited Basis
        Does Not Give the FDIC the Right to Create Mutuality Where None Otherwise Exists.
        ......................................................................................................................................... 41

IV.   EVEN IF THE FDIC WERE ABLE TO SET OFF AGAINST THE DEBTOR
      DEPOSITS AS A MATTER OF LAW, THE BANKRUPTCY COURT'S DENIAL OF
      THE FDIC'S MOTION FOR STAY RELIEF SHOULD BE AFFIRMED....................42

V.    THE BANKRUPTCY COURT PROPERLY GRANTED THE DEBTOR'S MOTION
      TO USE CASH COLLATERAL. ......................................................................................44

CONCLUSION .....................................................................................................................................45

# TABLE OF AUTHORITIES

## CASES

*Alabama v. Lett (In re Lett),*
    416 B.R. 780 (S.D. Ala. 2009) ................................................................14

*Ansfield v. Whitewater Oil Co.,*
    254 F. Supp. 494 (E.D. Wis. 1966) ........................................................33

*Atkinson v. FDIC,*
    635 F.2d 508 (5th Cir. 1981) ..................................................................21

*B.F. Goodrich Employees Fed. Credit Union v. Patterson (In re Patterson),*
    967 F.2d 505 (11th Cir. 1992) ..............................................19, 21, 43, 44

*In re Bill Heard Enters., Inc.,*
    400 B.R. 813 (Bankr. N.D. Ala. 2009) ......................................18, 20, 23

*In re Bill Heard Enters., Inc.,*
    438 B.R. 745 (Bankr. N.D. Ala. 2010) ..................................................26

*Boston and Maine Corp. v. Chicago Pac. Corp.,*
    785 F.2d 562 (7th Cir. 1986) ..................................................................34

*Braniff Airways, Inc. v. Exxon Co., U.S.A. (In re Braniff),*
    814 F.2d 1030 (5th Cir. 1987) ................................................................19

*Brooks Farms v. U.S. Dep't of Agric. (In re Brooks Farms),*
    70 B.R. 368 (Bankr. E.D. Wisc. 1987) ............................................26, 32

*CBS Corp. v. D'Urso (In re Westinghouse Credit Corp.),*
    278 F.3d 138 (2d Cir. 2002) ..................................................................19

*Christensen v. Tuscon Estates, Inc. (In re Tucson Estates, Inc.),*
    912 F.2d 1162 (9th Cir. 1990) ................................................................43

*Citizens Bank of Md. v. Strumpf,*
    516 U.S. 16 (1995) ................................................................................20

*Cooper-Jarrett, Inc. v. Cent. Transp., Inc.,*
    726 F.2d 93 (3d Cir. 1984) ....................................................................26

*Darr v. Muratore,*
    8 F.3d 854 (1st Cir. 1993) ......................................................................18

*In re Davicter Enters., Inc.,*
  248 B.R. 794 (Bankr. S.D. Ill. 2000) ................................................40

*In re Dayton Circuit Courts,*
  80 B.R. 434 (Bankr. S.D. Ohio 1987) ..........................................32, 44

*Desser, Rau & Hoffman v. Goggin,*
  240 F.2d 84 (9th Cir. 1957).........................................................33

*In re Ealy,*
  392 B.R. 408 (Bankr. E.D. Ark. 2008),
  *appeal dismissed,* 396 B.R. 20 (B.A.P. 8th Cir. 2008) ..........................44

*In re Elcona Homes Corp.,*
  863 F.2d 483 (7th Cir. 1988)........................................................32

*In re Elmira Litho, Inc.,*
  174 B.R. 892 (Bankr. S.D.N.Y. 1994) ...........................................43

*First Nat'l Bank of Abbeville v. Capps,*
  94 So. 109 (Ala. 1922) ..............................................................21

*In re Gregg,*
  371 B.R. 817 (Bankr. E.D. Tenn. 2007) ........................................23

*Gunter v. Hutcheson,*
  674 F.2d 862 (11th Cir. 1982).......................................................41

*Herzog v. Mandan Sec. Bank (In re PRS Products, Inc.,*
  574 F.2d 414 (8th Cir. 1978).........................................................32

*Ingersoll Int'l, Inc. v. Iscar, Ltd. (In re Ingersoll, Inc.),*
  2009 Bankr. LEXIS 2321 (Bankr. N.D. Ill. July 22, 2009) ...................18

*King v. Porter,*
  160 So. 101 (Ala. 1938) ............................................................21

*In re Lehman Bros. Holdings Inc.,*
  404 B.R. 752 (Bankr. S.D.N.Y. 2009) ...................................26, 27, 28

*Mottaz v. St. Louis Post-Dispatch Pulitzer Publ'g Co. (In re Murphy),*
  203 B.R. 972 (Bankr. S.D. Ill. 1997) ............................................26

*Nashville Lodging Co. v. Resolution Trust Corp.,*
  59 F.3d 236 (D.C. Cir. 1995) ......................................................36

*In re New Haven Foundry, Inc.*,
    285 B.R. 646 (Bankr. E.D. Mich. 2002) ...............................................................24

*In re Nuclear Imaging Sys., Inc.*,
    260 B.R. 724 (Bankr. E.D. Pa. 2000)...................................................................44

*Official Comm. of Unsecured Creditors v. Mfr. & Traders Trust Co.*
    *(In re Bennett Funding Group, Inc.)*, 212 B.R. 206 (B.A.P. 2d Cir. 1997) ............................20

*Official Comm. of Unsecured Creditors v. Mfrs. & Trading Trust Co.*
    *(In re Bennett Funding Group, Inc.)*, 146 F.3d 136 (2d Cir. 1998) ..........................................32

*In re Orlinksi*,
    140 B.R. 600 (Bankr. S.D. Ga. 1991) ..................................................................44

*Photo Mech. Servs., Inc. v. E.I. Dupont De Nemours & Co.*
    *(In re Photo Mech. Servs., Inc.)*, 179 B.R. 604 (Bankr. D. Minn. 1995)................................30

*In re Powell*,
    223 B.R. 225 (Bankr. N.D. Ala. 1998) ................................................................43

*Prudential Ins. Co. of Am. v. Nelson (In re Chickamauga)*,
    101 F.2d 441 (6th Cir. 1939)...............................................................................33

*In re Rosteck*,
    899 F.2d 694 (7th Cir. 1990)...............................................................................26

*Schechter v. Acme Screw Co., Inc. (In re Assured Fastener Prods. Corp.*,
    773 F.2d 105 (7th Cir. 1985)...............................................................................24

*Sherman v. First City Bank of Dallas (In re United Sciences of Am., Inc.)*,
    893 F.2d 720 (5th Cir. 1990)...............................................................................40

*Stephenson v. Salisbury (In re Corland Corp.)*,
    967 F.2d 1069 (5th Cir. 1992)........................................................................26, 40

*Turner v. Officers, Directors and Employees of Mid Valley Bank*,
    712 F. Supp. 1489 (E.D. Wash. 1988) ................................................................41

*U.S. Aeroteam, Inc. v. Delphi Automotive Sys., LLC (In re U.S. Aeroteam, Inc.)*,
    327 B.R. 852 (Bankr. S.D. Ohio 2005)................................................................24

*United States v. Gould (In re Gould)*,
    401 B.R. 415 (B.A.P. 9th Cir. 2009)...................................................................44

*United States v. Jones (In re Jones),*
   230 B.R. 875 (M.D. Ala. 1999) ...............................................................................18

## STATUTES

11 U.S.C. § 362 (2011) ...............................................................................................43

11 U.S.C. § 553(a) (2011)................................................................................ *passim*

12 U.S.C. § 1822(d) (2011) ........................................................................................20

## MISCELLANEOUS

3 ALAN N. RESNICK, ET AL., COLLIER ON BANKRUPTCY, ¶ 362.10 (16th ed. rev. 2010)...............43

5 ALAN N. RESNICK ET AL., COLLIER ON BANKRUPTCY, ¶ 553.03[3][b] (16th ed. rev. 2010) .......19

The Colonial BancGroup, Inc. (the "Debtor") and the Official Committee of Unsecured Creditors appointed in the Debtor's chapter 11 case (the "Committee") respectfully submit this memorandum in opposition to the appeal of the Federal Deposit Insurance Corporation (the "FDIC"), as receiver for Colonial Bank, Montgomery, Alabama ("Colonial Bank") from (i) an order of the United States Bankruptcy Court for the Middle District of Alabama (the "Bankruptcy Court") entered on January 24, 2011, denying the motion (the "Renewed Stay Relief Motion") of the FDIC under section 362(d) of the Bankruptcy Code for relief from the automatic stay [Doc. No. 1051][1]; (ii) a Memorandum Opinion of the Bankruptcy Court entered on January 24, 2011 with respect to the foregoing [Doc. No. 1050]; and (iii) an order of the Bankruptcy Court entered on January 25, 2011 (the "Cash Collateral Order") granting the motion of the Debtor to use cash collateral (the "Cash Collateral Motion") and overruling the FDIC's objection to that motion [Doc. No. 1053].

## STATEMENT OF THE CASE

### A.     Nature of the Case

This appeal arises out of the FDIC's numerous unsuccessful attempts since the outset of the Debtor's bankruptcy case to seize more than $35 million of the Debtor's money being held in the Debtor's bank accounts at Branch Banking & Trust Company ("BB&T") (the "Debtor Deposits").  As the Bankruptcy Court held, the Debtor Deposits are not, and cannot become, pre-petition liabilities of Colonial Bank.  The FDIC, therefore, cannot meet the requirements of section 553 of the Bankruptcy Code to set off the Debtor Deposits against any purported pre-petition claims Colonial Bank may have against the Debtor.  Accordingly, there is

---

[1] Citations to "Doc. No. ___" refer to filings on the Bankruptcy Court docket in the Debtor's Chapter 11 bankruptcy case, *In re The Colonial BancGroup, Inc.*, No. 09-32303 (DHW) (Bankr. M.D. Ala.).

1

no basis for the FDIC's motion to lift the bankruptcy automatic stay in order to effectuate such a setoff.

On August 14, 2009, BB&T purchased the assets and assumed the deposits of Colonial Bank pursuant to a Purchase and Assumption Agreement (the "P&A Agreement") between the FDIC, as Colonial Bank's receiver, and BB&T.  As a result, at that time, all liabilities relating to the Debtor Deposits were released by Colonial Bank and assumed by BB&T.  At no time since August 14, 2009 has Colonial Bank or the FDIC had any liability (fixed, contingent or otherwise) with respect to the Debtor Deposits.  On August 25, 2009 (the "Petition Date"), eleven days after the FDIC's liability with respect to the Debtor Deposits was extinguished, the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

These facts are not in dispute.  The Bankruptcy Court thus appropriately found that there was "overwhelming evidentiary support" for the proposition that the FDIC's liability with respect to the Debtor Deposits was fully and completely extinguished on August 14, 2009, and that BB&T has had such liability at all times since then.  The FDIC does not challenge the Bankruptcy Court's factual findings.  Moreover, the FDIC does not dispute that the clear language of section 553 of the Bankruptcy Code requires that, in order to effectuate a setoff in bankruptcy, there must be (i) a pre-petition debt of a debtor owed to a creditor and (ii) a pre-petition debt of that same creditor owed to that same debtor.

Conceding that the Debtor Deposits are not currently a debt of the FDIC (pre-petition or otherwise), the FDIC filed the Renewed Stay Relief Motion seeking the Bankruptcy Court's permission to effectuate a maneuver that would allow the FDIC to assume the Debtor Deposit liabilities, in an effort to manufacture a right of setoff against any pre-petition claims

that Colonial Bank may have against the Debtor.[2]  The maneuver is relatively simple — the FDIC seeks to exercise a purported contractual right in the P&A Agreement to compel BB&T to transfer the Debtor Deposits to the FDIC, with the FDIC assuming the related liability.  The flaw in the FDIC's plan, however, is that even if the relief sought in the Renewed Stay Relief Motion were granted and the FDIC acquired the Debtor Deposits, the debt that those deposits represent would be incurred by the FDIC *after* the Debtor's bankruptcy petition.  Section 553 of the Bankruptcy Code clearly and unequivocally prohibits a creditor's use of a debt to a bankruptcy debtor incurred by that creditor post-petition to set off a claim by the creditor against the bankruptcy debtor.

