# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| In re:<br><br><br>THE COLONIAL BANCGROUP, INC.,<br><br>Debtor.<br><br>_____<br><br>FEDERAL DEPOSIT INSURANCE<br>CORPORATION, as Receiver for Colonial Bank,<br><br>Appellant,<br><br>v.<br><br>THE COLONIAL BANCGROUP, INC., et al.,<br><br>Appellees. | Case No.  2:11-cv-0133 (MHT)<br><br>**Bankruptcy Appeal** |

## RESPONSE OF THE COLONIAL BANCGROUP, INC.
## TO MOTION OF THE FDIC-RECEIVER FOR A STAY PENDING
## APPEAL AND EMERGENCY REQUEST FOR INTERIM RELIEF

PARKER HUDSON RAINER & DOBBS LLP
C. Edward Dobbs, Esq.
Rufus T. Dorsey, IV, Esq.
J. David Freedman, Esq.
285 Peachtree Center Avenue, Suite 1500
Atlanta, GA 30303
(404) 523-5300

Attorneys for Debtor, The Colonial BancGroup, Inc.

_____

**Dated:  December 12, 2011**

# TABLE OF AUTHORITIES

**CASES**                                                                            **Page(s)**

Acquisition Corp. of Am. v. Fed. Sav. & Loan Ins. Corp.,
    96 B.R. 380 (S.D. Fla. 1988) ...........................................................................9

Blocker v. Wyatt,
    2009 U.S. Dist. LEXIS 64329 (S.D. Ga. July 27, 2009) ..........................................8

Citizens Bank of Maryland v. Strumpf,
    516 U.S. 16 (1995).......................................................................................................4

Garcia-Mir v. Meese,
    781 F.2d 1450 (11th Cir. 1986) ................................................................................9

Hope for Families & Cmty. Serv. v. Warren,
    2009 U.S. Dist. LEXIS 42131 (M.D. Ala. Apr. 21, 2009) ......................................9

IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs.),
    408 F.3d 689 (11th Cir. 2005) ................................................................................10

In re The Colonial BancGroup, Inc.,
    Case No. 09-32303 (DHW) (Bankr. M.D. Ala.)......................................................1

In re Commercial Millwright Serv. Corp.,
    245 B.R. 585 (Bankr. N.D. Iowa 1998)..................................................................15

In re Costa & Head Land Co.,
    68 B.R. 296 ................................................................................................................9

In re Englander,
    95 F.3d 1028 (11th Cir. 1996) ..................................................................................9

In re Freeman,
    2010 Bankr. LEXIS 4599 (Bankr. M.D. Ala. Dec. 22, 2010) .................................8

In re Gamble,
    168 F.3d 442 (11th Cir. 1999) ..................................................................................9

In re Gulf States Steel,
    285 B.R. 739 (Bankr. N.D. Ala. 2002) ....................................................................9

In re Newman,
    399 B.R. 541 (Bankr. M.D. Fla. 2008) ..................................................................15

In re Victory Markets, Inc.,
  221 B.R. 298 (2d Cir. BAP 1998)...................................................................................15

Jet Networks FC Holding Corp. v. Goldberg,
  2009 U.S. Dist. LEXIS 53593 (S.D. Fla. June 8, 2009) .....................................................9

Sirius Computer Solutions, Inc. v. AASI Creditor Liquidating Trust,
  2011 U.S. Dist. LEXIS 96460 (S.D. Fla. Aug. 26, 2011).................................................15

Turner v. Citizens Nat'l Bank (In re Turner),
  207 B.R. 373 (2d Cir. BAP 1997)......................................................................................9

Wilson Refining LP v. Notre Dame Investors, Inc. (In re In re Notre Dame Investors,
  Inc.),
  306 Fed. Appx. 62 (5th Cir. 2009).....................................................................................15

STATUTES

11 U.S.C. § 1141(a) ...........................................................................................................15

Section 362 of the Bankruptcy Code ...................................................................................11

Section 553 of the Bankruptcy Code ...................................................................................11

OTHER AUTHORITIES

Rule 8005 of the Bankruptcy Rules of Procedure ..................................................................1

Rule 8011(d) ..........................................................................................................................1

The Colonial BancGroup, Inc. (the "Debtor") hereby responds to the *Motion for a Stay Pending Appeal and Emergency Request for Interim Relief* (the "Stay Motion") [Doc. No. 47], which was filed on December 8, 2011, by the Federal Deposit Insurance Corporation, as receiver for Colonial Bank (the "FDIC-Receiver").  Relying on Rule 8005 of the Bankruptcy Rules of Procedure (entitled "Stay Pending Appeal"), the FDIC-Receiver seeks a stay of the bankruptcy court's order entered on December 1, 2011 [Bankr. Doc No. 1651] (the "Operating Account Order"),[1] which authorized the Debtor to access the remaining balance in the Debtor's operating account at Branch Banking & Trust Company ("BB&T").

