IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| IN RE THE COLONIAL BANCGROUP, INC., | ) ) ) | |
| Debtor. | ) | |
| | | |
| FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Colonial Bank, | ) ) ) ) | |
| Appellant, | ) | |
| v. | ) ) | CIVIL ACTION NO. 2:11cv133 (WO) |
| THE COLONIAL BANCGROUP, INC., et al., | ) ) ) | |
| Appellees, | ) | |

OPINION

Appellant Federal Deposit Insurance Corporation ("FDIC"), in its capacity as receiver for Colonial Bank, appeals two decisions of the Bankruptcy Court of the Middle District of Alabama, entered on January 24 and 25, 2011, based on a finding that the FDIC-Receiver may not exercise setoff rights in six demand-deposit accounts owned by appellee Colonial BancGroup, Inc., the

bankruptcy debtor, and transferred by the FDIC-Receiver to appellee Branch Banking and Trust Company ("BB&T"). The January 24 decision denied the receiver's motion for relief from automatic stay, and the January 25 one granted BancGroup's motion to use cash in one of these accounts to pay BancGroup's operating expenses and the fees and expenses of professionals. The jurisdiction of this court is invoked pursuant to 28 U.S.C. § 158. For the reasons that follow, the bankruptcy court's decisions will be vacated.

## I. STANDARD OF REVIEW

On appeal from the bankruptcy court, the district court functions as an appellate court in reviewing the bankruptcy court's decision. See Enron Corp. v. The New Power Co. (In re New Power Co.), 438 F.3d 1113, 1117 (11th Cir. 2006). In this capacity, the district court reviews the bankruptcy court's conclusions of law de novo and factual findings for clear error. Id.

## II. BACKGROUND

Colonial Bank was the largest bank to fail in 2009, and the FDIC estimates that the failure of the bank and its holding company BancGroup will cost the FDIC and American taxpayers approximately $ 5 billion. BancGroup's principal place of business was in Montgomery, Alabama, and its principal operating subsidy was, at 99.3 % of its consolidated assets, Colonial Bank.

On August 14, 2009, Colonial Bank was closed by its state regulatory authorities, and the FDIC was appointed its receiver. With this appointment, the FDIC-Receiver succeeded by operation of law to "all rights, titles, powers, and privileges of" the bank. 12 U.S.C. § 1821(d)(2)(A)(i). That same day, the FDIC-Receiver entered into a purchase and assumption agreement ("P&A Agreement") with the FDIC (in its corporate capacity) and BB&T. Pursuant to the P&A Agreement, the FDIC-Receiver transferred nearly all of Colonial Bank's assets to BB&T. Among these assets were six demand-deposit accounts owned

by BancGroup, with the largest being BancGroup's so-called "operating account."   On August 17, the first business day following the bank's shut-down, the FDIC-Receiver placed an administrative hold on all six accounts.

On August 25, just eleven days after Colonial Bank failed, BancGroup filed a voluntary petition for Chapter 11 bankruptcy.   In addition to the administrative hold the FDIC-Receiver had already entered, an automatic stay was placed on the demand-deposit accounts.   See 11 U.S.C. § 362(a).  As of the petition date, the holding company's deposit accounts totaled approximately $ 38.41 million, and the "operating" account, in particular, had a balance of approximately $ 14.38 million.

On October 5, 2009, the FDIC-Receiver filed a motion seeking relief from the automatic stay, see 11 U.S.C. § 362(d), so as to exercise rights against the deposit balances in these accounts pursuant to 11 U.S.C. § 365(o).   The bankruptcy court denied the motion on

4

August 31, 2010, <u>In Re Colonial BancGroup, Inc.</u>, 436 B.R. 713 (2010) (Williams, B.J.), and the FDIC-Receiver's appeal of that order is pending before this court in a separate action.  <u>FDIC v. The Colonial BancGroup, Inc.</u>, 2:10cv877 (M.D. Ala.) (Thompson, J.).

In the meantime, the FDIC-Receiver filed a proof of claim against BancGroup on November 30, 2009, and that matter remains pending before this court.  <u>In re The Colonial BancGroup, Inc</u>, 10cv409 (M.D. Ala.) (Thompson, J.).  The rights asserted in the FDIC-Receiver's proof of claim form the basis for its second, and currently pending before this court, motion for relief from the automatic stay, which was submitted in September of 2010. Though the amount of the FDIC-Receiver's claim far exceeds the aggregate deposit balances of all of the accounts, BB&T did not object to the FDIC-Receiver's motion because it was limited to the portion of the deposit balances that are not needed to pay BB&T's security claim (which, by agreement, is in the other

accounts and not the operating account at issue here, <u>see</u> BB&T Br. 3 (Doc. No. 25, at 6)).  The FDIC-Receiver seeks to setoff the amount in the operating account and whatever money, if any, would be left-over in the case that BB&T is over-secured by the balances in the other accounts.  In response, BancGroup sought to use deposit balances in the operating account to pay administrative expenses, which the FDIC-Receiver opposed.