The FDIC has advanced myriad different arguments over the past year in an effort to circumvent the clear language of section 553.  At one point, for example, the FDIC attempted to claim that it never actually assigned the Debtor Deposits to BB&T, and that BB&T merely held them as a custodian on the FDIC's behalf.  [Doc. No. 728, at 4.]  The FDIC has since abandoned this as well as other claims,[3] and—it would appear from its Brief—has settled on two principal arguments.  Each of them is premised on the notion that the FDIC can now, twenty months after the Petition Date, assume the Debtor Deposits and treat them as though they had been liabilities of Colonial Bank on the Petition Date.

---

[2]  In the Renewed Stay Relief Motion, the FDIC undertook a detailed review of various contingent claims against the Debtor that may become fixed as a result of litigation between the parties on which a plenary hearing is currently scheduled for October 2011.  The Debtor and Committee acknowledge that Colonial Bank may have pre-petition general unsecured claims against the Debtor as a result of this litigation.  It was not necessary, however, for the Bankruptcy Court to address the validity of Colonial Bank's contingent claims because, regardless of whether Colonial Bank has pre-petition claims against the Debtor, the Debtor Deposits are not pre-petition liabilities of Colonial Bank, and thus setoff is unavailable.

[3]  Other arguments that were made by the FDIC and subsequently dropped include the FDIC's claim that its contractual right under the P&A Agreement to restrict BB&T from paying the deposit liabilities was enough to satisfy the mutuality requirement for setoff despite the fact that the Debtor Deposits were not liabilities of Colonial Bank.  (*Amended Motion of the Federal Deposit Insurance Corporation, as Receiver for Colonial Bank, for an Order Modifying the Automatic Stay* [Doc. No. 499, at ¶ 18].)

First, the FDIC argues that—despite the fact that the Debtor Deposits have not been a debt of Colonial Bank since August 14, 2009—if the automatic stay is lifted and the FDIC is permitted to assume the Debtor Deposit liabilities pursuant to Section 9.5 of the P&A Agreement, the resulting incurrence of debt should be treated as a pre-petition debt of the FDIC because the deposit accounts were initially opened prior to the Petition Date in 2009.  According to the FDIC, if the obligation that the Debtor Deposits represent is now transferred from BB&T to the FDIC (or presumably to any other party that may have a pre-petition claim against the Debtor and a desire to step in front of all other general unsecured creditors), it can be used to set off pre-petition claims against the Debtor.   Because the Debtor Deposits were created pre-petition, the argument runs, they purportedly will always be a pre-petition debt for setoff purposes regardless of when that debt may be incurred by someone else as a result of a subsequent transfer.  As discussed below, the FDIC's position is utterly without merit and runs contrary to the plain meaning of section 553 of the Bankruptcy Code, applicable case law, the policy considerations limiting the right to setoff in bankruptcy, and common sense.  As the Bankruptcy Court correctly found, "if the FDIC were to incur liability on the accounts at this time, it would constitute a postpetition debt ineligible for setoff under 11 U.S.C. § 553."  (J.A. at 20.)[4]

Second, the FDIC argues that by virtue of the P&A Agreement's definition of "Assumed Deposits," if the FDIC now notifies BB&T that a deposit balance is excluded from the

---

[4] Citations to "J.A. at __" refer to pages within the Joint Appendix of Appellees The Colonial BancGroup, Inc. and the Official Committee of Unsecured Creditors, dated April 26, 2011.  A redacted version of the Joint Appendix omitting certain documents containing "Highly Confidential" materials, as that term is defined in the Confidentiality Stipulation and Protective Order that was entered in the underlying proceedings on April 7, 2010 by the United States Bankruptcy Court for the Middle District of Alabama [Doc. No. 654], has been filed along with this Brief. Concurrently, the Debtor and Committee filed a motion in this Court seeking leave to file the unredacted Joint Appendix under seal.

deposits that were transferred under the P&A Agreement and asks for such deposit to be transferred back to the FDIC pursuant to Section 9.5 of the P&A Agreement any such returned deposit would be deemed to have never been assumed by BB&T in the first place.  In short, the FDIC is claiming that it can rewrite history such that the prior assumptions by BB&T of deposit accounts not only can be unwound, but also can be deemed to have never happened at all.  As the Bankruptcy Court noted:  "Even if the FDIC could achieve mutuality at this point in time by requesting a return of the debtor's accounts, the FDIC could not, within this universe of time and space, transform its postpetition assumption of the accounts into prepetition debt."  (J.A. at. 19.)

   In sum, neither of the FDIC's theories remedy the fundamental problem with the FDIC's position, which is that any assumption of the Debtor Deposits by the FDIC at this point would be a post-petition incurrence of debt that would be unavailable for setoff purposes. Because the Bankruptcy Court correctly found that the FDIC's proposed plan to manufacture setoff rights would not work, the Court did not need to reach the question of whether it would be appropriate to grant the FDIC relief from the automatic stay to perform a setoff.

   Even if the FDIC's proffered maneuvers *could* enable it to create setoff rights, the automatic stay should not be lifted to allow the FDIC to do so.  In support of its Renewed Stay Relief Motion, the FDIC cites to a number of cases in which a court did grant relief from the automatic stay for a creditor to exercise setoff rights.  However, the setoff rights in those cases were valid and pre-existing rights.  By contrast, in the present case, the FDIC seeks relief from the automatic stay so that it can complete transactions specifically intended to *create* a right of setoff that would not otherwise exist.  The right to setoff in bankruptcy is a highly circumscribed one, because it permits a creditor to satisfy a claim dollar for dollar rather than for cents on the dollar as most creditors do.  The FDIC did not, and cannot, provide any authority for granting

stay relief to enable a creditor to seek to improve its position vis-à-vis other creditors.  Providing stay relief so that an unsecured creditor like the FDIC can try to create setoff rights would be analogous to granting an unsecured creditor stay relief in order to somehow create a security interest in property of the estate.  Granting stay relief for such purposes would be without precedent.  Accordingly, even if the FDIC's maneuvers could create a right of setoff, which they cannot, relief from the automatic stay should not be granted to permit creation of such rights and thereby advantage the FDIC vis-à-vis other creditors.

The FDIC also appeals the Bankruptcy Court's decision granting the Debtor's Cash Collateral Motion to use cash from one of the Debtor Deposits to pay its operating expenses.  Because the Bankruptcy Court properly concluded that the FDIC has no rights or interests in the Debtor Deposits, the Bankruptcy Court appropriately granted the Debtor's Cash Collateral Motion over the FDIC's objection.

For all of the reasons set forth herein, the Debtor and Committee respectfully submit that each of the Bankruptcy Court's decisions was correct and should be affirmed.

**B.     Statement Of Facts**

The Debtor, a Delaware corporation with its principal place of business in Alabama, is a bank holding company organized under the Bank Holding Company Act of 1956, as amended.  Before the Petition Date, the Debtor owned Colonial Bank and certain non-banking subsidiaries.

(i)     The Debtor Deposits Were Assumed By BB&T on August 14, 2009.

Prior to August 14, 2009, the Debtor had seven accounts (defined above as the Debtor Deposits) at Colonial Bank, including its operating account, five other accounts with balances, and a dormant account.  [Doc. No.  965, ¶¶ 6-9.]  On the Petition Date, the total

amount in the Debtor Deposits was $38,408,337.74, including $14,381,038.24 in the operating account.[5]  [Doc. No.  965, ¶ 15.]

On August 14, 2009, the State of Alabama Banking Department ("SABD") closed Colonial Bank and appointed the FDIC as its receiver.  Upon Colonial Bank's closing, the FDIC entered into the P&A Agreement with BB&T.  Pursuant to that agreement, among other things, (i) the FDIC sold substantially all of Colonial Bank's assets to BB&T and (ii) BB&T agreed to assume all of Colonial Bank's deposits.  (J.A. at 206-14.)  Specifically, the P&A Agreement provided that BB&T, as the "Assuming Bank," assumed all "Assumed Deposits" of Colonial Bank, except for any deposits specifically listed on Schedule 2.1(a) of the agreement.  (J.A. at 206.)  Schedule 2.1(a), entitled "Excluded Deposit Liability Accounts," did not, however, exclude the Debtor Deposits (or any other accounts).  (J.A. at 241.)

The FDIC-Receiver issued a Press Release that day stating:  "To protect the depositors, the FDIC entered into a purchase and assumption agreement with [BB&T] to assume all of the deposits of Colonial Bank. . . . BB&T's acquisition of all of the deposits was the 'least costly' resolution for the FDIC's [Deposit Insurance Fund] compared to the alternatives."  (emphasis added)  (J.A. at 383.)  Similarly, the SABD issued a Press Release stating:  "All deposit accounts of Colonial Bank have been transferred to BB&T and are available immediately."  (emphasis added)  (J.A. at 381.)

In addition, in connection with the FDIC's seizure and sale of Colonial Bank, the FDIC posted "Failed Bank Information" on its website (www.fdic.gov).  The Failed Bank Information includes a question and answer guide relating to the Colonial Bank failure, which

---

[5] Due to the payment of post-petition expenses, as approved by the Bankruptcy Court, the balance of the operating account is now $9,672,594.44.  (J.A. at 347.)

states, among other things, that "[i]f you had an account with Colonial Bank, you now have an account with BB&T.  All deposit accounts, which include checking, savings, money market, CDs and retirement accounts, have been transferred to BB&T, regardless of the dollar amount. No one lost any money on deposit in Colonial Bank."  (J.A. at 386.)

BB&T provided the Debtor with bank account statements for the Debtor Deposits for the period from October 1, 2009 to October 31, 2009, which state:  "As you may know, Branch Banking and Trust recently acquired the deposit accounts of Colonial Bank.  Welcome to the BB&T family."  (J.A. at 329-34.)  BB&T, and not Colonial Bank, also provided the Debtor with bank account statements for the Debtor Deposits in subsequent months.  (J.A. at 335-40 (November 2009); J.A. at 341-46 (December 2009).)

Thomas Brent Hicks, a senior vice president at BB&T, testified at his deposition that the Debtor Deposits were assumed by BB&T, are maintained on BB&T's depository platform, and were not designated "excluded deposit liability accounts" as part of the sale transaction.  (J.A. at 359; 360; 364-65 (Hicks tr. at 24:21-25:5; 27:18-28:6; 45:20-46:8).)  Mr. Hicks further testified that "the best way I know to say it is BB&T has been responsible for these deposits as a liability and believes that they were transferred to BB&T and that they are BB&T's deposits."  (J.A. at 373 (Hicks tr. at 79:8-13).)

Mr. Hicks also testified that (i) BB&T paid a deposit premium to the FDIC based on a calculation of Colonial Bank deposits to be assumed (which included the Debtor Deposits), and that the FDIC had not returned to BB&T the deposit premium relating to the Debtor Deposits; (ii) since BB&T assumed the Debtor Deposits, they have been included as BB&T deposits in quarterly call reports submitted to the FDIC and the North Carolina State Banking Authority; and (iii) BB&T has been paying deposit insurance on all former Colonial Bank

8

deposits, including the Debtor Deposits.  (J.A. at 362-63; 364; 371-72 (Hicks tr. at 34-38; 43:11-45:6; 72:23-74:6).)

On May 26, 2010, counsel for BB&T told the Bankruptcy Court about the Debtor Deposits:  "I want to be clear on the record that it is our position that these are assumed liabilities of BB&T.  We have treated them like that since day one.  They are our deposit accounts.  We have had control since August 14th of those accounts."  (J.A. at 186-87 (Hearing tr. at 163:24-164:3).)

> (ii) FDIC And BB&T Excluded Certain Other Deposits From Transaction But Did Not Exclude Debtor Deposits.

The treatment of the Debtor Deposits stands in stark contrast to how the deposits of another entity, the Taylor, Bean, Whitaker Mortgage Corporation ("TBW"), were handled.  Five days after BB&T assumed the Debtor Deposits, on August 19, 2009, the FDIC and BB&T entered into a letter agreement (the "Letter Agreement") regarding TBW's deposit accounts.  (J.A. at 325-28.)  Pursuant to the Letter Agreement, BB&T acknowledged that "the deposit balances under the deposit accounts associated with [TBW or its affiliates] . . . do not constitute 'Deposits' for the purposes of the . . . [P&A Agreement] and remain obligations of the . . . [FDIC]."  (J.A. at 325.)  The Letter Agreement further provides that to administer the TBW accounts, BB&T was to "move such accounts from its deposit platform [to] a custodial account(s) within its trust department."  (J.A. at 325.)  Mr. Hicks testified at his deposition regarding the Letter Agreement that "[t]o my understanding, this document removes those Taylor, Bean & Whitaker accounts from being deemed deposits to simply being held in trust."  (J.A. at 360 (Hicks tr. at 27:7-10).)  At no time did the FDIC execute an equivalent agreement with BB&T relating to the Debtor Deposits.  On August 24, 2009, TBW filed for bankruptcy.