As a threshold matter, the Stay Motion is procedurally deficient.  The FDIC-Receiver clearly wants this Court to stay the Operating Account Order.[2]  However, the FDIC-Receiver has not filed a notice of appeal from that order, a logical and required prerequisite for seeking such a stay.  Rothenberg v. Ralph D. Kaiser Co., Inc., 200 B.R. 461 (D.D.C. 1996); In re Hanson, 282 B.R. 240 (Bankr. D. Colo. 2002).  The FDIC-Receiver also paid only lip service to Rule 8011(d) and its requirements to make efforts of emergency notice, even though the FDIC-Receiver waited seven days before filing the Stay Motion.

---

[1] The order  was entered in In re The Colonial BancGroup, Inc., Case No. 09-32303 (DHW) (Bankr. M.D. Ala.), relied on a memorandum opinion at Bankr. Doc No. 1650, granted the Debtor's motion to use cash in one of its banking accounts [Bankr. Doc. No. 1613] and overruled the FDIC-Receiver's objection to that motion [Bankr. Doc. No. 1637].  The FDIC-Receiver couched its objection to the Debtor's motion to use cash as a motion to "enforce" the Agreed Cash Use Order (which order is discussed in this Response (*see, infra at* 5)).  The bankruptcy court denied this motion in the order that the FDIC-Receiver now seeks to stay.  For the reasons explained in the text, the FDIC-Receiver's attempt to "enforce" an order that expressly contemplated the Debtor's right to revisit after notice and a hearing is simply procedural gamesmanship.

[2] If what the FDIC-Receiver is doing is seeking a stay pending appeal of  the bankruptcy court's order of January 25, 2011, denying the FDIC-Receiver relief from the automatic stay, such a request is of no legal significance.   The automatic stay has been, and remains, in effect in the Debtor's case.  The FDIC-Receiver sought relief from the stay, which was denied, and the stay therefore remains in effect.  Staying the order that denied the relief requested by the FDIC-Receiver does not alter the fact that the automatic stay remains in place.  It is equally futile to request a stay pending appeal from the bankruptcy court's order of January 25, 2011, which granted the Debtor unrestricted use of the cash in the Operating Account.  That order controlled past use of cash, and the new Operating Account Order controls future use.

- 1 -

Putting aside these procedural points, the Debtor submits that the FDIC-Receiver's Stay Motion should nevertheless be denied. The FDIC-Receiver has not established any of the bases for such extraordinary relief, which require a showing that the FDIC-Receiver is likely to prevail on its appeal of the Operating Account Order; absent a stay, the FDIC-Receiver will suffer irreparable damage; the Debtor will not suffer substantial harm from the issuance of a stay; and the public interest will be served by issuing the stay.

## I.  Background

### A.  Debtor's Accounts at BB&T

The Debtor has six deposit accounts at BB&T with an aggregate balance in excess of $27 million (the "BB&T Accounts"). One of these accounts, the Operating Account, has a current balance of approximately $5.4 million.

Prior to August 14, 2009, these six accounts were held at Colonial Bank. Effective August 14, 2009, BB&T acquired these accounts, as well as thousands of other customer deposit accounts and associated balances, under a Purchase and Assumption Agreement (the "P&A Agreement") with the FDIC-Receiver. BB&T acknowledges that it is responsible for the BB&T Accounts and liable to the Debtor for the deposit balances.[3] BB&T has consistently recognized the Debtor as its account depositor and pays insurance premiums to the  Federal Deposit Insurance Corporation, in its corporate capacity, to insure the BB&T Accounts.[4] BB&T, as the depository institution, asserts a lien upon the deposit accounts, which it asserts is *perfected by*

---

[3]  Thomas Brent Hicks, the senior vice-president at BB&T, testified at deposition that the deposits were assumed by BB&T, are maintained on BB&T's depository platform, are BB&T deposits, and are a responsibility to the Debtor for which BB&T is liable. (J.A. at 373; 359;360;364-65 (Hicks tr at79:8-13; 24:21-25:5; 27:18-28:6;45:20-46:8)).

[4]  J.A. at 362-63 (Hicks tr. 34-38).

*control* through its possession of the account deposits.[5]  BB&T, however, does not assert any lien against the $5.4 million in the Debtor's Operating Account at BB&T.