On January 24, 2011, the bankruptcy court denied the FDIC-Receiver's second motion for relief and held that the receiver did not have a right to setoff BancGroup's debts with the deposit accounts because the receiver lost the "mutuality" required to have a setoff once it transferred BancGroup's accounts to BB&T.  Further, the bankruptcy court found that any attempt to get that money back, through provisions of the P&A Agreement, would constitute a post-petition incurrence of liability and be therefore ineligible for setoff.  <u>In re The Colonial BancGroup, Inc.</u>, 2011 WL 239201 (Bankr. M.D. Ala. Jan. 24, 2011)

6

(Williams, B.J.).  The next day, on January 25, the
bankruptcy court granted BancGroup's motion "to use cash
in [BancGroup]'s operating account to pay [BancGroup]'s
operating expenses and the fees and expenses of
professionals."  Cash Collateral Order (Doc. No. 2-51).

The bankruptcy court briefly reasoned that, by its
January 24 decision, it had "held that the FDIC has no
right to offset the funds in the account."  Id.

The FDIC-Receiver has now appealed from the
bankruptcy court's January 24 and 25 decisions.


## III. DISCUSSION

As a prelude, it should be remembered that this
appeal of the bankruptcy court's January 24 and 25
decisions addresses the FDIC-Receiver's right of setoff,
not whether the receiver is actually entitled to setoff.

The Bankruptcy Code preserves the right of setoff for
mutual debts incurred before the bankruptcy petition was
filed.  "Setoff is an established creditor's right to

cancel out mutual debts against one another in full or in part," the purpose of which is to avoid "'the absurdity of making A pay B when B owes A.'" <u>B.F. Goodrich Emps. Fed. Credit Union v. Patterson (In re Patterson)</u>, 967 F.2d 505, 508 (11th Cir. 1992) (quoting <u>Studley v. Boylston Nat'l Bank</u>, 229 U.S. 523, 528 (1913)); <u>see also</u> <u>Dzikowski v. No. Trust Bank of Fla., N.A. (In re Prudential of Fla. Leasing, Inc.)</u>, 478 F.3d 1291, 1297 (11th Cir. 2007). 11 U.S.C. § 553 provides that bankruptcy does not "affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under [the Bankruptcy Code] against a claim of such creditor against the debtor that arose before the commencement of the case."  Therefore, a setoff in a bankruptcy proceeding "requires that the obligation between the debtor and creditor arose before filing the bankruptcy petition and that mutuality of obligation exists." <u>Patterson</u>, 967 F.2d at 509.

8

However, while § 553 preserves a right to setoff, it does not create that right.  See Citizens Bank of Md. v. Strumpf, 516 U.S. 16, 19-20 (1995); Patterson, 967 F.2d at 509.  A right to setoff must be found in another substantive area of law.  While state law is frequently the source of a right to offset, Prudential of Florida, 478 F.3d at 1297; see also, e.g., Woodrum v. Ford Motor Credit Co. (In re Dillard Ford, Inc). 940 F.2d 1507, 1512 (11th Cir. 1991), the right may also be found in federal law.  See, e.g., STM Microelectronics, N.V. v. Credit Suisse Securities (USA) LLC, 648 F.3d 68, 82 (2d Cir. 2011); Prudential of Florida, 478 F.3d at 1300.

Here, the FDIC-Receiver points to federal law, 12 U.S.C. § 1822(d), where Congress has determined that the FDIC is empowered to offset mutual debts.[1]  Specifically,

---

1.  The FDIC-Receiver asserts a right to setoff under Alabama law, but the court need not reach this source of law to resolve this case.  In addition, it appears that Alabama law would permit setoff where there is no mutual debt, see Winecoff v. Compass Bank, 876 So.2d 1145, 1151 (Ala. Civ. App. 2003), which goes beyond the ambit of § 553.

under § 1822(d), the FDIC may "withhold payment of such portion of the insured deposit of any depositor in a depository institution in default as may be required to provide for the payment of any liability of such depositor to the depository institution in default or its receiver, which is not offset against a claim due from such depository institution, pending the determination and payment of such liability by such depositor or any other person liable therefor." 12 U.S.C. § 1822(d). As other courts have acknowledged, this statute "has been found to create a federal statutory right to setoff." Villafañe Neris v. Citibank, N.A., 845 F. Supp. 930, 934 (D.P.R. 1994) (Fuste, J.); see also Abrams v. FDIC, 944 F.2d 307, 311 (6th Cir. 1991) (treating § 1822(d) as a right to setoff); Northern Trust Co. V. FDIC, 619 F. Supp. 1340, 1342 (W.D. Okla. 1985) (Russell, J.) ("Setoffs by the FDIC as Receiver are specifically authorized by ... 12 U.S.C. § 1822(d).").

Section 1822(d) does not add substantive criteria to those necessary for offset already embodied in § 553. Here, that means the court must inquire whether (1) there are mutual debts between the FDIC-Receiver and BancGroup, and (2) if they arose before the filing of the bankruptcy petition.  Dillard Ford, 940 F.2d at 1512.[2]

## A. Mutuality

Essential to setoff, and a prerequisite to a claim under § 553, is that liabilities be "mutual": A owes B and B owes A.  Prudential of Florida, 478 F.3d at 1297, 1299. Therefore, as a general matter, it is well-settled that debts are considered mutual when they are between the same parties acting in the same capacity.  See, e.g., Westinghouse Credit Corp. v. D'Urso, 278 F.3d 138, 149 (2d Cir. 2002).