### C.      The Proceedings Below

On the Petition Date, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  On September 28, 2009, upon recommendation by the Bankruptcy Administrator for the Middle District of Alabama, the court below appointed the Committee to serve as fiduciary to the many unsecured creditors in this case, who collectively hold claims against the Debtor's estate of approximately $400 million.

### 1.      The FDIC's Original Stay Relief Motion

On October 5, 2009, the FDIC filed an Emergency Motion of the Federal Deposit Insurance Corporation, as Receiver for Colonial Bank, for an Order Modifying the Automatic Stay [Doc. No. 156] (the "Original Stay Relief Motion"), which sought relief from the automatic stay to exercise purported setoff rights against the Debtor Deposits at BB&T.  In support of the Original Stay Relief Motion, the FDIC asserted that (i) it held a perfected security interest in the Debtor Deposits pursuant to a security agreement allegedly executed by the Debtor in favor of Colonial Bank (the "Security Agreement")[6]; and (ii) the Debtor was obligated to Colonial Bank for approximately $1 billion under an alleged capital maintenance commitment pursuant to section 365(o) of the Bankruptcy Code.

On November 5, 2009, the FDIC filed a motion (the "Section 365(o) Motion") seeking an order requiring the Debtor to "immediately cure all outstanding deficiencies under its commitment to maintain the capital of Colonial Bank" or, in the alternative, "converting the Debtor's chapter 11 bankruptcy case to a case under Chapter 7."  [Doc. No. 257, at 1.]

---

[6]  The FDIC later conceded that it did not have a security interest in the Debtor Deposits.  (*Agreed Order Amending Order Setting Hearing, January 20, 2010* [Doc. No. 486, at ¶ 1].)

### 2.     The FDIC's Amended Stay Relief Motion

On January 22, 2010, the FDIC filed an Amended Motion of the Federal Deposit Insurance Corporation, as Receiver for Colonial Bank, for an Order Modifying the Automatic Stay (the "Amended Stay Relief Motion") [Doc. No. 499].   On April 26, 2010, the Committee filed an Objection to the Amended Stay Relief Motion [Doc. No. 694] and the Debtor filed summary judgment motions to dismiss both the Amended Stay Relief Motion and the Section 365(o) Motion [Doc. Nos. 697-700].  The objections of both the Committee and the Debtor pointed out the FDIC's inability to demonstrate the mutuality necessary for setoff.

On May 17, 2010, just nine days before the hearing on both of the FDIC motions, the FDIC filed a Consolidated Pre-Hearing Memorandum [Doc. No. 728], in which it argued for the first time that its basis for asserting mutuality was that (i) the Debtor Deposits were not in fact assumed by BB&T; (ii) the Debtor Deposits have at all times constituted a liability of Colonial Bank; and (iii) BB&T is merely a custodian of the Debtor Deposits for the FDIC.

The Court held a hearing on the Amended Stay Relief Motion and the Section 365(o) Motion on May 26, 2010.  On August 31, 2010, the Bankruptcy Court issued an order granting summary judgment in the Debtor's favor on both motions.  [Doc. No. 864.]   The court issued a memorandum opinion that day explaining its grant of summary judgment, and an amended opinion correcting some typographical errors on September 1, 2010.  [Doc. No. 869.] The Court held, among other things, that the Debtor did not make a commitment to maintain the capital of Colonial Bank and, therefore, the FDIC did not hold a claim against the Debtor to form a basis for setoff of the Debtor Deposits. Accordingly, the Court stated in the memorandum opinion that, to the extent the Amended Stay Relief Motion sought relief from the automatic stay "predicated on a claim under § 365(o), the motion for relief from stay is . . . denied."  [Doc. No.

11

869, at 42-43.]  The FDIC has appealed the Bankruptcy Court's denial of the Section 365(o)

Motion, and that appeal is fully briefed and pending before this Court.

### 3.        The FDIC's Renewed Stay Relief Motion

On September 27, 2010, the FDIC filed the Renewed Stay Relief Motion that is

the subject of this appeal [Doc. No. 922], seeking authority to exercise its purported setoff rights

against the Debtor Deposits based on contingent claims the FDIC has asserted other than in the

Section 365(o) Motion, even though the FDIC has never established the validity of any such

claims.  In the Renewed Stay Relief Motion, the FDIC again overhauled its argument,

abandoning its claim in the Amended Stay Relief Motion that BB&T held the Debtor Deposits

only as custodian for the FDIC and arguing, instead, that the language of the P&A Agreement

allows the FDIC to treat BB&T's assumption of the liabilities as though it never even happened.

Both the Debtor and the Committee objected to the Renewed Stay Relief Motion.

[Doc. Nos. 993, 996.]  At the Bankruptcy Court's direction, the Debtor and the FDIC filed a joint

stipulation of facts in connection with the motion [Doc. No. 965], and each separately filed a

statement of its version of the material disputed facts [Doc. Nos. 981, 983].

### 4.        The Debtor's Motion to Use Cash Collateral

On November 23, 2010, the Debtor filed a motion to use cash in the Debtor's

operating account at BB&T (the "Cash Collateral Motion") to pay the Debtor's operating

expenses and, to the extent payable under the Bankruptcy Court's applicable orders, the fees and

expenses of professionals.  [Doc. No. 1000.]  The FDIC objected to the Cash Collateral Motion

on the ground that, if granted, the requested relief would reduce or eliminate the FDIC's

purported setoff rights against the cash in certain of the Debtor Deposits.  [Doc. No. 1010.]

D.     **The Disposition Of The FDIC's Motion**

On January 24, 2011, the Bankruptcy Court issued an order denying the Renewed Stay Relief Motion (J.A. at 22), and issued a 21-page memorandum opinion explaining its decision (the "Opinion") (J.A. at 1-21).  The Bankruptcy Court also issued an order granting the Cash Collateral Motion.  (J.A. at 23.)

1.     **The Opinion on the Renewed Stay Relief Motion**

The Opinion summarized the Bankruptcy Court's disposition of the Renewed Stay Relief Motion as follows:

> The FDIC has not shown the requirements for the exercise of setoff against the debtor's deposit balances.  The debt is not a mutual debt because the FDIC has no liability to the debtor on the accounts.  Further, if the FDIC were to incur liability on the accounts at this time, it would constitute a postpetition debt ineligible for setoff under 11 U.S.C. § 553. Because the FDIC has no right of setoff against the accounts, the FDIC's motion for relief from the automatic stay imposed by 11 U.S.C. § 362(a) is due to be denied.

(J.A. at 20.)  Prior to reaching those conclusions, the court provided a summary of the undisputed facts, as submitted by joint stipulation of the Debtor and the FDIC, which the court expressly adopted.  (J.A. at 3-7.)  The court also provided a recitation of additional evidence, including documents and deposition testimony, submitted by the Debtor and the FDIC in support of their respective positions  (J.A. at 7-10), as well as a discussion of the relevant provisions of the P&A Agreement (J.A. at 10-12).  In addition, the court provided an overview of section 553 of the Bankruptcy Code, which the court explained "merely preserves the right [to setoff], with certain exceptions, where (1) the debts are mutual and (2) both debts arose prepetition" (J.A. at 13), as well as a brief summary of the respective arguments of the Debtor and the FDIC, including the FDIC's asserted bases for its right to setoff (J.A. at 14-15).  The court then explained the grounds for its Opinion as follows.

13

(a)     BB&T's Assumption of the Debtor Deposits

The Bankruptcy Court first considered the FDIC's contention, which the FDIC has abandoned on appeal, that BB&T never assumed liability for the Debtor Deposits.  (J.A. at 16.)[7]  After reviewing the stipulated undisputed facts, as well as the additional evidence submitted by the Debtor and the FDIC, the Bankruptcy Court concluded:

> Based on the overwhelming evidentiary support, the court concludes that BB&T assumed liability for the debtor's accounts under the P&A Agreement with the FDIC dated August 14, 2009. . . . The court concludes that the FDIC has no right of setoff against the deposits because they are not a debt of the FDIC.  In other words, with respect to the deposits, the debts between the FDIC and the debtor are not mutual and cannot serve as the basis of a setoff under 11 U.S.C. § 553.

(J.A. at 17.)

The Bankruptcy Court noted the FDIC's reliance on the definition of "Assumed Deposits" in the P&A Agreement, which excludes any deposit balances that, in the discretion of the FDIC, "may be needed to provide payment of any liability of any depositor in the Failed Bank or the Receiver."  (J.A. at 16.)  The Bankruptcy Court then found that "although the FDIC had discretion to exclude the debtor's deposits . . . , there is no evidence that it did so . . . at any time before the debtor filed the chapter 11 petition."  (J.A. at 16.)  The Bankruptcy Court also observed in this regard that no accounts were listed on Schedule 2.1(a) to the P&A Agreement, which states that excluded accounts were "[t]o be provided."  (J.A. at 16.)

As further support for its holding that BB&T assumed the Debtor Deposits, the Bankruptcy Court noted that the deposition testimony and documentary evidence reflect that all of Colonial Bank's deposit accounts were assumed by BB&T except for certain "OFAC"

---

[7] Even if the FDIC did dispute the Bankruptcy Court's finding that the Debtor Deposits were transferred to and assumed by BB&T pre-petition, the court's findings of fact could be reversed only upon a showing by the FDIC of clear error.  *See Alabama v. Lett (In re Lett)*, 416 B.R. 780, 785 (S.D. Ala. 2009).

accounts and TBW accounts.  (J.A. at 16.)  The Bankruptcy Court also described "a plethora of stipulated facts show[ing] that BB&T assumed liability for the debtor's deposits under the P&A Agreement," including that (i) the FDIC transferred records relating to the Debtor Deposits to BB&T; (ii) at all times after the Petition Date, BB&T sent out monthly statements for the Debtor Deposits; and (iii) since Colonial Bank's closing, BB&T has included the balances of the Debtor Deposits in various regulatory filings and in calculating its deposit insurance premiums paid to the FDIC.  (J.A. at 16-17.)

> (b)    Section 9.5 of the Purchase and Assumption Agreement

The Bankruptcy Court next considered and rejected the FDIC's argument that if, pursuant to Section 9.5 of the P&A Agreement, the FDIC now exercised its purported right to demand return of the Debtor Deposits from BB&T, the deposits would be treated as if they were never transferred to and assumed by BB&T in the first place.  According to the FDIC, by taking such an action, the terms of its contract enable it to deem the Debtor Deposit liabilities a pre-petition debt so as to meet the requirements of section 553(a) for setoff.

In considering the FDIC's claim, the Bankruptcy Court first analyzed the effect of a pre-petition instruction the FDIC gave to BB&T to withhold payment of the Debtor Deposits. (J.A. at 17-18.)  The Bankruptcy Court noted that the FDIC had discretion under Section 9.5 to make such an instruction, the effect of which was that BB&T was required to withhold payment of the account balances until directed in writing by the FDIC, and that if the FDIC also had requested BB&T to return a Debtor Deposit, BB&T would have been required to do so.  (J.A. at 17.)  However, the Bankruptcy Court pointed out that even if the FDIC had requested that BB&T return the Debtor Deposits, BB&T would not have been relieved of liability to the Debtor until it returned the Debtor Deposits to the FDIC.  (J.A. at 17-18.)

The Bankruptcy Court then found that even though the FDIC had directed BB&T to withhold payment of the Debtor Deposits, "the FDIC has not directed BB&T to return the balances of the accounts to the FDIC." (J.A. at 18.)  The Bankruptcy Court concluded:  "[A] contractual right to assume a liability does not equate to the liability itself.  At all times since the execution of the P&A Agreement, liability for the accounts has resided with BB&T."  (J.A. at 18.)

The Bankruptcy Court then considered the FDIC's argument that "even if BB&T assumed the accounts under the P&A Agreement, the FDIC may yet assume the accounts and offset the debt under 11 U.S.C. § 553" pursuant to Section 9.5.  (J.A. at 18.)  After reviewing the language of the P&A Agreement and the FDIC's arguments, the Bankruptcy Court concluded that "even if the FDIC implemented Section 9.5 of the P&A Agreement by requesting a return of the debtor's deposit balances, the debt incurred thereby would constitute a postpetition debt ineligible for setoff under 11 U.S.C. § 553." (J.A. at 20.)