Since the inception of the Debtor's Chapter 11 case on August 25, 2009, the FDIC-Receiver has instructed BB&T, pursuant to powers that the FDIC-Receiver claims to have under the P&A Agreement, to dishonor all requests of the Debtor to withdraw funds from the BB&T Accounts unless expressly consented to by the FDIC-Receiver.  The Debtor is not a party to the P&A Agreement.

### B.      The FDIC-Receiver's Stay Relief Motion

On September 27, 2010, the FDIC-Receiver filed its motion for relief from the automatic stay (the "Renewed Stay Relief Motion") seeking authority to take actions that, if allowed to occur, would have enabled it to establish post-petition setoff rights against all of the BB&T Accounts.  The FDIC-Receiver characterized its requested relief as leave to offset the BB&T Accounts against obligations allegedly owed to it by the Debtor.  However, the real thrust of the Renewed Stay Relief Motion was an effort by the FDIC-Receiver to put itself in the position of having a right of setoff, as all of the BB&T Accounts and the deposit balances had been transferred to BB&T prior to the Debtor's bankruptcy.

On January 24, 2011, the bankruptcy court entered an order denying the relief requested in the Renewed Stay Relief Motion [Bankr. Doc. No. 1051].[6]  The next day, the bankruptcy court

---

[5]  BB&T's Brief at Doc 25, pdf page 6, para 2

[6]  Never in the long history of the law of setoff has an entity in this situation been recognized in a reported case to have a right of setoff, and the FDIC-Receiver cites no authority to support such a novel proposition.  The FDIC-Receiver's repeated citations to the Supreme Court's ruling in Citizens Bank of Maryland v. Strumpf, 516 U.S. 16 (1995), are wholly misplaced.  Strumpf stands for the proposition that a bank with offset rights need not honor withdrawal demands of a debtor until those offset rights are determined or the bank is otherwise adequately protected.  Here, the FDIC-Receiver is not the depository bank, has no obligation to the Debtor with respect to the Debtor's deposit accounts at BB&T, and has no right of offset, as rightly determined by the bankruptcy court in its opinion [Bankr. Doc. No. 1050].

entered an order granting the Debtor's motion to use the balances in its Operating Account [Doc. No. 1053]. The foregoing orders are the subject of appeals, and they are referred to herein as the "Appealed Orders."

### C. Debtor's Actions After Entry of Appealed Orders

On January 25, 2011, the day after the denial of the Renewed Stay Relief Motion, the Debtor's Chief Recovery Officer (and now the plan trustee under the Debtor's plan of liquidation) directed BB&T to transfer the balances in the Debtor's operating account to the Debtor's bank account at Regions Bank. Contrary to the FDIC-Receiver's attempt to characterize these actions as nefarious, this request was a proper exercise of the Debtor's rights under the Appealed Orders and its fiduciary duties to secure possession of funds judicially determined to belong to its estate.

### D. Disposition of the FDIC-Receiver's First Stay Request

On January 25, 2011, the FDIC-Receiver filed a notice of appeal from the Appealed Orders and requested the bankruptcy court to stay them [Bankr. Doc. No. 1057]. The Debtor objected to the FDIC-Receiver's stay request [Bankr. Doc. No. 1060]. After several telephonic hearings before the bankruptcy court and negotiations between counsel, the parties submitted a proposed form of order *disposing* of (and not granting, as the FDIC-Receiver contends) the FDIC-Receiver's request for a stay pending appeal (the "Agreed Cash Use Order").[7]

The Agreed Cash Use Order authorized the Debtor to withdraw up to $7 million from its Operating Account to pay "administrative expenses" pending this Court's ruling on the Appealed

---

[7] In remarkable revisionist history, the FDIC-Receiver contends in the present Stay Motion that following the entry of the Appealed Orders it filed an "emergency motion in the bankruptcy court for a stay pending appeal, and that motion was *granted* by the bankruptcy court in an agreed order." [Doc. No. 47-1 at 2 (emphasis added). See also Doc. No. 47-1 at 5 (". . . the FDIC-Receiver first sought the relief requested herein from the bankruptcy court, which granted the FDIC-Receiver's motion for a stay pending appeal in an agreed order. . . ")]. The bankruptcy court did not grant that motion, much less make any factual findings about the factors necessary for a stay pending appeal. In entering the Agreed Cash Use Order, the bankruptcy court simply resolved a dispute between the Debtor and the FDIC-Receiver over the Debtor's request to move its funds from BB&T to another bank.