---

2.  There are exceptions to the right of setoff in § 553, see Dillard Ford, 940 F.2d at 1513, but those exceptions, to the extent applicable (if at all), are not before the court.

With bank accounts, establishment of mutuality is straightforward, though counterintuitive.  As a bank-account holder may be shocked to learn, a bank account does not actually consist "of money belonging to the depositor and held by the bank."  Strumpf, 516 U.S. at 21. Instead, a bank account "consists of nothing more or less than a promise to pay, from the bank to the depositor," id., and the "relationship of bank and depositor is that of debtor and creditor, founded upon contract."  Bank of Marin v. England, 385 U.S. 99, 101 (1966); see also Parker v. Community First Bank (In re Bakersfield Westar Ambulance, Inc.), 123 F.3d 1243, 1246 (9th Cir. 1997). Therefore, the deposit of cash into a bank account creates nothing other than a debtor-creditor relationship, with the bank as debtor and the depositor as creditor.  As a consequence, "[o]rdinarily, funds in a general deposit account can be used to setoff debts owed to the bank." Official Committee of Unsecured Creditors v. Manufacturers & Traders Trust Co. (In re Bennett Funding Group, Inc.), 146 F.3d 136, 139 (2d Cir. 1998).

12

It is undisputed that, as receiver for Colonial, the FDIC had a mutual debt with BancGroup before it entered into the P&A Agreement with BB&T.    Because a "debt arises" for purposes of section 553(a) at the time the obligation "comes into existence," a creditor-debtor relationship arose when BancGroup departed with its funds and placed them into the six accounts at Colonial Bank. Cf. Bennett Funding, 146 F.3d at 139; Cooper-Jarrett, Inc. v. Cent. Transp., Inc., 726 F.2d 93, 96 (3d Cir. 1984)). The rub, then, is whether anything in the P&A Agreement destroyed mutuality by extinguishing the FDIC-receiver's liability on BancGroup's deposit accounts.

The bankruptcy court concluded that the P&A Agreement extinguished the FDIC-Receiver's liability as follows: When "the FDIC was appointed as the receiver for Colonial Bank, the FDIC had liability for the debtor's accounts as fully-insured deposits.    At that time, the FDIC had a right under 12 U.S.C. § 1822(d) to offset the mutual debt. However, when BB&T assumed liability for the deposits under the P&A Agreement dated August 14,2009, mutuality

13

ceased to exist." <u>In re The Colonial BancGroup, Inc.</u>, 2011 WL 239201, at *8.  The bankruptcy court appears to have viewed the issue of mutuality to turn on whether BB&T was liable on the transferred accounts.  <u>See</u> <u>id</u>. at *9 ("Because BB&T and not the FDIC is liable for the amount of the debtor's deposits, the deposits cannot serve as a basis for setoff by the FDIC under 11 U.S.C. § 553.").  As this court will explain, the issue is instead, simply put, whether the FDIC-Receiver is liable on the accounts despite the transfer; whether BB&T is liable, in addition to or instead, is immaterial.[3]

The court holds that, regardless of the terminology employed--whether the P&A Agreement was an "assignment," a "transfer," or a "delegation" of the account--one

_____

3.  It appears that the bankruptcy court may have improperly viewed the issue as an either-or situation: Either the FDIC-Receiver or BB&T was liable to BancGroup, with the result that if one was liable the other was not. However, the FDIC-Receiver's liability did not turn on BB&T's liability.  Indeed, it could be argued that the FDIC-Receiver and BB&T were liable together on the accounts, but that is not the issue for this court; rather the sole issue for this court is the FDIC-Receiver's liability.

14

important fact is clear: the P&A Agreement did not extinguish the FDIC-Receiver's liability in the deposit accounts to BancGroup.[4]   First and most obviously and compellingly, application of the basic principles of contract law compel the conclusion that the FDIC-Receiver's liability to BancGroup was not addressed in the agreement and could not be addressed in the agreement, for BancGroup was not a party to the agreement.   As explained, BancGroup and the FDIC-Receiver had a creditor-debtor relationship, with BancGroup as the creditor and

_____

4.   In reaching this conclusion, this court is focused on the FDIC-Receiver's right to setoff, not whether the transfer of the accounts was sufficient to create mutuality for BB&T.   While courts generally agree that assignment may create a right to offset a debt, Mayco Plastics, inc. v. TRW Vehicle Sysafety Systems, Inc. (In Re Mayco Plastics, Inc.), 389 B.R. 7, 31 (Bankr. E.D. Mich. 2008) (Shefferly, B.J.); U.S. Aeroteam, Inc. v. Delphi Auto Sys. (In re U.S. Aeroteam, Inc.), 327 B.R. 852, 865-66 (Bankr. S.D. Ohio 2005) (Walter, B.J.), not all forms of assignment create rights to setoff, which is why courts typically use the term 'may' in this context. Thus, this court's conclusion that the FDIC-Receiver did not discharge its liability does not necessarily mean that BB&T also obtained a right to setoff or, conversely, that BB&T did not obtain a right to setoff. That is a different question not before the court.

the FDIC-Receiver as the debtor.   It goes without saying
that a debtor cannot unilaterally extinguish its debt.
Therefore, the P&A Agreement could not extinguish the
FDIC-Receiver's liability to BancGroup in BancGroup's
absence and without BancGroup's agreement.