In reaching its conclusion, the Bankruptcy Court noted that the FDIC had not to date requested return of the Debtor Deposits, and that the purported purpose of the FDIC's request for stay relief was to allow it to do so without violating the automatic stay.  (J.A. at 18-19.)  The Bankruptcy Court then explained that "the Bankruptcy Code preserves the right to setoff only where (i) the debts are mutual; and (ii) both debts arose pre-petition," and held: "Even if the FDIC could achieve mutuality at this point in time by requesting a return of the debtor's accounts, the FDIC could not, within this universe of time and space, transform its postpetition assumption of the accounts into prepetition debt."  (J.A. at 19.)  As the Bankruptcy Court properly found, "if the FDIC assumes liability at this time, the FDIC will necessarily incur that liability postpetition."  (J.A. at 19 n.16.)

The Bankruptcy Court also rejected the FDIC's argument that the language of section 553(a) of the Bankruptcy Code by implication permits a debt transferred post-petition to be set off against a pre-petition claim.  (J.A. at 19.)  In doing so, the Bankruptcy Court noted that there was no need for section 553 to expressly prohibit the use of post-petition debts for setoff, because such a provision "would be superfluous.  Section 553(a) preserves the right of setoff only where both debts were incurred prepetition.  A creditor who assumes a liability postpetition necessarily incurs a postpetition debt."  (J.A. at 19.)

(c)      The FDIC's Purported Policy Argument

The Bankruptcy Court also rejected the FDIC's argument that it should be excused for not excluding the Debtor Deposits from the pre-petition transfer of deposit accounts to BB&T based on "the exigent circumstances surrounding the closing of a bank and the execution of a purchase and assumption agreement with another entity."  (J.A. at 20.)   The Bankruptcy Court observed that while provisions such as Section 9.5 of the P&A Agreement can provide the FDIC with additional time, "[u]nfortunately for the FDIC, in the instant case, bankruptcy intervened."  (J.A. at 20.)  The Bankruptcy Court noted that "the FDIC could have anticipated the financial distress and potential need for bankruptcy relief the debtor would experience on the demise of Colonial Bank," and anticipated that Colonial Bank "would have claims against the debtor and that the right of setoff should be preserved, especially given the size of the debtor's deposits."  (J.A. at 20-21.)  The court thus concluded that it "would not have threatened the public policy goals of the FDIC" to have retained the deposits of the Debtor, which was the parent and an insider of Colonial Bank, long enough to make an informed decision.  (J.A. at 21.)

17

### 2.  Order Granting Debtor's Motion to Use Cash Collateral

In a separate order, the Bankruptcy Court granted the Debtor's motion to use cash in the Debtor's operating account to pay the Debtor's operating expenses and the fees and expenses of professionals.  The court overruled the FDIC's objection that the use of the money would undermine its setoff claims, inasmuch as the FDIC has no right to set off the funds in the Debtor Deposits.  (J.A. at 23.)

## ARGUMENT

## I.   NEITHER THE FDIC NOR COLONIAL BANK IS LIABLE TO THE DEBTOR FOR THE DEBTOR DEPOSITS, AND THUS THE MUTUALITY REQUIREMENT FOR SETOFF IS NOT SATISFIED.

Putting aside for the moment the FDIC's request to attempt to manufacture mutuality by assuming the Debtor Deposit liabilities (discussed in Sections II and III below), it is undisputed that at this point in time, the Debtor Deposits are not liabilities of the FDIC, and thus the FDIC cannot satisfy the mutuality requirement under both bankruptcy and non-bankruptcy law.

To effectuate a setoff under section 553 of the Bankruptcy Code, a creditor must have a right of setoff under applicable non-bankruptcy law, and must also satisfy the additional requirements of the Bankruptcy Code.[8]  Both the non-bankruptcy law cited by the FDIC, as well

---

[8]  *See In re Bill Heard Enters., Inc.,* 400 B.R. 813, 823 (Bankr. N.D. Ala. 2009) (further citations omitted) ("Section 553 [of the Bankruptcy Code] merely 'preserves for the creditor's benefit any setoff right that it may have under applicable nonbankruptcy law,' and 'imposes additional restrictions on a creditor seeking setoff' that must be satisfied for a creditor to effectuate a setoff against a debtor in bankruptcy"); *see also Darr v. Muratore,* 8 F.3d 854, 860 (1st Cir. 1993) (noting that section 553 of the Bankruptcy Code adds additional restrictions to the common law of setoff); *United States v. Jones (In re Jones),* 230 B.R. 875, 878 (M.D. Ala. 1999) ("The additional conditions requisite to making a setoff under § 553(a) are: (1) the absence of the exceptions listed in § 553(a); (2) a debt owed by the creditor to the debtor which arose prior to the commencement of the bankruptcy case; (3) a claim of the creditor against the debtor which arose prior to the commencement of the bankruptcy case; and (4) the debt and claim must be mutual or reciprocal obligations."); *Ingersoll Int'l, Inc. v. Iscar, Ltd. (In re Ingersoll, Inc.),* 2009 Bankr. LEXIS 2321, at *8 (Bankr. N.D. Ill. July 22, 2009) (section 553 adds additional restrictions to the setoff doctrine).

as section 553 of the Bankruptcy Code, require that in order to establish a valid right of setoff, a creditor must establish mutuality. This means that "whereas A and B may offset their mutual obligations, A may not offset an obligation that it owes to B against a debt that B owes to C." 5 ALAN N. RESNICK ET AL., COLLIER ON BANKRUPTCY, ¶ 553.03[3][b] (16th ed. rev. 2010); *see also CBS Corp. v. D'Urso (In re Westinghouse Credit Corp.),* 278 F.3d 138, 149 (2d Cir. 2002) (further citations omitted) (stating that debts entitled to setoff are mutual only when "they are due to and from the same persons in the same capacity"); *Braniff Airways, Inc. v. Exxon Co., U.S.A. (In re Braniff),* 814 F.2d 1030, 1036 (5th Cir. 1987) (further citations omitted) (stating that mutuality requires that "each party . . . own his claim in his own right severally, with the right to collect in his own name [and] in his own right and severally").

A.    **Bankruptcy Law Requirements For Setoff**

Under section 553(a) of the Bankruptcy Code, "[s]etoff is an established creditor's right to cancel out mutual debts against one another in full or in part. The purpose of setoff is to avoid 'the absurdity of making A pay B when B owes A.'" *B.F. Goodrich Employees Fed. Credit Union v. Patterson (In re Patterson),* 967 F.2d 505, 508 (11th Cir. 1992). Section 553(a) of the Bankruptcy Code provides, in pertinent part:

> [T]his title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case . . .

11 U.S.C. § 553(a) (2011). Thus, section 553(a) requires that to effectuate a right of setoff, a creditor must establish that (i) a debt that arose prior to the commencement of the bankruptcy case exists from the creditor to the debtor; (ii) the creditor has a claim against the debtor which also arose prior to the commencement of the bankruptcy case; and (iii) the debt and claim are mutual obligations. *See In re Braniff*, 814 F.2d at 1035.

19

The mutuality requirement is strictly construed against the party seeking setoff, which has the burden of proof by a preponderance of the evidence. *See Official Comm. of Unsecured Creditors v. Mfr. & Traders Trust Co. (In re Bennett Funding Group, Inc.)*, 212 B.R. 206, 212 (B.A.P. 2d Cir. 1997); *In re Bill Heard Enters.,* 400 B.R. at 823-24.

## B. Requirements of Non-Bankruptcy Law Cited By FDIC For Setoff

In discussing the non-bankruptcy source of the setoff rights that it wishes to assert, the FDIC references federal statutory law and Alabama law. (FDIC Br. at 16-18.) Neither is relevant to the issues on appeal because, as discussed above, the Bankruptcy Code requires mutuality for setoff in bankruptcy. However, even if Congress had not required mutuality for setoff in bankruptcy, both of the FDIC's non-bankruptcy bases for setoff do.

First, the FDIC relies on section 12(d) of the Federal Deposit Insurance Act, which provides that "[t]he [FDIC] may withhold payment of any such portion of the insured deposit of any depositor in a depository institution in default as may be required to provide for the payment of any liability of such depositor to the depository institution in default or its receiver." 12 U.S.C. § 1822(d) (2011). Like section 553(a), however, the statutory right to setoff under section 1822(d) requires mutuality, providing that the FDIC can withhold the deposit of a depositor in a defaulted bank only to the extent that the depositor is indebted to such failed bank. Here, the deposit is not with the defaulted depository institution, Colonial Bank, but rather is with BB&T.[9]

_____

[9] In reliance on *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16 (1995), the FDIC also argues that after the Petition Date, "in accordance with Supreme Court guidance," it sought stay relief "in order to protect and determine its setoff rights." In *Strumpf*, the Supreme Court held that a creditor bank with a valid pre-petition right of setoff did not violate the automatic stay by placing an administrative hold on the bankruptcy debtor's deposit account. *Id.* at 21. Here, however, the FDIC is seeking stay relief not to execute on a valid pre-petition right of setoff, but, instead, to create such a right post-petition. Accordingly, *Strumpf* provides no basis for the relief the FDIC seeks.

Similarly, there must be mutuality for setoff to be asserted under Alabama law, the FDIC's other purported non-bankruptcy basis for setoff.  *See Atkinson v. FDIC*, 635 F.2d 508, 511-12 (5th Cir. 1981) (FDIC was not entitled to setoff husband's debt against the husband and wife's joint deposit account because the demand between the bank and the depositor was not "mutual" under Alabama law); *King v. Porter*, 160 So. 101, 104 (Ala. 1938); *First Nat'l Bank of Abbeville v. Capps*, 94 So. 109, 110 (Ala. 1922); *see also In re Patterson*, 967 F.2d at 510 (mutuality required for setoff under Alabama law).

The FDIC argues that it has a banker's right of setoff under Alabama common law as the statutory successor to Colonial Bank, which includes "all rights, titles, powers, and privileges" of Colonial Bank.  (FDIC Br. at 17.)  The FDIC claims that these "rights, titles, powers, and privileges" include a right of setoff based on Colonial Bank's rules and regulations for deposit accounts, which provide:  "You acknowledge that we have the right to set off any indebtedness which you owe us. . . .  We may set off against the account any claim that we have against any one or more of the account owners on a joint account . . . ."  (FDIC Br. at 17.).  However, Colonial Bank's rules and regulations plainly relate to deposits of Colonial Bank, not deposits of BB&T.  Nothing therein permits Colonial Bank to use deposit accounts at other banks as part of a setoff.

Regardless of what law applies, the FDIC must establish mutuality, and it cannot do so because the Debtor Deposits are liabilities of BB&T.  That is fatal to the FDIC's request for setoff under both bankruptcy and non-bankruptcy law.  Recognizing this problem, the FDIC has devised a number of theories as to why it should be permitted to now assume the Debtor Deposit liabilities, and, if successful, try to set them off against purported pre-petition claims of Colonial Bank.  For the reasons discussed below, the FDIC's latest theories do not provide a

21

basis for the FDIC to manufacture a right of setoff today where one did not exist on the Petition

Date.

## II.   THE BANKRUPTCY COURT CORRECTLY HELD THAT EVEN IF THE FDIC COULD TAKE BACK THE DEBTOR DEPOSITS UNDER SECTION 9.5 OF THE P&A AGREEMENT, IT WOULD THEREBY INCUR POST-PETITION DEBT INELIGIBLE FOR SETOFF UNDER 11 U.S.C. § 553.

In denying the FDIC's Renewed Stay Relief Motion, the Bankruptcy Court

properly found that by transferring the Debtor Deposits to BB&T prior to the Petition Date, the

FDIC extinguished any debt it owed to the Debtor and thus destroyed the mutuality necessary to

effectuate setoff under section 553(a) that previously existed.  Nevertheless, the FDIC argues

that by exercising certain purported rights under Section 9.5 of the P&A Agreement, it can

assume the Debtor Deposits from BB&T and, despite the passage of nearly 20 months since the

Petition Date, regain the pre-petition debt necessary to re-establish mutuality.[10]  However, as the

Bankruptcy Court correctly held, any debt the FDIC incurs in the future by taking back the

Debtor Deposits pursuant to the P&A Agreement would necessarily constitute post-petition debt

and would be ineligible for setoff under section 553(a).