Orders.  However, the Agreed Cash Use Order explicitly was without prejudice to the Debtor's right to seek further use of funds in the Operating Account at a later date.[8]

### E.      Operating Account Order

On November 8, 2011, the Debtor filed a motion requesting further authority to use cash in its Operating Account.  The FDIC-Receiver opposed the relief requested in that motion.[9] After an evidentiary hearing before the bankruptcy court on November 29, 2011, the bankruptcy court granted the Debtor's motion and denied the FDIC-Receiver's objection.

In its Stay Motion, the FDIC-Receiver is critical of the Debtor for allegedly not adducing any evidence at the hearing.  However, it is the FDIC-Receiver that had the burden of proof and failed to call a single witness (other than to cross-examine the Debtor's plan trustee) in response to the Debtor's evidence of its critical need to use cash in the administration of this case.

---

[8] The Agreed Cash Use Order provided in paragraph 3 as follows:

> Subject to the limitations provided in this Order, the Debtor shall be authorized to use the balance in its Operating Account to pay any and all Administrative Expenses (as hereinafter defined) that have heretofore been incurred or are hereafter incurred; provided, however, that during the period (the "<u>First Appeal Period</u>") from the date of entry of this Order to the date of entry of an order entered by the United States District Court for the Middle District of Alabama affirming, reversing or otherwise modifying any of the Appealed Orders, the aggregate amount of balances in the Operating Account that may be withdrawn by the Debtor shall be limited to $7 million **unless and to the extent otherwise ordered by this Court after notice and a hearing**.  (Emphasis added).

Paragraph 10 of the Agreed Cash Use Order provided as follows:

> Nothing in this Order shall prohibit the Debtor, or **any successor to** or representative of the Debtor under any confirmed plan of liquidation or reorganization in this Chapter 11 case, from **requesting entry of an order by this Court, after notice and a hearing, allowing the use of any balances in the Operating Account** or in any of the Other Depository Accounts in order to compromise or otherwise settle any asserted lien, right of offset or other claim to any of such balances (including, without limitation, any asserted lien, right of offset or other claim of the State of Alabama Department of Revenue, BB&T or the FDIC-Receiver) or **to implement the terms of any confirmed plan of liquidation or reorganization in this Chapter 11 case**; or prohibit the FDIC-Receiver or BB&T from opposing the entry of any such order.  (Emphasis added).

[9] The FDIC-Receiver also couched its objection as a motion to "enforce" an order agreed to by the parties and entered by the bankruptcy court.  The bankruptcy court denied this motion in its ruling that the FDIC-Receiver now seeks to stay.  For the reasons explained in the text, the FDIC-Receiver's attempt to "enforce" an order that expressly contemplated the Debtor's right to revisit after notice and a hearing is simply procedural gamesmanship

Contrary to the FDIC-Receiver's depiction, the plan trustee provided at the hearing, and does so again in his supporting declaration (the "Declaration"), the following evidence: (a) the $7 million previously authorized was properly used to pay monthly expenses approved by the bankruptcy court without any opposition by the FDIC-Receiver; (b) the payments spanned much more than the 10 months argued by the FDIC-Receiver, even assuming for the sake of argument that is even relevant; (c) the Debtor now has obligations for accrued post-confirmation fees and expenses in excess of $890,000, which the FDIC-Receiver has never challenged as unreasonable or improper pursuant to procedures set forth in the Debtor's liquidation plan; (d) additional unpaid fees and expenses have accrued in excess of $430,000, as reflected in the Declaration; (e) the use of cash is critical to pursing litigation, including litigation with the FDIC-Receiver, the auditor defendants, defendants in the Chapter 5 avoidance actions, and in the claims allowance process and otherwise to implement the Plan and to administer the bankruptcy case; (f) the Debtor will need to retain experts in the area of insolvency, accounting standards and other areas of expert testimony, and retention of such experts and the commencement of such work must begin promptly; and (g) funds on hand with the Debtor are already reserved and dedicated for litigation costs that the Debtor will incur, including costs for document management and other discovery costs.

## II.  Response

### A.    Applicable Law

The Stay Motion is governed by the provisions of Bankruptcy Rule 8005, which provides in part as follows:

> A motion for a stay of the judgment, order, or decree of a bankruptcy judge, for approval of a supersedeas bond, or for other relief pending appeal must ordinarily be presented to the bankruptcy judge in the first instance.  Notwithstanding Rule 7062 but subject to the power of the district court and the bankruptcy appellate

panel reserved hereinafter, the bankruptcy judge may suspend or order the continuation of other proceedings in the case under the Code or make any other appropriate order during the pendency of an appeal on such terms as will protect the rights of all parties in interest.

FED. R. BANKR. P. 8005.