And that the P&A Agreement involved a transfer of a
debt from the creditor to another does not alter this
basic contractual principle.[5]   See, e.g., Bank of N.Y. v.

---

5. BancGroup argues that the court should treat this
argument as new on appeal.   The court disagrees.   The
contract-based argument responds to the reasoning of the
bankruptcy court, which held that the P&A Agreement
discharged the FDIC-Receiver's liability in the deposit
accounts;  in addition,  the  FDIC-Receiver  has  long
maintained that the court should look to contract
principles when addressing mutuality, which makes the
point proper for consideration.   See Yee v. City of
Escondido, 503 U.S. 519, 534 (1992) ("Once a federal
claim  is  properly  presented,  a  party  can  make  any
argument in support of that claim; parties are not
limited to the precise arguments they made below.").
But, even if viewed as 'new,' and as a new 'claim,' the
point would still be considered.   There would be no
manifest injustice from its consideration because this
argument was fully briefed in supplemental briefing, the
issue is one of law alone, and it would do substantial
injustice to ignore this point, especially in a case of
as much public importance as this one.   The argument is,
therefore, properly before the court.   See Dean Witter
(continued...)

Sunshine-Jr. Stores, Inc. (In re Sunshine Jr. Stores), Inc., 456 F.3d 1291, 1309 (11th Cir. 2006) (Under Florida contract law, "[n]ormally, an assignment involves only the assignee's acquisition of rights under a contract and not the assignor's obligations, unless it is found that the assignment was also a novation."); Fair v. NationsBanc Mortgage Corp. (In re Noletto), 280 B.R. 868, 872 (Bankr. S.D. Ala. 2001) (Mahoney, B.J.) (explaining that a "'mere assignment does not release the assignor from his or her obligations to the other party under the assigned contract'" (quoting Am. Jur. 2d, Assignments § 129 (2000)); In re Washington Capital Aviation & Leasing, 156 B.R. 167, 175 n.3 (Bankr. E.D. Va. 1993) (Tice, B.J.) (A "party subject to a contractually created obligation ordinarily cannot divest itself of liability by substituting another in its place without the consent of the party owed the duty. While the assignee may be

---

5(...continued)
Reynolds, Inc. v. Fernandez, 741 F.2d 355, 360 (11th Cir. 1984); Sundale, Ltd. v. Ocean Bank, 441 B.R. 384, 385-86 (Bankr. S.D. Fla. 2010) (Moreno, C.J.).

entitled to perform for the original obligor, the original obligor remains ultimately liable until discharged by performance or otherwise." (internal citation omitted)).[6]

----

6. BancGroup does not claim that it has provided, or that it has been given the opportunity to provide, consent to the an assignment of its accounts that would release the FDIC-Receiver from its liability in the deposit accounts. Doing so, if it had the opportunity, could have effected a novation and ended the FDIC-Receiver's liability in the deposit accounts. See Golden v. Bank of Tallassee, 639 So.2d 1366, 1369) (Ala. 1994) ("[A] novation releases the party bound by the original contract."). This is, in fact, another way mutuality might be destroyed. Once the obligor discharges the assignor, its liability, and therefore mutual obligation, ends. This has not happened here and it is unlikely that the P&A Agreement would have allowed such a discharge of liability to occur. BancGroup implicitly acknowledges as much in another contested matter pending before this court where it is pursuing a protective claim for the balances in the deposit accounts "in the event the FDIC-Receiver purports to exercise any rights it may assert" under the P&A Agreement. Amended Complaint ¶ 73, The Colonial BancGroup, Inc. v. FDIC, 10cv198 (M.D. Ala.) (Doc. No. 20, at 13).

In response, BancGroup points out that federal law gives the FDIC-Receiver the right to "transfer any asset or liability of the institution in default ... without any approval, assignment, or consent with respect to such transfer." 12 U.S.C. § 1821(d)(2)(G)(i) (emphasis added). This provision, however, does not relieve the FDIC-Receiver from its retained liability under the common law. See Waterview Mgmt. Co. v. FDIC, 105 F.3d

(continued...)

Second, even if, despite the general laws of contract, a purchase-and-assumption agreement could pursuant to federal or state law alter the FDIC-Receiver's liability to a deposit holder without that holder's consent, the language of the P&A Agreement here reflects that it was not intended to extinguish the FDIC-Receiver's liability in the deposit accounts to BancGroup. In reaching this conclusion, the court begins with a description of certain relevant provisions in the agreement:  Articles I, II, and IX.

Article I:  This article defines relevant terms and provides that "assumed deposits" simply means "deposits." P&A Agreement Art. I., at 4 (Doc. No. 3-1, at 22).  In turn, "'Deposit' means a deposit as defined in 12 U.S.C.