---

[10] The FDIC notes that the Debtor has asserted a claim against the FDIC for the balance of each of the Debtor Deposits, and asserts that the Debtor's claim "acknowledges that the [Debtor Deposits] are pre-petition debts." (FDIC Br. at 18.)  According to the FDIC, "[m]utuality therefore is satisfied, and the inquiry should end here." (FDIC Br. at 18.)  In support of this claim, the FDIC relies on two paragraphs in a complaint filed by the Debtor. (Amended Compl., ¶¶ 64 & 73, *The Colonial BancGroup, Inc. v. F.D.I.C.*, No. 2:10-cv-0198 (MHT) (M.D. Ala. May 28, 2010).)  The paragraphs cited by the FDIC, however, make no such acknowledgements.  Paragraph 64 states only that as of the date the FDIC was appointed as Colonial Bank's receiver—which was eleven days prior to the Petition Date—the Debtor Deposits were held by Colonial Bank.  This, of course, changed prior to the Petition Date, when the Debtor Deposits were transferred to and assumed by BB&T.  Similarly, Paragraph 73 provides that the Debtor is asserting a "protective claim" for the balances of the Debtor Deposits "in the event the FDIC-Receiver purports to exercise any rights it may assert under the P&A Agreement or otherwise with respect to the [Debtor Deposits]."  The purpose of the Debtor's protective claim was to ensure that if the FDIC is able to assume the Debtor Deposit liabilities, the FDIC would not be able to argue that it did not need to satisfy the deposit liability because the Debtor had not filed a claim in the Colonial Bank receivership before the bar date.  Nowhere in the Debtor's claim does the Debtor agree that the Debtor Deposits are pre-petition liabilities of the FDIC.

**A.     Section 553 of the Bankruptcy Code Prohibits the Setoff of a Post-Petition Debt Against a Pre-Petition Claim.**

As discussed above, in addition to establishing mutuality, a creditor seeking to set off under section 553(a) has the burden of meeting the Bankruptcy Code's timing requirements by establishing that both its debt to the debtor and its claim against the debtor arose prior to the commencement of the debtor's bankruptcy case.  11 U.S.C. § 553(a) (stating that "this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case . . . ."); *see also In re Bill Heard Enters., Inc.*, 400 B.R. at 823-24 (explaining the "timing" and "mutuality" requirements of section 553(a)); *In re Gregg*, 371 B.R. 817, 819 (Bankr. E.D. Tenn. 2007) ("With respect to the element of timing, the claims must both have arisen 'before the commencement of the case . . . .'").  A creditor cannot satisfy this requirement by re-incurring a liability post-petition that it had previously incurred, but transferred, pre-petition.

**B.     The FDIC's Proposal to Assume Debtor Deposit Liabilities Would Result in the Post-Petition Incurrence of Debt.**

When the Debtor Deposits were transferred to and assumed by BB&T, the necessary alignment of mutual pre-petition obligations required for setoff was broken.  By the Renewed Stay Relief Motion, the FDIC now seeks to remedy this lack of mutuality by using Section 9.5 of the P&A Agreement[11] to compel BB&T to transfer the deposits to the FDIC, with

---

[11]  Section 9.5 of the P&A Agreement states, in relevant part:

> At any time, the Receiver . . . may, in its discretion, determine that all or any portion of any deposit balance assumed by the Assuming Bank pursuant to this Agreement does not constitute a "Deposit" (or otherwise, in its discretion, determine that it is the best interest of the Receiver or Corporation to withhold all or any portion of any deposit), and may direct the Assuming Bank to withhold payment of all or any portion of any such deposit balance.  Upon such direction, the Assuming Bank agrees to hold such deposit and not to make any payment of such deposit balance to or on behalf of the depositor, or to itself, whether by way of transfer, set-off, or otherwise.  The

the FDIC thereby assuming the related liability to pay the deposit on demand.  However, even assuming that such a post-petition maneuver would create the mutuality the FDIC needs, the FDIC's assumption of the Debtor Deposit liabilities would result in a post-petition incurrence of debt that would be unavailable for setoff under section 553(a) of the Bankruptcy Code.  As the Bankruptcy Court found in its Opinion, "[e]ven if the FDIC could achieve mutuality at this point in time by requesting a return of the debtor's accounts, the FDIC could not, within this universe of time and space, transform its postpetition assumption of the accounts into a prepetition debt." (J.A. at. 19.)

There is no dispute that when the Debtor first deposited funds with Colonial Bank in 2009, Colonial Bank incurred a liability to the Debtor.  However, it is equally clear that once the Debtor Deposits were transferred to BB&T, Colonial Bank's debt was discharged and it had no further liability.  At the time BB&T assumed the Debtor Deposits, *it* incurred the corresponding debt.  If the stay were to be lifted and the FDIC was able to take back the Debtor Deposits, BB&T's debt would be discharged and the FDIC would once again incur a debt, although it necessarily would be a post-petition debt.[12]

---

Assuming Bank agrees to maintain the "withheld payment" status of any such deposit balance until directed in writing by the Receiver or the Corporation as to its disposition. At the direction of the Receiver or the Corporation, the Assuming Bank shall return all or any portion of such deposit balance to the Receiver or the Corporation, as appropriate, and thereupon the Assuming Bank shall be discharged from any further liability to such depositor with respect to such returned deposit balance.

(J.A. at 227-28.)

[12] The FDIC cites to a series of cases it claims stand for the proposition that "assignment of rights can create mutuality for setoff purposes."  (FDIC Br. at 20.)  However, the cases cited by the FDIC are inapposite, as each involved a *pre-petition* assignment of rights that created the necessary mutuality to effectuate setoff under section 553(a).  *See U.S. Aeroteam, Inc. v. Delphi Automotive Sys., LLC (In re U.S. Aeroteam, Inc.)*, 327 B.R. 852, 867 (Bankr. S.D. Ohio 2005) (assignment of claim more than 90 days prior to bankruptcy filing eligible for setoff); *Schechter v. Acme Screw Co., Inc. (In re Assured Fastener Prods. Corp.*, 773 F.2d 105, 107 (7th Cir. 1985) (pre-petition assignment of accounts receivable created mutual debts for setoff purposes); *In re New Haven Foundry, Inc.*, 285 B.R. 646, 648 (Bankr. E.D. Mich. 2002) (pre-petition assignment of accounts receivable gave creditor a

The FDIC attempts to address this problem by arguing that because Colonial Bank's liability on the Debtor Deposits was initially created pre-petition, the Debtor Deposit liability remains a pre-petition obligation as to any subsequent obligor. If accepted, the FDIC's claim would mean that the date a debt is incurred by the creditor who seeks to set off against that debt is irrelevant for purposes of section 553 of the Bankruptcy Code, and that the only relevant question is when the debt was initially incurred by any creditor. That is nonsensical on its face. Under the FDIC's theory, any future assumption of the Debtor Deposits at any time and by any party (whether under the P&A Agreement or any other agreement) would represent a pre-petition debt that could be used as part of a setoff against a pre-petition claim against the Debtor. The FDIC's position is without basis or legal support, is contrary to the language of the Bankruptcy Code and existing case law, would undermine the primary purpose of section 553, and would create a market in the trading of pre-petition debts owed to debtors that could be assumed by creditors seeking setoff in order to avoid having to share a bankruptcy debtor's limited assets with other creditors.

The Bankruptcy Court expressly considered the FDIC's argument in this regard and appropriately rejected it:

> The FDIC seems to argue that because Colonial Bank's liability on the deposits was established prepetition, the liability remains a prepetition obligation as to any subsequent obligor. However, that is not the case. The FDIC had no liability on the accounts when the petition was filed, and if the FDIC assumes liability at this time, the FDIC will necessarily incur that liability postpetition.

---

legally enforceable debt against the debtor). In the present case, however, the FDIC is seeking relief from the automatic stay to manufacture the mutuality that did not exist pre-petition.

(J.A. at 19 n.16.)  The FDIC offers nothing on this appeal to gainsay the soundness of the Bankruptcy Court's reasoning, nor could the FDIC do so.[13]

**C.**    **A Recent Decision in the Lehman Brothers Bankruptcy Case Is Directly on Point, Denying a Bank's Attempt to Set Off a Post-Petition Deposit Liability Against Its Pre-Petition Claim.**

Indeed, one of the very cases cited by the FDIC in its Brief directly contradicts the FDIC's position here.  *See In re Lehman Bros. Holdings Inc.* ("*Lehman Brothers*"), 404 B.R. 752 (Bankr. S.D.N.Y. 2009).  The facts of the *Lehman Brothers* case, and the Bankruptcy Court's decision, are described below.

On September 15, 2008, Lehman Brothers Holdings Inc. (the "Lehman Debtor") commenced a chapter 11 bankruptcy case (the "Lehman Petition Date").  *Id*. at 755.  As of the Lehman Petition Date, one of the Lehman Debtor's pre-petition creditors was DnB NOR Bank ASA (the "Creditor Bank").  *Id*.  Prior to the Lehman Petition Date, the Lehman Debtor's affiliate, Lehman Brothers Commercial Corporation ("LBCC") had opened and maintained a deposit account with Creditor Bank.  *Id*. at 754.  On September 12, 2008, three days prior to the Lehman Petition Date, LBCC attempted to transfer its deposit to Lehman Debtor.  *Id*. at 756.

---

[13] The cases cited by the FDIC to support its position that a debt created pre-petition remains so even if transferred post-petition are entirely inapposite.  Most of them do not even deal with the transfer of a debt, let alone the post-petition transfer of a debt.  *See Stephenson v. Salisbury (In re Corland Corp.)*, 967 F.2d 1069, 1077-78 (5th Cir. 1992) (guarantor's post-petition payments made upon debtor's default could be set off against guarantor's pre-petition debt to debtor because guaranty (and corresponding obligation to pay) was created pre-petition); *In re Rosteck*, 899 F.2d 694, 697 (7th Cir. 1990) (obligation to pay condominium association fees properly discharged in bankruptcy because fees arose from pre-petition contract) (superseded by statute); *Cooper-Jarrett, Inc. v. Cent. Transp., Inc.*, 726 F.2d 93, 96-97 (3d Cir. 1984) (post-petition settlement could *not* relate back for purposes of setoff, even though the dispute resolved by the settlement arose out of a pre-petition contract); *In re Bill Heard Enters., Inc.*, 438 B.R. 745, 751 (Bankr. N.D. Ala. 2010) (bank at which debtor automobile dealership held operating account could set off funds deposited pre-petition against pre-petition obligations of the debtor under various notes); *Mottaz v. St. Louis Post-Dispatch Pulitzer Publ'g Co. (In re Murphy)*, 203 B.R. 972, 976 (Bankr. S.D. Ill. 1997) (in preference case, debt arose when debtor became contractually obliged to pay); *Brooks Farms v. U.S. Dep't of Agric. (In re Brooks Farms)*, 70 B.R. 368, 371-72 (Bankr. E.D. Wisc. 1987) (allowing setoff of pre-petition obligations and explicitly noting that neither the claim nor debt was ever transferred).  As discussed herein, the one case cited by the FDIC on this point that does deal with the transfer of a debt, *In re Lehman Bros. Holdings Inc.*, 404 B.R. 752 (Bankr. S.D.N.Y. 2009), goes squarely against the FDIC's position.

However, as a result of administrative delays, LBCC's deposit was not actually transferred to the Lehman Debtor until after it had filed for bankruptcy.  *Id.*

The Creditor Bank sought to set off the deposit liability it owed to the Lehman Debtor against pre-petition claims that the Creditor Bank had against the Lehman Debtor.  Based on its Brief in this case, the FDIC would argue that because the deposit liability was initially created pre-petition (when the deposits were established by LBCC), it should be irrelevant that the Creditor Bank's liability to the Lehman Debtor (to whom the deposits were assigned by LBCC after the bankruptcy commenced) was incurred post-petition.  The Bankruptcy Court for the Southern District of New York (the "Lehman Court"), however, found that the Creditor Bank's attempt to characterize the bank account as a pre-petition debt "fails for the obvious reason that funds can only be in one account at a time, and at the time [the Lehman Debtor] commenced its case, the funds were held in the account of LBCC."  *Id.* at 761.

The Bankruptcy Court reached that conclusion even though the funds were in the process of being transferred to the Lehman Debtor at the time the bankruptcy commenced:

> [M]utuality requires that funds must be held in a specified borrower's account prior to commencement that borrower's bankruptcy in order for a lender to be able to exercise the right of setoff.  Proper alignment of mutual obligations is required.  It is not good enough for funds deposited or otherwise floating elsewhere within the bank to be on the verge of being transferred to the right account.  There is an absurdity to the notion of funds being almost on deposit.  Funds need to be accounted for properly and can only be in one account at a time.