Courts have described motions for a stay pending appeal as "questions for the bankruptcy judge whose decisions should be reviewed for abuse of discretion." In re Freeman, 2010 Bankr. LEXIS 4599 (Bankr. M.D. Ala. Dec. 22, 2010) (citing Forest Oaks, LLC v. SPCP Group, LLC (In re Forest Oaks, LLC), 2010 U.S. Dist. LEXIS 45676 (S.D. Ala. May 10, 2010)). See also Blocker v. Wyatt, 2009 U.S. Dist. LEXIS 64329 (S.D. Ga. July 27, 2009) ("Where the bankruptcy court has already denied a stay under [Bankruptcy Rule] 8005, the appellate court's review is limited to a simple determination of whether the bankruptcy court abused its discretion.") (citing In re North Plaza, LLC, 395 B.R. 113, 118 (S.D. Cal. 2008)).

The imposition of a stay pending appeal is an "exceptional response granted only upon" the showing of four factors:

(1)     whether the movant is likely to prevail on the merits on appeal;

(2)     whether the movant, absent a stay, will suffer irreparable damage;

(3)     whether the adverse party will suffer substantial harm from the issuance of a stay; and

(4)     whether the public interest will be served by issuing the stay.

Garcia-Mir v. Meese, 781 F.2d 1450, 1453 (11th Cir. 1986).[10]

---

[10]   The factors used in determining whether to grant a stay pending appeal mirror those used when ruling on an application for a preliminary injunction. Hope for Families & Cmty. Serv. v. Warren, 2009 U.S. Dist. LEXIS 42131, at *14 (M.D. Ala. Apr. 21, 2009) ("[t]he traditional four factors governing injunctive relief apply to whether a movant has shown that a stay pending an appeal is warranted"); In re Gulf States Steel, 285 B.R. 739, 741 (Bankr. N.D. Ala. 2002) ("the law is clear that the standard for granting a stay pending appeal is the same as that for the grant of a preliminary injunction"). See also In re Costa & Head Land Co., 68 B.R. 296; 296 (N.D. Ala. 1986) (same four-factor test in context of injunction).

A movant's failure to satisfy any one of these four factors warrants denial of the imposition of a stay. Turner v. Citizens Nat'l Bank (In re Turner), 207 B.R. 373, 375 (2d Cir. BAP 1997) ("[f]ailure to satisfy one prong of this standard for granting a stay will doom the motion"); Jet Networks FC Holding Corp. v. Goldberg, 2009 U.S. Dist. LEXIS 53593, at *7 (S.D. Fla. June 8, 2009) (same).

While a district court reviews a bankruptcy court's legal conclusions *de novo*, In re Englander, 95 F.3d 1028, 1030 (11th Cir. 1996), it reviews factual findings for clear error, giving due regard to the bankruptcy court's opportunity to judge the credibility of witnesses. In re Gamble, 168 F.3d 442, 444 (11th Cir. 1999). A reviewing court may not make independent factual findings. Id. When district courts review the factual findings of a bankruptcy court, the burden is on the appellant (here, the FDIC-Receiver) to show that the bankruptcy court's findings are clearly erroneous. Acquisition Corp. of Am. v. Fed. Sav. & Loan Ins. Corp., 96 B.R. 380, 382 (S.D. Fla. 1988) ("A mere showing that the Bankruptcy Court should have reached another conclusion is insufficient."). A finding of fact is not clearly erroneous unless the appeals court "after reviewing all the evidence, is left with the definite and firm conviction that a mistake has been committed." IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs.), 408 F.3d 689, 698 (11th Cir. 2005) (internal citations omitted).

### B.    Application of Law to Facts

The FDIC-Receiver is unable to satisfy the requirements for the imposition of a stay of the Operating Account Order.

#### 1.    The FDIC-Receiver is Not Likely to Prevail on its Appeal.

As to the first factor, the FDIC-Receiver has little likelihood of success on the merits. The Debtor is entitled to unfettered access and use of cash in its Operating Account, subject only

to valid rights of offset under Section 553 of the Bankruptcy Code.   BB&T, in turn, has a direct and unqualified obligation to the Debtor to disburse such funds to the Debtor on demand.

The FDIC-Receiver has no valid right of offset.  It is not the depository bank, is not liable to the Debtor in respect of the accounts, does not hold the deposit balances, and has no basis to direct BB&T to dishonor the Debtor's (BB&T's customer's) withdrawal requests.  This is true regardless of whatever priority claims that the FDIC-Receiver asserts it may have against the Debtor.  The two are separate and distinct for purposes of the analysis of the Debtor's right to access balances in the Operating Account.