_____

6(...continued)
696, 698 (D.C. Cir. 1997) ("Here state law defines the scope of the pre-receivership contract asset held by the failed institution. Federal law simply provides that the [FDIC] can transfer the asset held by the failed institution without consent. State contract law thus defines the nature of the asset that federal law allows the agency to transfer without consent.").

19

Section 1813(l), including without limitation, outstanding cashier's checks and other official checks and all uncollected items included in the depositors' balances and credited on the books and records of the Failed Bank." Id. This definition is augmented as follows: "the term 'Deposit' shall not include all or any portion of those deposit balances which, in the discretion of the Receiver or the Corporation, (i) may be required to satisfy it for any liquidated or contingent liability of any depositor arising from an unauthorized or unlawful transaction, or (ii) may be needed to provide payment of any liability of any depositor to the Failed Bank or the Receiver, including the liability of any depositor as a director or officer of the Failed Bank, whether or not the amount of the liability is or can be determined as of Bank Closing." Id.

Article II: This article of the P&A Agreement sets out the liabilities assumed by BB&T, the "assuming bank." In addition to a number of liabilities not relevant here, § 2.1(a) of the P&A Agreement provides that BB&T assumes

20

liability for all "Assumed Deposits, except those Deposits specifically listed on Schedule 2.19(a); provided, that as to any Deposits of public money which are Assumed Deposits, the Assuming Bank agrees to properly secure such Deposits with such of the Assets as appropriate which, prior to Bank Closing, were pledged as security therefor by the Failed Bank, or with assets of the Assuming bank, if such securing Assets, if any, are insufficient to properly secure such Deposits." Id. at 8.  Schedule 2.19 does not list any deposits that were excluded from the initial assumption.

Article IX:  This article of the P&A Agreement describes and defines areas of "continuing cooperation" between the FDIC (in both its capacity as receiver and corporation) and BB&T.  Section 9.4 concerns a potential depositor who "does not accept the obligation of the Assuming Bank to pay any Deposit liability of the Failed Bank assumed by the Assuming Bank ... and asserts a claim against the Receiver for all or any portion of any such deposit liability."  Id. at 29.  In such a case, BB&T

21

"agrees on demand to provide the Receiver funds sufficient to pay such claim in an amount not in excess of the Deposit liability," which also discharges BB&T from "any further obligation ... to pay any such depositor the amount of such Deposit liability paid to the Receiver." Id.

Further, echoing the definition of "deposits", § 9.5 of the P&A Agreement provides for "withheld payments." This section empowers the FDIC-Receiver to engage in three actions.  First, is the actual withholding:

> "At any time, the Receiver or the Corporation may, in its discretion, determine that all or any portion of any deposit balance assumed by the Assuming Bank pursuant to this Agreement does not constitute a 'Deposit' (or otherwise, in its discretion, determine that it is the best interest of the Receiver or Corporation to withhold all or any portion of any deposit), and may direct the Assuming Bank to withhold payment of all or any portion of any such deposit balance. Upon such direction, the Assuming Bank agrees to hold such deposit and not to make any payment of such deposit balance to or on behalf of the depositor, or to itself, whether by way of transfer, set-off, or otherwise. The Assuming Bank agrees to maintain the

22

'withheld payment' status of any such
deposit balance until directed in
writing by the Receiver or the
Corporation as to its disposition."

Id. at 29-30.

Second, the FDIC-Receiver may request that the
assuming bank do more than just "hold" a withheld deposit,
it can take the additional step of requiring the funds to
be physically returned.  Section 9.5 provides that, "At
the direction of the Receiver or the Corporation, the
Assuming Bank shall return all or any portion of such
deposit balance to the Receiver or the Corporation, as
appropriate, and thereupon the Assuming Bank shall be
discharged from any further liability to such depositor
with respect to such returned deposit balance."  Id. at
30.

Third, § 9.5 provides the FDIC-Receiver with the
authority to demand money back should the assuming bank
defy its order: "The Assuming Bank shall be obligated to
reimburse the Corporation or the Receiver, as the case may
be, for the amount of any deposit balance or portion

23

thereof paid by the Assuming Bank in contravention of any previous direction to withhold payment of such deposit balance or return such deposit balance the payment of which was withheld pursuant to this Section." Id.

For a number of reasons, it is apparent from these provisions in Articles I, II, and IX that the P&A Agreement did not extinguish the FDIC-Receiver's liability to BancGroup. For one, the definition of "deposits" expressly excludes any deposit balances that, "in the discretion of the Receiver or the Corporation, (i) may be required to satisfy it for any liquidated or contingent liability arising from an unauthorized or unlawful transaction, or (ii) may be needed to provide payment of any liability of any depositor to the Failed Bank or the Receiver." Id. at 30. The fact that the FDIC-Receiver retained the right, as a matter of discretion, to determine that, though physically transferred, BB&T would be prohibited from treating certain accounts as "deposits" is a powerful indicium of the FDIC-Receiver's liability for these accounts.