*Id.*  In so holding, the court noted that the issue "is whether all transactions giving rise to liability arose before the time of filing of the bankruptcy petition."[14]  *Id.* at 759.  The court emphasized that the debt had to be incurred pre-petition under section 553(a), explaining that "[p]ending the

---

[14] The Bankruptcy Court further noted that "what could have been done in theory by [the Creditor] to accelerate execution of the transfer is irrelevant.  What matters is the actual conduct[]."  *Lehman Brothers*, 404 B.R. at 758.

completion of the transfer, the funds were not property of [the Lehman Debtor's] estate and were not available for setoff purposes." *Id.* at 760.  In this case, the FDIC was not even in the process of attempting to acquire the Debtor Deposits from BB&T at the time the bankruptcy commenced.[15]

The reasoning of the court in *Lehman Brothers* applies with equal or greater force here.  The proper analysis is not when the deposit liability initially was created, but rather when the creditor incurred the debt at issue.  If the answer to that question is "post-petition," then setoff is unavailable.

**D.     The Bankruptcy Court Correctly Held that the Inclusion of Language in Section 553(a)(3) Prohibiting Setoff of Post-Petition Debt Would Be Superfluous.**

As noted above, section 553(a) of the Bankruptcy Code expressly requires that in order to effectuate a setoff in bankruptcy, a creditor must have a valid pre-petition claim against a debtor and must owe a pre-petition debt to such debtor.  In its effort to claim that post-petition transfers of debt would not violate the timing requirement of section 553(a) and preclude setoff, the FDIC references the exceptions to section 553(a) but mischaracterizes them.  (FDIC Br. at 21-24.)  According to the FDIC, because section 553(a)(2) bars a creditor with a pre-petition debt from setting off that debt against a pre-petition *claim* that was "transferred . . . to such creditor after the commencement of the case," while section 553(a)(3) includes no corresponding prohibition barring setoff where a pre-petition *debt* is transferred to a creditor after the petition date, the latter must be permissible.  (FDIC Br. at 21-22.)

---

[15] Moreover, in this case, a creditor is seeking to incur a debt to the bankruptcy debtor post-bankruptcy expressly for the purpose of manufacturing mutuality in order to effectuate a setoff.  In *Lehman Brothers*, by contrast, the debt owing to the bankruptcy debtor was incurred by a creditor post-bankruptcy as a result of a transaction between the debtor and one of its affiliates, not a transaction concocted by a creditor for its own purposes.

In pertinent part, section 553(a) bars a creditor from using a debt owed to a bankruptcy debtor to set off a claim against the bankruptcy debtor when:

> (2)    such claim was transferred, by an entity other than the debtor, to such creditor –
>
> (A)    after the commencement of the case; or
> (B)    (i)    after 90 days before the date of the filing of the petition; and
>         (ii)    while the debtor was insolvent . . . ; or
>
> (3)    the debt owed to the debtor by such creditor was incurred by such creditor –
>
> (A)    after 90 days before the date of the filing of the petition;
> (B)    while the debtor was insolvent; and
> (C)    for the purpose of obtaining a right of setoff against the debtor . . .

11 U.S.C. § 553(a).

As the above statutory language reflects, the use of claims against bankruptcy debtors, and debts owing to bankruptcy debtors, is limited for setoff purposes if they have been transferred within 90 days prior to the bankruptcy petition.  *See* 11 U.S.C. § 553(a)(2)(B) and § 553(a)(3).  The statute also expressly bars for setoff purposes the use of claims transferred post-petition.  *See* 11 U.S.C. § 553(a)(2)(A).  It does not include an analogous provision in section 553(a)(3) barring the use for setoff purposes of debt owing to bankruptcy debtors that is transferred post-petition.  However, the Bankruptcy Court correctly held that such a provision would be "superfluous."  (J.A. at 19.)  As the court observed in explaining its decision, "[a] creditor who assumes a liability postpetition necessarily incurs a postpetition debt."  (J.A. at 19.)  Accordingly, there would be no need to proscribe the use in setoff of debt incurred after the

petition date, as section 553(a) already provides that such a debt cannot be used in setoff because it is not incurred pre-petition.[16]

The variation in the structures of section 553(a)(2) and section 553(a)(3) is also clear from the nature of setoff, which involves the offsetting of two debts.  In the bankruptcy context, one debt is the debtor's obligation to its creditor, *i.e.*, a creditor's "claim."  The other debt is the creditor's obligation to the debtor.  To determine whether these two debts are both pre-petition debts, as section 553(a) requires, one must determine when each party incurred its debt.  Transferring a claim against the debtor would not alter the date the bankruptcy debtor incurred that debt.  Accordingly, the requirement that a claim against a debtor be pre-petition could be satisfied even if a claim were transferred from one creditor to another post-petition, because such a transfer would not alter the date that the bankruptcy debtor incurred the obligation.  Section 553(a)(2)(A) expressly does not permit use of such a claim for setoff purposes, and it therefore constitutes an exception to the general right of setoff provided for in section 553(a).  The exception reflected in section 553(a)(2)(A) was enacted to prevent post-petition purchases by creditors of pre-petition claims against a bankruptcy debtor for use in setoff.[17]

No analogous exception is required in section 553(a)(3) (or anywhere else) to prevent post-petition trading by creditors in debts owed to a bankruptcy debtor in order to

---

[16] The FDIC asserts that the Bankruptcy Court's holding in this respect was made "without analysis or citation of authority."  (FDIC Br. at 24.)  But the court below unquestionably explained its conclusion.  (J.A. at 19.)  The analysis and authority comes from section 553(a) itself, which could not be clearer:  "[T]his title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case . . ."  11 U.S.C. § 553(a).

[17] *See, e.g., Photo Mech. Servs., Inc. v. E.I. Dupont De Nemours & Co. (In re Photo Mech. Servs., Inc.)*, 179 B.R. 604, 620 (Bankr. D. Minn. 1995) ("The purpose of § 553(a)(2)(A) is to prohibit the trafficking of claims against a debtor in order to effect a setoff—which would provide a windfall . . . at the expense of [debtor's creditors].")

manufacture setoff claims.  That is because when such debts are transferred, the date of

incurrence of the debt necessarily changes, inasmuch as there is a new and different debtor—

who obviously does not incur the debt unless and until he acquires it.  The FDIC argues that

under section 553(a), the test is when a debt "arose" (FDIC Br. at 18-19), but that does not

support the FDIC's position.  Section 553(a)(3), which deals specifically with debts owing to

bankruptcy debtors, makes clear that such a debt arises for purposes of that provision when it is

"incurred" by the creditor seeking to set it off.  Thus, if a pre-petition debt is assumed by another

creditor post-petition, the assuming creditor's debt arises post-petition and cannot form the basis

of a setoff under section 553(a).  Given section 553(a)'s requirement that debts owing to

bankruptcy creditors must be incurred pre-petition in order for setoff to be possible, the

Bankruptcy Court was absolutely correct in concluding that a statutory exception to prevent post-

petition assignment of pre-petition debts owing to bankruptcy debtors to create setoff rights

would be superfluous.

    Contrary to the FDIC's claim, then, the difference between section 553(a)(3) and

section 553(a)(2) does *not* mean that debt owing to a bankruptcy debtor can be transferred post-

petition and used for set-off purposes.  The FDIC's argument not only ignores the clear language

of section 553(a) that already addresses the issue by solely permitting debts incurred pre-petition

to be set off, but it also fails from a policy perspective.  It would make no sense for Congress to

have prohibited this type of manipulation of the bankruptcy process during the 90 days prior to

the petition date, which section 553(a)(3) unquestionably does for debts owing to bankruptcy

debtors (as section 553(a)(2) does for debts owing by bankruptcy debtors), yet allow such

manipulation post-petition.

In enacting section 553(a)(3), Congress intended to both prevent the build-up of a debtor's account for purposes of securing a greater setoff and "to eliminate an opportunity for a creditor to engage in some form of manipulation at the expense of other creditors."  *See In re Dayton Circuit Courts*, 80 B.R. 434, 440 (Bankr. S.D. Ohio 1987) (quoting *In re Brooks Farms*, 70 B.R. at 372); *see also Herzog v. Mandan Sec. Bank (In re PRS Products, Inc.*, 574 F.2d 414, 418 (8th Cir. 1978) (explaining that under the predecessor to section 553(a), no voidable preference was created when a bank set off funds in a deposit account against a debt owed to the bank, except "where a deposit is accepted by a bank with an intent to apply it on a pre-existing claim against the depositor").[18]  If the FDIC's argument were accepted, a creditor could make an end-run around section 553(a)(3)'s prohibition against acquiring debts owed to a bankruptcy debtor within 90 days prior to a bankruptcy for setoff purposes simply by waiting until after the debtor filed for bankruptcy to acquire the debt.  That cannot possibly be the correct—or intended—result.[19]

### E.   The FDIC's Position Is Not Supported by the Legislative History of Section 553(a).

The FDIC also argues that the legislative history of section 553(a) "supports the conclusion that Congress acted intentionally" in not prohibiting the setoff of debt owing to

---

[18] *See also In re Elcona Homes Corp.*, 863 F.2d 483, 486 (7th Cir. 1988).  In this case, which dealt with a different and more complicated setoff issue, Judge Posner began his analysis by positing an "easier" case in which "the creditor of a bankrupt buys a debt owed by someone else to the debtor in order to offset the debt that the bankrupt debtor owes him and so gain an advantage over the other unsecured creditors."  According to Judge Posner, such an action would be "plainly evasive and easily rebuffed."  *Id.*  That is this case.

[19] Relying on *Official Comm. of Unsecured Creditors v. Mfrs. & Trading Trust Co. (In re Bennett Funding Group, Inc.)*, 146 F.3d 136 (2d Cir. 1998), the FDIC argues that because section 553(a)(3) "does not prohibit setoff when a debt owed to a debtor was incurred by the creditor in good faith and in the ordinary course of business."  (FDIC Br. at 23.)  *Bennett Funding* involved the setoff of a pre-petition claim against a pre-petition debt incurred during the 90-day period prior to bankruptcy and thus the inquiry was whether section 553(a)(3) applied.  The Second Circuit found that section 553(a)(3) did not apply because the debt owed to the debtor was not incurred for the purpose of obtaining a right of setoff.  In the present case, the FDIC cannot claim that by now engaging in a post-petition transaction for the sole purpose of obtaining a debt to set off against its pre-petition claim, it would be incurring such debt in good faith or in the ordinary course of business.

bankruptcy debtors that is acquired post-petition.  (FDIC Br. at 22.)  In fact, the legislative history quoted by the FDIC simply sets forth the changes to the setoff provisions of the Code and makes no mention of the alleged rationale advanced by the FDIC.  What the legislative history of section 553(a) *does* make clear is a strong policy to limit setoff of claims and debts obtained post-petition.

Section 68 of the Bankruptcy Act of 1898, the immediate predecessor of section 553, contained no requirement that both of the debts to be set off against one another be incurred pre-petition.  Section 68 did require, however, that the relevant debts and credits be "mutual," and the courts interpreting that provision added the pre-petition requirement to satisfy the mutuality called for in section 68.  *See Ansfield v. Whitewater Oil Co.*, 254 F. Supp. 494, 499 (E.D. Wis. 1966) (holding that "[t]he right of set-off must be measured as of the time when the bankruptcy petition was filed"); *Desser, Rau & Hoffman v. Goggin*, 240 F.2d 84, 86 (9th Cir. 1957) (holding that if no right of setoff existed at the time of bankruptcy, then the creditor could not establish a right to setoff following the petition date).

In describing the rationale for the requirement that both debts be incurred pre-petition to satisfy the requirements for setoff under the Bankruptcy Code, the Sixth Circuit explained as follows:

> If the [creditor's] debt to the trustee did not accrue until after bankruptcy, then equity does not permit the set-off because as the debt of the [creditor] did not exist when the estate of the bankrupt passed into the hands of the trustee, the equities of the bankrupt's other creditors intervene to prevent the depletion of the assets in the hands of the trustee by extinguishing a good debt due to the estate of a bad one due a creditor from the estate.

*See Prudential Ins. Co. of Am. v. Nelson (In re Chickamauga)*, 101 F.2d 441, 443 (6th Cir. 1939) (looking to whether the creditor was obligated to pay the debt on the petition date and explaining that if, on that date, the creditor only "had an option to accept or decline [the debt], it is without

the right" to setoff).  In this case, even if the FDIC now assumed the Debtor Deposit liabilities pursuant to Section 9.5 of the P&A Agreement, the FDIC would not incur an obligation to the Debtor until it exercised its purported rights and BB&T returned the accounts, which would necessarily be a post-petition occurrence that would render the debt ineligible for setoff under section 553(a).

After section 68 was superseded by section 553(a) in 1978 to expressly include the requirement that both debts must be incurred pre-petition, courts continued to offer the same policy rationale for the rule.  Thus, in interpreting the requirement now embodied in section 553 itself, the 7th Circuit explained:

> There is no reason why some creditors of the pre-bankruptcy firm should have their rights diminished by post-bankruptcy transactions of the firm that might create setoffs — yet that would be the result of allowing pre- and post-bankruptcy debts to cancel each other out, because a setoff would reduce the cash intake of the firm, and therefore usually reduce the funds available to satisfy competing claims.