The bankruptcy court in a well-reasoned opinion on the Renewed Stay Relief Motion rejected the FDIC-Receiver's arguments that it had a right of setoff against bank accounts it does not have and deposit balances it does not possess.  The FDIC-Receiver has not advanced any colorable basis for the establishment of a *prima facie* case it has any such setoff rights with respect to deposit balances in bank accounts transferred to and maintained at BB&T.

Indeed, the FDIC-Receiver is not requesting relief from the automatic stay **to exercise an existing right of setoff**.  Instead, it has asked for relief from stay **to take actions to establish a right of setoff** -- that is, to manufacture post-petition a right of setoff that does not currently exist.  The actions that the FDIC-Receiver seeks stay relief to implement consist of requiring BB&T, pursuant to the P&A Agreement, to transfer the Debtor's bank accounts to the FDIC-Receiver together with cash in the amount of the associated deposit balances.[11]

---

[11] The FDIC-Receiver, however, says in its briefs that it will yield to BB&T's exercise of its asserted lien and setoff rights with respect to those accounts (other than the Operating Account to which BB&T lays no claim), rights that are the subject of a separate adversary proceeding before this Court.  Thereafter, when BB&T has satisfied its claims (or been found by the Court to have no right to do so), the FDIC-Receiver will seek to exercise setoff rights that are not choate until BB&T retransfers to the FDIC-Receiver the accounts and remaining deposit balances.

"Cause" for stay relief under Section 362 of the Bankruptcy Code has never been found to exist for the purpose of allowing a creditor to create a post-petition right of setoff.  It would be tantamount to allowing a creditor after bankruptcy to file an unrecorded mortgage or UCC financing statement to perfect a pre-petition lien.  Such post-petition action to improve one's position is antithetical to the bankruptcy process and the goal of equality of distribution.

However, even if "cause" existed for relief from the stay to allow such action, it still would not achieve the FDIC-Receiver's desired result.  Any post-petition action by the FDIC-Receiver would, at best, only create a ***new*** post-petition obligation, not an ***old*** pre-petition obligation that could be used for setoff in accordance with Section 553 of the Bankruptcy Code. The FDIC-Receiver cannot wish away this fact through self-serving provisions in its P&A Agreement to which the Debtor is not a party, but which the FDIC-Receiver asserts empowers it to claw back from BB&T the account obligations and deposit balances.  Since before the bankruptcy filing, BB&T has been, and remains, the Debtor's depository bank and the holder of the Debtor's deposits, and no purported right to claw back those balances under the P&A Agreement has been exercised.  Any post-petition transfer to the FDIC-Receiver now creates a new obligation that cannot create a post-petition offset right given the lack of mutuality between a new post-petition obligation and the old pre-petition debt alleged to be owed by the Debtor to the FDIC-Receiver.

This significant hole in the FDIC-Receiver's position is why it now argues, for the first time on appeal, that the BB&T Accounts (and associated liability for them) were only "delegated" to BB&T and that the FDIC-Receiver remains obligated on the accounts.  This new argument, however, is at odds with the conduct of its receivership, in which the FDIC-Receiver disallowed the Debtor's receivership claim and denied the existence of any liability to the Debtor.

This denial wholly contradicts its newly-concocted argument that it has always remained liable on the BB&T Accounts.  Furthermore, even if FDIC-Receiver did (and could) retain the obligation, it does not have the deposit balances. A setoff of an obligation allegedly owed by the FDIC-Receiver to the Debtor without the deposit balances in hand is a setoff with little benefit. It is not surprising, then, that the FDIC-Receiver seeks leave to claw back from BB&T both the deposit obligations to the Debtor and the deposit balances.

No matter what the FDIC-Receiver states its rights and obligations are *vis-a-vis* the Debtor, such rights do not alter BB&T's obligation to the Debtor.  BB&T, as the Debtor's depository bank since prior to bankruptcy, has a direct obligation to the Debtor and owes the Debtor the amount of the deposit balances in the Operating Account.  Although federal banking law empowers the FDIC-Receiver to assign to BB&T the Debtor's deposit accounts that were maintained at Colonial Bank, the FDIC-Receiver may not unilaterally discharge BB&T of its obligations to the Debtor with respect to the BB&T Accounts by calling them back, post-petition under a contract to which the Debtor is not a party.

### 2. The FDIC-Receiver Has Not Shown Irreparable Harm Absent a Stay.

To satisfy the second factor, the FDIC-Receiver must show that it will suffer irreparable harm in the absence of a stay.  Of course, if the FDIC-Receiver cannot convincingly demonstrate that it has a likelihood of success on the merits on appeal, it follows that it cannot demonstrate that it will suffer irreparable harm.