24

Second, § 9.4 of the P&A Agreement contemplates depositors making claims against the FDIC-Receiver directly: "In the event any depositor <u>does not accept</u> the obligation of the Assuming Bank to pay any Deposit liability of the Failed Bank assumed by the Assuming Bank ... and asserts a claim against the Receiver for all or any portion of any such Deposit Liability," the assuming bank will provide funds for this claim. <u>Id</u>. at 29 (emphasis added). Though BB&T is obligated, by § 9.4, to reimburse the FDIC-Receiver for any deposit paid, the language indicates the FDIC-Receiver's liability to the original depositor has not been extinguished; the fact that a depositor can seek performance on its debt from the FDIC-Receiver and expect satisfaction demonstrates that liability for that debt has not been discharged. Section 9.4 therefore indicates that, regardless of whatever else the P&A Agreement did, it did not extinguish the FDIC-Receiver's liability on the deposit accounts transferred to BB&T.

25

Third, and perhaps most significantly, the language of the P&A Agreement indicates that the FDIC-Receiver did not just passively retain liability by remaining liable to depositors who, under § 9.4, might seek satisfaction from the FDIC-Receiver.  Instead, § 9.5 of the agreement gave the FDIC-Receiver affirmative rights over the accounts despite their physical transfer to BB&T.  As explained, the FDIC-Receiver may require BB&T to withhold payments of any account balance it deems no longer a "deposit" within the meaning of the agreement.  The fact that the FDIC-Receiver retained the option to withhold payment once it has been determined that the assets are required to cover those needed for a failing bank indicates that, at a minimum, its liability had not been extinguished through the assumption agreement here.  Yet, these affirmative rights go further: § 9.5 empowers the FDIC-Receiver actually to extinguish BB&T's obligation on any account by demanding its return, and the FDIC-Receiver may even penalize BB&T for wrongly distributing funds. Unequivocally, therefore, these provisions demonstrate

26

that the FDIC-Receiver has not been discharged of its
liability for the demand-deposit accounts.[7]

For the above reasons, the court concludes that the
transfer of BancGroup's demand-deposit accounts from the
FDIC-Receiver to BB&T pursuant to the P&A Agreement did
not destroy the mutuality between the FDIC-Receiver and
BancGroup.

---

7.  As evidence that the FDIC-Receiver discharged all
of its liabilities in these accounts, BancGroup and the
bankruptcy court point to the fact thatccounts were
listed on Schedule 2.19.  This argument, however, misses
two other important facts. First, this schedule defined
the relationship between FDIC-Receiver and BB&T, not that
between FDIC-Receiver and BancGroup.  What was included
or omitted from the schedule defined, at most, which
accounts or liabilities were assumed or not assumed
between FDIC-Receiver and BB&T.  Because the schedule was
not between FDIC-Receiver and BancGroup, it could not
extinguish the former's liability to the latter.
Moreover, though Article II of the P&A Agreement
contemplates initial liabilities definitely un-assumed by
BB&T, it does not, however, say anything about the FDIC
discharging its liability for accounts not listed on
Schedule 2.19, and subject to the definitional authority
retained in Article I and then affirmed in § 9.5.   In
other words, while the FDIC <u>could</u> have listed accounts on
this schedule, it was not <u>required</u> to do so to prevent a
discharge of its own liability for the accounts.

## B. Prepetition Liability

To be setoff under § 553, an obligation must arise before the filing of the bankruptcy petition. Cooper-Jarrett, 726 F.2d at 96. "[F]or purposes of setoff, a debt arises when all transactions necessary for liability have occurred, regardless of whether the claim was contingent when the petition was filed." In re Lehman Bros. Holdings Inc., 404 B.R. 752, 759 (Bankr. S.D. N.Y. 2009) (Peck, B.J.) (internal quotes and citation omitted). Thus, the fact that post-petition litigation determines the amount that will be due does "not affect mutuality" if "all acts giving rise to liability arose before the petition date." Id.; see also Braniff Airways, Inc. v. Exxon Co., 814 F.2d 1030, 1036 (5th Cir. 1987) ("[A] contingent claim which arises prior to the commencement of a bankruptcy case may be setoff against a pre-petition claim of the debtor's estate."); Columbia Hosp. For Women Med. Ctr., Inc. v. NCRIC, Inc. (In re columbia Hosp. For Women Med. Ctr., Inc.), ____ B.R. ____, ____, 2011 WL 4578317, at *14 (Bankr. D.D.C. Sept. 21, 2011) (Teel,

28

B.J.) (similar).  Therefore, the "general rule" is as
follows:  A "claim is eligible for setoff even though
contingent at the time of the commencement of the case,
and even though the claim remains contingent until after
confirmation of the debtor's plan. ... The fact that the
debtor's liability may not 'accrue' or become 'fixed'
until some point in the future owing to the occurrence of
some extrinsic event bearing on the debtor's liability
does not mean that the liability is not a claim.  It
simply means that the liability is a contingent claim."
5 Collier On Bankruptcy ¶ 553.03[1][h] (Alan N. Resnick
& Henry J. Sommer eds., 16th ed. 2011).