*Boston and Maine Corp. v. Chicago Pac. Corp.*, 785 F.2d 562, 565 (7th Cir. 1986) (reversing the district court's decision allowing a creditor with a pre-petition claim to set off its claim against a post-petition debt to the bankruptcy debtor).  The FDIC's attempt here to set off a debt that it did not hold at the Petition Date and has not held at any time during the twenty months since would undermine the policy articulated by the Sixth and Seventh Circuits of minimizing the extent to which setoff may be used to disadvantage other creditors.

The FDIC itself correctly notes that that the restriction on setoff based on claims acquired post-petition in section 553(a)(2) was intended to prevent creditors from purchasing discounted claims from third-party creditors against the debtor for purposes of effectuating a setoff against a debt owed to the debtor's estate.  (FDIC Br. at 22-23.)  Although the FDIC conclusorily asserts that this concern only applies in the context of claims trading (FDIC Br. at

23), precisely the same mischief could occur if there was no prohibition on trading post-petition debt for purposes of setoff. But for this prohibition, a party with a pre-petition claim against the debtor, which likely would be paid at a fraction of its total value in the bankruptcy process, could acquire an obligation to the debtor after the petition date in order to set off its claim against such an obligation at full value.[20] There is no question that such a maneuver would implicate the precise policy concerns articulated by the Sixth and Seventh Circuits, as it would necessarily impair the recovery of the bankruptcy estate's other creditors.

Accordingly, the FDIC cannot now artificially satisfy the requirements of section 553(a) that both debts be incurred pre-petition by engaging in a transaction specifically for the sole purpose of creating such a debt.

## III. THE FDIC CANNOT RELY ON THE P&A AGREEMENT'S DEFINITION OF ASSUMED DEPOSITS TO SATISFY THE TIMING AND MUTUALITY REQUIREMENTS OF SECTION 553(a).

The FDIC also argues that the definition of "Assumed Deposits" in the P&A Agreement enables the FDIC to effectively rewrite history such that prior assumptions by BB&T of deposit accounts not only can be unwound, but can be deemed to have never happened at all. (FDIC Br. at 25.) However, while the FDIC clearly would like to go back to August 2009 so as to exclude the Debtor Deposits from the deposits assumed by BB&T, nothing in the definition of "Assumed Deposits" makes such time travel possible. The FDIC had the opportunity to exclude the Debtor Deposits from the assignment to BB&T prior to the Debtor's bankruptcy, but did not

---

[20] For example, another unsecured creditor of the Debtor could offer to assume the Debtor Deposit liabilities from BB&T in exchange for BB&T giving that creditor just 75 percent of the cash in the deposit accounts. If the creditor was then able to effectuate a setoff involving the Debtor Deposits, the net result would be that (i) the creditor would receive 75 percent of the cash in the deposit accounts in respect of its unsecured claim; (ii) BB&T would receive a windfall of 25 percent of the cash in the deposit accounts; and (iii) the rest of the Debtor's unsecured creditors would not receive any of the cash in the accounts. If the FDIC's interpretation of section 553(a) is correct, this type of debt-trading market would immediately develop to the detriment of all creditors.

do so.  The conduct of both the Colonial Bank and BB&T demonstrate that the Debtor Deposits

were assumed by BB&T prior to the Petition Date and have remained liabilities of BB&T ever

since.  The FDIC does not deny this, and it cannot now do anything after the fact to alter what

has occurred.

A.     **The FDIC's Transfer and BB&T's Assumption of the Debtor Deposits
       Pursuant to the P&A Agreement Destroyed Mutuality.**

There is no dispute that prior to the Petition Date the Debtor Deposits were sold to

and assumed by BB&T prior to the Petition Date, and that BB&T has had the liability for these

accounts at all times since that transfer.  Specifically, as set forth above, the P&A Agreement

provided that BB&T assumed all "Assumed Deposits" of Colonial Bank, except for any deposits

specifically listed on Schedule 2.1(a) of the agreement.  (J.A. at 206.)  Schedule 2.1(a), entitled

"Excluded Deposit Liability Accounts," does not identify the Debtor Deposits as being excluded.

(J.A. at 241.)  Nor is there any other provision in the P&A Agreement or any of its schedules

providing that the Debtor Deposits were not among the accounts being transferred to BB&T.[21]

1.     **The Undisputed Record Establishes That BB&T Has Retained
       Liability for the Debtor Deposits Since Prior to the Petition Date.**

The statements made by BB&T representatives at deposition and during hearings

in this case confirm that the Debtor Deposits were transferred:  At all times since the execution

of the P&A Agreement, the Debtor Deposits have been liabilities of BB&T, and BB&T always

has treated them as such.  (J.A. at 373, 364-65 (Hicks tr. at 79:8-13, 45:14-46:20); J.A. at 186-87

(May 26, 2010 Hearing tr. at 163:23-164:9).)

---

[21] In the context of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), courts interpret purchase and assumption agreements based on their plain language.  *See Nashville Lodging Co. v. Resolution Trust Corp.*, 59 F.3d 236, 247 (D.C. Cir. 1995) (finding plaintiff could not set off against successor bank because successor bank acquired asset but not liability pursuant to purchase and assumption transaction).

The FDIC asserts that "BB&T's position has been consistent that the Accounts 'are subject to whatever rights the FDIC-Receiver may have under the P&A Agreement.'"[22] (FDIC Br. at 29 (quoting BB&T's Response to FDIC-Receiver's Motion for an Order Modifying the Automatic Stay and Reservation of Rights, dated June 25, 2010 [Doc. No. 780]).)  However, at no point has BB&T ever suggested that the FDIC exercised any right pre-petition to exclude the Debtor Deposits from what was being transferred to BB&T.

To the contrary, Mr. Hicks, a BB&T senior vice president, testified under oath that the Debtor Deposits were not "excluded deposit liability accounts" as part of the sale transaction, and that "BB&T has been responsible for these deposits as a liability and believes that they were transferred to BB&T and that they are BB&T's deposits."  (J.A. at 364-65, 373 (Hicks tr. at 45:20-46:20, 79:9-13).)  Similarly, BB&T's counsel made the following statement to the Bankruptcy Court at the hearing on the FDIC's Section 365(o) Motion:

> I want to be clear on the record that it is our position that these are assumed liabilities of BB&T.  We have treated them like that since day one.  They are our deposit accounts.  We have had control since August 14th of those accounts.  Now, we acknowledge that the deposit accounts are subject to whatever contractual rights the FDIC has, just like all of the assets and liabilities that we have assumed, but, to-date, those rights have not been exercised.

(J.A. at 186-87 (May 26, 2010 Hearing tr. at 163:24-164:9).)  Given these statements and the express provisions of the P&A Agreement, there can be no reasonable dispute that the Debtor Deposits were assumed by and remain liabilities of BB&T.

---

[22] The FDIC also argues that by finding that BB&T had, in fact, assumed liability for the accounts, the court "disregarded the effect of the automatic stay that it had recognized elsewhere."  (FDIC Br. at 29).  The FDIC neither explains its claim nor offers any examples of what the Bankruptcy Court previously had "recognized."  Regardless, nothing in the court's finding—based on the plain language of the P&A Agreement and the undisputed factual records—disregards the court's prior findings.

2.      **The FDIC's Own Conduct Demonstrates That It Understood That the Debtor Deposits Were Transferred to and Assumed by BB&T.**

When the FDIC wanted to exclude deposit accounts from those transferred to and assumed by BB&T, it knew that it had to take affirmative steps and, in fact, took them with respect to the accounts of another former Colonial Bank depositor.  As described above, five days after the execution of the P&A Agreement, the FDIC and BB&T entered into the Letter Agreement relating to the TBW accounts.  (J.A. at 325-28.)  Just as with the Debtor Deposits, the TBW accounts had been established at Colonial Bank and transferred to BB&T pursuant to the P&A Agreement, when they became liabilities of BB&T.  And just as with the Debtor here, TBW filed for Chapter 11 bankruptcy protection less than two weeks after the P&A Agreement was finalized.  However, that is where the similarities with the present dispute end.

While the FDIC did nothing to take back the Debtor Deposits prior to the Debtor filing what had become an inevitable petition for bankruptcy relief, the FDIC acted swiftly to enter into the Letter Agreement prior to TBW's petition date.  Pursuant to the Letter Agreement, BB&T acknowledged that "the deposit balances under the deposit accounts associated with [TBW or its affiliates] . . . do not constitute 'Deposits' for the purposes of the [P&A Agreement] and remain obligations of the [FDIC]."  (J.A. at 325.)  The Letter Agreement also directed BB&T to "move such accounts from its deposit platform [to] a custodial account(s) within its trust department."  (J.A. at 325.)

The Letter Agreement makes clear that the FDIC knew that the TBW accounts—like the Debtor Deposits—had been assumed by BB&T, and that to reassume the accounts and their corresponding liability, the FDIC had to take affirmative actions.  Nevertheless, despite demonstrating a clear understanding of how to take back accounts transferred under the P&A Agreement, the FDIC did not execute an equivalent agreement with BB&T with respect to the

Debtor Deposits.[23]  Accordingly, the FDIC never regained the pre-petition liability necessary to set off against the Debtor Deposits.

   **B.    The FDIC May Not Satisfy the Requirements of Section 553(a) by Invoking the Definition of Assumed Deposits.**

   In the face of the indisputable fact that it transferred the Debtor Deposits and their corresponding liability to BB&T on August 14, 2009, the FDIC insists that the definition of "Assumed Deposits" and Section 9.5 of the P&A Agreement permit it to do now what it failed to do prior to the Petition Date.  The term "Assumed Deposits" is defined in the P&A Agreement to include all "Deposits," which is defined as follows:

> **"Deposit"** means a deposit as defined in 12 U.S.C. Section 1813(l), including without limitation, outstanding cashier's checks and other official checks and all uncollected items included in the depositors' balances and credited on the books and records of the Failed Bank; provided, that the term "Deposit" shall not include all or any portion of those deposit balances which, in the discretion of the Receiver or the Corporation, (i) may be required to satisfy it for any liquidated or contingent liability of any depositor arising from an unauthorized or unlawful transaction, or (ii) may be needed to provide payment of any liability of any depositor to the Failed Bank or the Receiver including the liability of any depositor as a director or officer of the Failed Bank, whether or not the amount of the liability is or can be determined as a Bank Closing.

(J.A. at 202.)

   According to the FDIC, this definition enables it not only to employ Section 9.5 of the P&A Agreement to require the return of deposit accounts previously transferred to and assumed by BB&T, but also to deem such assumptions to have never happened at all.[24]  (FDIC

---

[23]  The FDIC has admitted that it is now seeking to do post-petition what it failed to do pre-petition.  (J.A. at 156 (Hearing tr. at 133:17-21 ("Well, the committee says that [the FDIC doesn't] have this letter for the debtor accounts, and the answer for that is, Your Honor, that's what we are asking for stay relief for."))).

[24]  The FDIC argues that "[t]here is nothing novel" about such "relation back" for purposes of effectuating a setoff under section 553(a).  (FDIC Br. at 27.)  However, in each of the cases relied on by the FDIC for that proposition a guarantee existed pre-petition and was triggered after the petition date by a default.  The court in each case found

Br. at 26-27.)  The definition of "Assumed Deposits" does expressly exclude any deposit balance

that, in the FDIC's discretion, "may be needed to provide payment of any liability of any

depositor to the Failed Bank."  (J.A. at 200, 202.)  However, this definition at most only permits

the FDIC to call back accounts that it has transferred.  The actual transfer of assets and

assumption of liabilities either happened or it did not.[25]  If the FDIC were now to exercise its

right to take back the Debtor Deposits, that would not change the fact that for the past twenty

months, BB&T has had the liability on the accounts, and, among other things, issued monthly

statements for the accounts to the Debtor, paid deposit insurance on the accounts, and included

them as BB&T deposits in quarterly call reports submitted to the FDIC and the North Carolina

State Banking Authority.[26]

        Therefore, even if the FDIC were to exercise its purported rights to call back the

Debtor Deposits from the accounts assumed by BB&T, it cannot meet the requirements

necessary to validly set off the Debtor Deposits under section 553(a).  Whatever rights the FDIC

---

that the claim at issue existed pre-petition and was simply unmatured until the default. *See Stephenson v. Salisbury (In re Corland Corp.)*, 967 F.2d 1069, 1077-78 (5th Cir. 1992) (guarantor's post-petition payments made upon debtor's default could be set off against guarantor's pre-petition debt to debtor because guaranty was created pre-petition); *Sherman v. First City Bank of Dallas (In re United Sciences of Am., Inc.)*, 893 F.2d 720, 724 (5th Cir. 1990) (allowing bank to set off claim for post-petition credit card chargebacks of pre-petition purchases pursuant to a pre-petition surety/indemnification agreement between bank and debtor); *In re Davicter Enters., Inc.*, 248 B.R. 794, 798-99 (Bankr. S.D. Ill. 2000) (allowing general contractor who acted as surety to suppliers furnishing materials to debtor-subcontractor to set off its liabilities to suppliers).  Here, the FDIC's pre-petition debt was completely extinguished when it transferred the Debtor Deposits to BB&T prior to the Petition Date.  If the FDIC wants to assume the Debtor Deposits again expressly for the purpose of effectuating a setoff, its obligation to the Debtor will be post-petition.