Even assuming that the FDIC-Receiver has a colorable basis for asserting any interest in the Operating Account, the FDIC-Receiver's interest is adequately protected by the Debtor's grant of a replacement lien for any alleged diminution in value, a factor cited by the bankruptcy court.  While the FDIC-Receiver denigrates the replacement lien, its position cannot be squared with the manner in which it touts the eventual receipt of funds by the Debtor as reason for

delaying the Debtor's use of the cash in the Operating Account.  The FDIC-Receiver points to both the Debtor's imminent receipt of the net sale proceeds from the sale of certain real property ("$650,000 from the sale of certain real property" Stay Brief at 12-13) and an ultimate settlement of the Debtor's claim in the Lehman Brothers bankruptcy case ("an asset that could be worth more than $2 million" Stay Brief at 13).  If the FDIC-Receiver is so confident that these funds will be available to the Debtor, then they will be equally available to the FDIC-Receiver's adequate protection replacement lien.  In addition to those funds about which the FDIC-Receiver expresses optimism, the Debtor has pending avoidance and other third party claims, such as the director and officer claims and the auditor claim that seeks recovery for an amount in excess of $500 million.

It is important to note that under Operating Account Order the Debtor is only authorized to use the deposit balance in the Operating Account for purpose of paying "Administrative Expenses."  These expenses are payable prior to any payments to either unsecured creditors or any priority claim, including the FDIC-Receiver's asserted priority claim arising under Sections 365(o) and 507(b)(9) of the Bankruptcy Code (assuming such a claim existed).  Therefore, the use of funds comports with the natural priority of administrative claims, and this limitation on use further protects the interests, no matter how speculative, of the FDIC-Receiver.

     3.      <u>The FDIC-Receiver Has Not Shown Absence of Harm to Debtor by a Stay</u>.

Turning to the third factor, which focuses upon whether the Debtor will suffer substantial harm from the issuance of a stay, it is clear that the harm of a stay to the Debtor would be substantial.

The Debtor seeks to use the cash in the Operating Account to administer its bankruptcy case and to pursue and defend against claims under its liquidation plan.  Cash is the life blood of any case, without which the debtor is rendered impotent.  This is particularly true in the present

case where the lion's share of activity involves the recovery of assets, pursuit of third party claims, and scrutiny of claims made against the Debtor's estate.[12]   The prime objective of this activity is to achieve a return for the Debtor's legitimate creditors, whose claims total at least $500 million and consist of claims of employees, debenture holders, the Pension Benefit Guaranty Fund, taxing authorities and various vendors.   At this juncture, this objective is achieved through the confirmed plan of liquidation, which sets forth the ground rules for the liquidation process.   No legitimate argument can be made that the use of cash in accordance with the confirmed plan is improper.[13]

---

[12] The bankruptcy court aptly describes the position the Debtor is currently in as it attempts to carry out its fiduciary duties to maximize the value of its bankruptcy estate for the benefit of its creditors:

> Unlike many, or perhaps most, chapter 11 debtors, where the debtor is an operating concern with a stream of income, the instant debtor is not reorganizing but liquidating in chapter 11.  Though the debtor has some hard assets, the overwhelming bulk of its assets exist in the form of causes of action.  Therefore, from its inception, the primary thrust of this case has been the prosecution of claims – claims such as malpractice claims against the debtor's accountants, substantial tax refund claims, claims against the FDIC-Receiver, preference claims against prior attorneys, fraudulent conveyance claims, and more.  The debtor values these claims in the hundreds of millions of dollars.

> Prosecution of these claims requires considerable professional fees and expenses.  While the court shares the FDIC's concern with regard to the amount of professional fees in this case, the fees are a small percentage of the purported value of the claims.

> The debtor has been actively prosecuting, as well as defending, claims since the inception of this case.  Many actions are underway, and the prosecution of those claims are at various stages of completion.  Most, however, have yet to be litigated.  Many have already been set for trial, and the debtor is operating under pending scheduling orders with approaching deadlines.

> To cutoff the debtor's funding at this point would harm the debtor irreparably.  It would effectively shut down and handcuff the debtor's ability to proceed in this chapter 11 case.  It would prejudice the debtor in pending litigation and jeopardize the ultimate recovery of its claims.  The FDIC has not, and cannot, show that the debtor will suffer no substantial harm from the issuance of the stay.

[Bankr. Doc. No. 1650 at 4-5].