The FDIC-Receiver argues that the definition of
deposits included in the P&A Agreement, along with the
language of § 9.5 providing for withheld payments,
established a pre-petition liability in BancGroup's
demand-deposit accounts.  BancGroup counters that the
FDIC-Receiver's failure to exercise the discretion
afforded by the P&A Agreement and actually deem the
balances of its deposit accounts no longer "deposits" or

29

"assumed deposits" is dispositive.  In BancGroup's world,
the most relevant fact is that the money was held by BB&T
the day the bankruptcy petition was filed.  The bankruptcy
court reached a similar conclusion: "[E]ven if the FDIC-
Receiver implements Section 9.5 of the P&A Agreement by
requesting a return of the debtor's deposit balances, the
debt incurred thereby would constitute a post petition
debt ineligible for setoff under 11 U.S.C. § 553."  <u>In re
The Colonial BancGroup, Inc.</u>, 2011 WL 239201, at *10.

      The FDIC-Receiver has the winning argument.  First,
according to Article I of the P&A Agreement, "deposits"
do not include "all or any portion of those deposit
balances which, in the discretion of the Receiver or the
Corporation, ... may be needed to provide payment of any
liability of any depositor to the Failed Bank or the
Receiver, ... <u>whether or not the amount of the liability
is or can be determined as of Bank Closing</u>."   P&A
Agreement 4 (Doc. No. 3-1, at 22) (emphasis added).
Likewise, § 9.5 of the P&A Agreement's allowance for
"withheld payments" provides that, "[a]t any time," the

FDIC-Receiver may determine that any portion of any deposit balance is not a "deposit" and "may direct the Assuming Bank to withhold such deposit and not make any payment of such deposit balance to or on behalf of the depositor, or to itself, whether by way of transfer, set-off, or otherwise."  <u>Id</u>. at 29-30.

The rights created by these provisions were established pre-petition on August 14, 2009, when the P&A Agreement was made, even though the amount or value of those rights was not known the date the petition was filed.  Specifically, the definition of deposit describes a liability for funds "needed to provide payment of any liability of any depositor to the Failed Bank," and it provides that this sort of deposit can burdened by the FDIC "whether or not the amount of the liability is or can be determined as of Bank Closing."  While this determination might come postpetition, the amount of the claim is based upon the liability of any depositor in the failed bank, an event that was necessarily pre-petition and occurred when the depositor departed with its funds

31

and placed them in an account.  In other words, the definition of "deposits" creates a contingent liability owing to the FDIC.

Section 9.5, which concerns the deposit accounts already made, reflects a similar prepetition contingent liability on behalf of the FDIC.  The money in the deposit accounts, which is what gave rise to the liability that the FDIC-Receiver would owe by withholding payment, was deposited well before the petition date, and the fact that the actual amount the FDIC-Receiver might have a right to offset was not established at the time the petition was filed does not mean that the FDIC-Receiver has no claim.

The conclusion that the P&A Agreement sets forth a liability that can be setoff under § 553 finds further support in 12 U.S.C. § 1822(d).  This provision represents Congress's determination that the FDIC be permitted to offset debts when it acts as the receiver for a failed bank: "The [FDIC] may withhold payment of such portion of the insured deposit of any depository institution in default as may be required to provide for the payment of

32

any liability of such depository institution in default or its receiver, which is not offset against a claim due from such depository institution, <u>pending the determination and payment of such liability</u> by such depositor or any other person liable therefor. 12 U.S.C. § 1822(d) (emphasis added). The language "pending the determination and payment of such liability" makes clear that Congress recognized the liability created by the s setoff right in § 1822(d) would frequently be contingent, and the court finds it compelling that in many respects the contingent language of § 1822(d) mirrors the language of § 9.5 of the P&A Agreement. More profoundly than it did when recognizing a general right of setoff in bankruptcy proceedings under § 553, Congress has determined that a certain creditor--the FDIC--should be entitled to offset debt from the debtor's estate without proceeding as an unsecured creditor in the general bankruptcy distribution scheme.

The contingent nature of this liability is logical, if not inevitable, in the context of a purchase and

assumption of a large bank like Colonial Bank. "When a bank fails, the FDIC will generally be appointed as a receiver" and will then "determine the future course for the failed bank." FDIC v. Jenkins, 888 F.2d 1537, 1539 (11th Cir. 1989). At this point, the FDIC has two options: (1) close the bank (and engage in a "deposit payoff" or liquidation of the bank by paying depositors up to $100,000 per account out of the deposit insurance fund) or (2) a purchase-and-assumption transaction (where the FDIC "arranges for the sale of the failed bank's assets and deposit liabilities to another solvent bank"). Id. at 1540; see also, Fed. Sav. & Loan Ins. Corp. v. Falls Chase Special Taxing Dist., 983 F.2d 211, 213 (11th Cir. 1993) (describing a purchase and assumption).

For a number of reasons, a purchase and assumption is preferred. Jenkins, 888 F.2d at 1540. As happened here, the Monday after Colonial failed on a Friday, a "failed bank reopens in the solvent bank's name, and depositors are benefitted by uninterrupted banking service." Id. In addition to this benefit, the purchase and assumption

34

is preferred because completely closing bank accounts undermines public confidence in the banking system; may require depositors to wait to recover the insured portion of their funds; harms depositors with over $ 100,000 who may never recover the uninsured amounts; and it is typically much cheaper for taxpayers.