[25] For example, if a building was transferred to BB&T under the P&A Agreement—but at a later date, the building was returned to the FDIC—it would not mean that BB&T did not own and hold title to the building prior to the amendment as a result of the transfer.  Likewise, over the past twenty months, either the FDIC was liable for the Debtor Deposits or BB&T was liable for them.

[26] In addition to arguing that it can exercise its contractual powers to rewrite history such that the BB&T assumption of the Debtor Deposits never happened, the FDIC also attempts to do so in such a way as to pick and choose which other parties it will allow to access the Debtor Deposits.  Specifically, in the Renewed Automatic Stay Motion, the FDIC asserted that it would not seek to set off against any portion of the account balances that may secure obligations owing to BB&T.  So not only does the FDIC seek to rewrite history, but it seeks to do so in a way that will favor whatever parties it chooses.

has to obtain the return of the Debtor Deposits had to have been exercised pre-petition in order for the FDIC to have setoff rights under the Bankruptcy Code.

C.    **That Purchase and Assumptions Agreements Are Negotiated on an Expedited Basis Does Not Give the FDIC the Right to Create Mutuality Where None Otherwise Exists.**

After reaching its conclusion that the FDIC had not established the requirements to set off against the Debtor Deposits, the Bankruptcy Court noted it was aware of the "exigent circumstances surrounding the closing of a bank and the execution of a purchase and assumption agreement with another entity." (J.A. at 20.) However, the court correctly rejected this as a basis for granting the FDIC the relief it sought, observing that the FDIC could have anticipated both the Debtor's need for potential bankruptcy relief and Colonial Bank's claims against the Debtor, and that should have indicated to the FDIC "that the right of setoff should be preserved." (J.A. at 20-21.)

On appeal, the FDIC argues that because of the need to move on an expedited basis to resolve failed banks, purchase and assumption agreements, such as the P&A Agreement here, are intended to "preserve [the FDIC's] statutory setoff rights so that the failed bank's receivership is assured some recovery on those claims."[27] (FDIC Br. at 28.) However, the FDIC failed to take any such steps prior to the Debtor's bankruptcy. While the FDIC could have protected itself by excluding the Debtor Deposits from the BB&T sale transaction or exercising

---

[27] The FDIC cites to two cases to support its statement that it must act with "great speed" when a bank fails. (FDIC Br. at 28.) The courts' observations in those cases, however, also reflect the fact that such circumstances do not excuse the FDIC's diligence obligations in entering into a purchase and assumption agreement. *See Gunter v. Hutcheson*, 674 F.2d 862, 865, 871 (11th Cir. 1982) (noting that the FDIC must conduct a statutory analysis as to whether the risk of a purchase and assumption is not greater than a liquidation); *Turner v. Officers, Directors and Employees of Mid Valley Bank*, 712 F. Supp. 1489, 1500 (E.D. Wash. 1988) ("As soon as it becomes apparent that the bank is in jeopardy, the FDIC . . . begins to look for potential buyers, with the goal of having such a buyer evaluated and approved before the bank's doors are closed by the Supervisor.")

rights under Section 9.5 prior to the commencement of the bankruptcy (as it did in the case of TBW), it did not do so.

The FDIC claims that it did not act prior to the Petition Date because "it was still investigating." (FDIC Br. at 29.) But the FDIC apparently had sufficient time to investigate the circumstances relating to the TBW accounts, and chose to exclude those deposit accounts. What is more, as the Bankruptcy Court expressly noted, the FDIC should have foreseen the Debtor's need for bankruptcy protection upon the demise of Colonial Bank, which was the Debtor's principal operating subsidiary and accounted for approximately 99.3 percent of its consolidated assets. (J.A. at 20-21.) Thus, the circumstances surrounding the closing of Colonial Bank and the execution of the P&A Agreement provide no basis for the FDIC to do now what it failed to do prior to the Petition Date.

## IV. EVEN IF THE FDIC WERE ABLE TO SET OFF AGAINST THE DEBTOR DEPOSITS AS A MATTER OF LAW, THE BANKRUPTCY COURT'S DENIAL OF THE FDIC'S MOTION FOR STAY RELIEF SHOULD BE AFFIRMED.

The FDIC argues that if this Court disagrees with the Bankruptcy Court's conclusion that the FDIC cannot create the mutuality required to set off its claims against the Debtor Deposits, it follows that its request for relief from the automatic stay must be granted. (FDIC Br. at 31.) That is not true.

Even if this Court were to find that the FDIC could exercise its purported contractual right under the P&A Agreement to take back the Debtor Deposits (and the Debtor and Committee submit that the Bankruptcy Court was correct in holding to the contrary), the FDIC still would not have made out the necessary *prima facie* case required for relief under section 362(d) of the Bankruptcy Code.

"The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws." *In re Patterson*, 967 F.2d at 512 n.9.  The filing of a bankruptcy petition operates as a stay "applicable to all entities" of, *inter alia*, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a), (a)(3) (2011).

Under section 362(d) of the Bankruptcy Code, the FDIC, as the moving party, had the burden of making a *prima facie* case that it was entitled to the relief that it sought.  *See In re Powell*, 223 B.R. 225, 232 (Bankr. N.D. Ala. 1998).  If the FDIC failed to make a *prima facie* showing, the court was required to deny its motion without requiring the Debtor to offer any evidence.  *See In re Elmira Litho, Inc.*, 174 B.R. 892, 901 n.7 (Bankr. S.D.N.Y. 1994); 3 ALAN N. RESNICK, ET AL., COLLIER ON BANKRUPTCY ¶ 362.10 (16th ed. rev. 2010).  The decision regarding "whether to lift the stay lies in the sound discretion of the bankruptcy court."  *See In re Patterson*, 967 F.2d at 509.  A court may lift the automatic stay "for cause" under section 362(d)(1), but "cause" under section 362(d)(1) "has no clear definition and is determined on a case-by-case basis."  *Christensen v. Tuscon Estates, Inc. (In re Tucson Estates, Inc.),* 912 F.2d 1162, 1166 (9th Cir. 1990).

In support of its argument that it is entitled to stay relief if it can create a right of setoff by calling back the Debtor Deposits, the FDIC cites to a number of cases for the proposition that "once a creditor has established a right of setoff, that creditor also has made a *prima facie* showing of 'cause' for relief from the automatic stay under section 362(d)(1) of the Bankruptcy Code."  (FDIC Br. at 30.)  However, those cases are plainly inapposite here.  There is no dispute that the FDIC does not presently have a right of setoff.  As the FDIC itself explains in its Brief, it sought stay relief not to execute a setoff right, but instead to *create* such a right.

43

(FDIC Br. at 3 (explaining that it sought stay relief to take back the Debtor Deposits from BB&T).)

The FDIC does not cite to a single case—and neither the Debtor nor the Committee is aware of one—in which a court was asked to find the necessary "cause" in a movant's effort to create a right of setoff, as the FDIC urges here.[28]  That is not surprising.  If a creditor could obtain relief from the automatic stay to turn a post-petition debt into a pre-petition debt to satisfy the requirements for setoff under section 553(a), the purpose of the automatic stay would be subverted.  *See In re Patterson*, 967 F.2d at 510-11; *see also In re Dayton Circuit Courts*, 80 B.R. at 439-40 ("The intent of the statement is clear that one creditor should not be unfairly favored over the class of creditors and, when justice dictates, setoff must be denied.").[29]

## V.   THE BANKRUPTCY COURT PROPERLY GRANTED THE DEBTOR'S MOTION TO USE CASH COLLATERAL.

The FDIC also argues that the decision of the Bankruptcy Court granting the Debtor's Cash Collateral Motion to use money from its operating account to pay for administrative expenses of the estate and professional fees should be reversed because it was

---

[28] None of the four cases the FDIC cites involve facts remotely analogous to the present dispute.  Three involved successful attempts to set off pre-petition claims against pre-petition debts.  *See United States v. Gould (In re Gould)*, 401 B.R. 415 (B.A.P. 9th Cir. 2009) (Internal Revenue Service ("IRS") entitled to stay relief to set off pre-petition tax debts against pre-petition tax refunds owed to debtor for pre-petition overpayment); *In re Nuclear Imaging Sys., Inc.*, 260 B.R. 724, 734-35 (Bankr. E.D. Pa. 2000) (mutuality existed where Department of Health and Human Services indebted to debtor health care providers for pre-petition Medicare payments and debtor indebted to IRS for pre-petition taxes); *In re Orlinksi*, 140 B.R. 600, 602-03 (Bankr. S.D. Ga. 1991) (IRS entitled to set off Debtor's tax liability for one pre-petition tax year against overpayment for different pre-petition year received from Debtor).  In the fourth case, the only one of the four that involved an attempt to set off a debt incurred post-petition, the court rejected the IRS' attempt to set off against a tax refund and economic stimulus payment the debtor became entitled to post-petition.  *See In re Ealy*, 392 B.R. 408, 414 (Bankr. E.D. Ark. 2008), *appeal dismissed*, 396 B.R. 20 (B.A.P. 8th Cir. 2008).

[29] Moreover, even if this Court were to conclude that the FDIC's proposed maneuvers would satisfy section 553(a) *and* that it would be appropriate to lift the stay in order to enable the FDIC to do so, the FDIC would still have to satisfy additional requirements to be entitled to set off against the Debtor Deposits (none of which the Bankruptcy Court was required to consider, given its decision).  Specifically, the FDIC would need to establish (i) the existence of a valid, allowed claim and the amount of such a claim; (ii) that its interest was not adequately protected; and (iii) the priority of its interest vis-à-vis other creditors claiming an interest in the Debtor Deposits.

based on the court's conclusion that the FDIC had no setoff rights with respect to the Debtor

Deposits, which the FDIC claims was "legally erroneous."  (FDIC Br. at 31-32.)  However, the

FDIC does not dispute that if the Bankruptcy Court's denial of the Renewed Stay Relief Motion

was correct, it has no basis to challenge the court's granting of the Cash Collateral Motion.

Because the Bankruptcy Court's ruling on the Renewed Stay Relief Motion is correct, its ruling

on the Cash Collateral Motion should be affirmed.

**<u>CONCLUSION</u>**

For all of the foregoing reasons, the Debtor and Committee respectfully request

that the Bankruptcy Court's decisions be affirmed.

**<u>CERTIFICATION</u>**

Pursuant to Rule II.C.3 of this Court's Administrative Procedures, Attorney Marc

P. Solomon certifies that he has the express permission and agreement of counsel for the Debtor

to affix the electronic signature of Rufus T. Dorsey, IV hereon and further certifies that the

Debtor and Committee are in agreement on the relief requested herein.

DATED:  April 26, 2011

Respectfully submitted,

/s/ Rufus T. Dorsey, IV                           
C. Edward Dobbs
Rufus T. Dorsey, IV
J. David Freedman
**PARKER, HUDSON, RAINER & DOBBS LLP**
1500 Marquis Two Tower
285 Peachtree Center Avenue, N.E.
Atlanta, Georgia  30303
Telephone:  404-523-5300
Facsimile:  404-522-8409

*Attorneys for the Debtor and*
*Debtor in Possession*

/s/ Marc P. Solomon
Robert B. Rubin
Marc P. Solomon
**BURR FORMAN LLP**
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone:  205-251-3000
Facsimile:  205-244-5733

- and -

Alan R. Glickman
Brian D. Pfeiffer
Brian T. Kohn
**SCHULTE ROTH & ZABEL LLP**
919 Third Avenue
New York, New York  10022
Telephone:  212-756-2000
Facsimile:  212-593-5955

*Attorneys for the Official Committee of Unsecured Creditors*