[13] A confirmed plan is binding upon a bankrupt debtor and its creditors.  See 11 U.S.C. § 1141(a) ("[T]he provisions of a confirmed plan bind the debtor. . .  and any creditor, . . . whether or not the claim or interest of such creditor. . . is impaired under the plan and whether or not such creditor. . . has accepted the plan."); Sirius Computer Solutions, Inc. v. AASI Creditor Liquidating Trust, 2011 U.S. Dist. LEXIS 96460, slip op. at 9-10 (S.D. Fla. Aug. 26, 2011) (It is well-settled that a Chapter 11 plan . . . binds both the debtor and creditor"); In re Newman, 399 B.R. 541, 546 (Bankr. M.D. Fla. 2008) ("Generally, the entry of an order confirming a Chapter 11 plan binds the debtor and all creditors of the debtor. . . ."); In re Victory Markets, Inc., 221 B.R. 298, 303 (2d Cir. BAP 1998) ("[A] confirmed

The Debtor's ability to prosecute this case and implement its confirmed plan, all the while defending multiple levels of attacks by the FDIC-Receiver through contested matters and related appeals, will continue to require resources. The Debtor is engaged in active litigation with the FDIC-Receiver, including two appeals to this Court and the FIRREA litigation, which is the subject of cross motions for summary judgment to be argued to the Court on January 20, 2012. The Debtor is actively engaged in settlement discussions regarding claims covered by its D&O insurance, prosecuting claim for refunds of federal taxes in the approximate amount of $250 million, dealing with claims under its $25 million fidelity bond, investigating potential claims against third parties that arise out of or relate to transactions entered into by the Debtor prior to the commencement of this bankruptcy case and that implicate as much as $350 million in potential (albeit disputed) asset recoveries, as well as fulfilling its other duties under the plan.

As previously noted, the Debtor does not have sufficient cash on hand to satisfy the amount of unpaid (but bankruptcy court approved) legal fees and expenses of the Debtor's professionals and other ongoing administrative expenses. The imposition of a stay could very well bring to a halt (or at a minimum, seriously delay) the ongoing efforts to pursue the claims and claim objections in accordance with the plan.

    4.    <u>Public Policy Is Not Served By Issuance Of A Stay</u>.

As for the fourth factor regarding any public interest to be served by issuance of a stay, the Debtor is unaware of any public policy that would be implicated by the Operating Account

---

plan holds the status of a binding contract as between the debtor and its creditors."); <u>In re Commercial Millwright Serv. Corp.</u>, 245 B.R. 585, 590 (Bankr. N.D. Iowa 1998) ("Upon confirmation of the plan, all prior obligations and rights of the parties are extinguished and replaced by the plan."). <u>See also Wilson Refining LP v. Notre Dame Investors, Inc. (In re In re Notre Dame Investors, Inc.)</u>, 306 Fed. Appx. 62, 64 (5th Cir. 2009) (noting that a confirmed plan is "final and binding against all creditors" and that a bankruptcy court's confirmation order is a final judgment for purposes of res judicata). Here, there is no question that the FDIC-Receiver is bound by the Plan. The FDIC-Receiver withdrew its objection to the Plan, allowed it to be confirmed, and did not appeal the confirmation order.[13] Therefore, use of cash in accordance with the Plan is beyond reproach.

Order or the imposition of a stay.  The granting of the FDIC-Receiver's requested stay would simply continue to deprive the Debtor of use of deposit balances that it admittedly owns and are vital to the conduct of the case.

### Conclusion

For the foregoing reasons, a stay of the Operating Account Order is neither warranted or justified under applicable law, and the FDIC-Receiver's Stay Motion should therefore be denied.

DATED:  December 12, 2011

Respectfully submitted,

/s/ Rufus T. Dorsey, IV
C. Edward Dobbs
Rufus T. Dorsey, IV
J. David Freedman
**PARKER, HUDSON, RAINER & DOBBS LLP**
1500 Marquis Two Tower
285 Peachtree Center Avenue, N.E.
Atlanta, Georgia  30303
Telephone:  404-523-5300
Facsimile:  404-522-8409

*Attorney to the Debtor*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was electronically served on December 12, 2011, by transmission of Notices of Electronic Filing generated by CM/ECF to persons registered as of issuance of filing, addressed as follows:

John J. Clarke, Jr. (john.clarke@dlapiper.com)

Mark D. Griffin (mark.griffin@revenue.alabama.gov)

Michael A. Fritz, Sr. (bankruptcy@fritzandhughes.com)

N. Christian Glenos (cglenos@ba-boult.com)

Spencer D. Stiefel  (spencer.stiefel@dlapiper.com)

T. Parker Griffin, Jr. (pgriffin@babc.com)

Thomas R. Califano (thomas.califano@dlapiper.com)


/s/ Rufus T. Dorsey, IV
Rufus T. Dorsey, IV

*Attorney for the Debtor*