However, the advantages do not make a purchase and assumption an easy task.  To achieve these benefits, the FDIC must evaluate a failed bank's assets "'with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services.'"  Langley v. FDIC, 484 U.S. 86, 91 (1987) (quoting Gunter v. Hutcheson, 674 F.2d 862, 865 (11th Cir. 1982)); see also Villafañe Neris, 845 F. Supp. at 933 ("In order to accomplish the purchase of the failed bank by the assuming bank with as little disruption as possible, P&A Agreements are carried out with great speed, usually overnight.").  The need for speed, as it were, means that the FDIC does not have time to analyze each account fully, or make a final decision as to the

35

liabilities associated with a particular asset. <u>See</u>
<u>Jenkins</u>, 888 F.2d at 1544 (discussing the fact that the
value of potential claims that must be adjudicated "cannot
be assessed during the quick review of a failed bank's
books which occurs during a purchase and assumption
transaction"). Indeed, and in the words of the bankruptcy
court, these "exigent circumstances surrounding the
closing of a bank and the execution of a purchase and
assumption agreement" mean that there "simply is not
enough time for the FDIC to make a fully informed and
considered decisions regarding the deposits it retains."
<u>In re The Colonial BancGroup, Inc.</u>, 2011 WL 239201, at
*11.

But, as the bankruptcy court put it, provisions like
§ 9.5 "supply that needed margin of time" for the FDIC to
deal with the highly volatile nature of a bank failure.
<u>Id</u>. These provisions do so by allowing the FDIC-Receiver
to retain an interest and ultimate authority (a liability)
over the accounts, should it later be determined that the
assets are needed to offset losses of a failed bank. The

fact that provisions like § 9.5 embody this authority indicates that they create a conditional liability on the deposits transferred.  That liability is created at the moment the purchase-and-assumption agreement is entered, even if the scope of those liabilities is later determined, and even if the FDIC-Receiver does not physically retain or service the accounts.

The bankruptcy court resisted the conclusion that § 9.5 establishes contingent liability, however.  Instead, according the bankruptcy court, "[u]nfortunately for the FDIC, ... bankruptcy intervened."  Id.  The bankruptcy court read into § 9.5 a proviso to allow the FDIC-Receiver to "'unwind' the assumption of a deposit by the assuming bank," id. at *10, and the court then concluded that "the section makes clear that the liability of the assuming bank to the depositor is not discharged until the deposit balance is actually returned to the FDIC."  There are several problems with this reading of the P&A Agreement.  First, there is nothing in the language of § 9.5, expressly or implicitly, to suggest that an "unwinding"

37

is necessary; the proviso is not there, because it is unnecessary.   The unwinding proviso is a straw man. Second, the bankruptcy court misses the fact that the deposits by definition were not, if they are later determined to be needed to account for debts of the failed bank, assumed deposits, a form of contingent liability and not the creation of a new claim.

Third, § 9.5 does not require that the FDIC-Receiver actually order a return of the funds to deem a balance no longer a "deposit" within the agreement.  Instead, as with similar provisions used by its predecessor under § 1822(d), § 9.5 allows the FDIC-Receiver first to withhold payment that may be subject to offset after the claims are adjudicated.  See Gross v. Bell Savings Bank, 974 F.2d 403, 407 (3rd Cir. 1992).  Returning the funds certainly discharges the assuming bank's liability as to the bank account, but that does not mean the FDIC-Receiver had nothing before that moment; as discussed above, the FDIC-Receiver retained substantial liability for the deposit accounts.

Fourth, as explained, it is not just § 9.5 that contemplates this needed margin of time: Congress did so as well. Section 1822(d) creates a right of offset that Congress recognized would rely heavily on contingent liabilities. As a consequence, and consistent with well-established law regarding setoff, § 553 does not require that the FDIC-Receiver identify and physically retain the funds in a deposit account before a potentially failed institution files for bankruptcy because the liability created by those deposits arose the moment that the debtor departed with the funds. Bennett Funding, 146 F.3d at 139; Lehman Bros., 404 B.R. at 758. In fact, such a requirement would produce perverse incentives and possibly undermine the right of setoff in § 1822(d) by giving institutions and holding companies with banks that have been purchased and assumed an incentive to race into bankruptcy to file a petition before the FDIC (1) determines which of thousands (and potentially millions) of bank accounts will be needed to offset liabilities later and (2) has actually the money transferred back from

39

the assuming bank.  The FDIC need not engage in such a 'race, for a provision like § 9.5, which mirrors § 1822(d), provides the FDIC a pre-petition liability.

\*\*\*

The court cannot say its conclusion that the P&A Agreement did not destroy mutuality, in itself, means that the bankruptcy court erred by denying the automatic stay and by granting use of the operating account to pay BancGroup's operating expenses and fees.  These determinations are questions that belong in the bankruptcy court in the first instance.  Accordingly, the bankruptcy court's decisions of January 24 and 25, 2011, will be vacated and this case remanded to allow the bankruptcy judge to reconsider and determine how, consistent with this opinion, the case should proceed.  An appropriate judgment will be entered.

DONE, this the 4th day of January, 2012.

    /s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE