# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA

|  |  |
|---|---|
| **In re:**<br><br><br>**THE COLONIAL BANCGROUP, INC.,**<br><br>**Debtor.** |  |
| **FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Colonial Bank,**<br><br>**Appellant,**<br><br>**v.**<br><br>**THE COLONIAL BANCGROUP, INC., et al.,**<br><br>**Appellees.** | **Case No. 2:11-cv-0133 (MHT)**<br><br>**Bankruptcy Appeal** |

**BRIEF OF THE COLONIAL BANCGROUP, INC. IN SUPPORT OF ITS MOTION FOR REHEARING, PURSUANT TO BANKRUPTCY RULE 8015, OF ORDERS ENTERED JANUARY 4, 2012**

PARKER HUDSON RAINER & DOBBS LLP
C. Edward Dobbs, Esq.
Rufus T. Dorsey, IV, Esq.
J. David Freedman, Esq.
285 Peachtree Center Avenue, Suite 1500
Atlanta, GA 30303
(404) 523-5300

Attorneys for Debtor, The Colonial BancGroup, Inc.

---

**Dated: January 16, 2012**

## TABLE OF CONTENTS

I.   OVERVIEW .............................................................................................................1

II.  APPLICABLE LAW ................................................................................................2

III. BACKGROUND ......................................................................................................3

   A.  **Relevant Motions of the FDIC-Receiver and Debtor** ...............................3

      1.  The FDIC-Receiver's Original Stay Relief Motion .................................3

      2.  The FDIC-Receiver's Amended Stay Relief Motion ...............................4

      3.  The FDIC-Receiver's Renewed Stay Relief Motion ...............................5

      4.  Debtor's First Motion to Use Cash in its Operating Account ................6

   B.  **Bankruptcy Court's Orders** .......................................................................6

      1.  Bankruptcy Court Order Denying Renewed Stay Relief Motion ...........7

      2.  Bankruptcy Court's First Cash Use Order ............................................7

      3.  Bankruptcy Court's Second Cash Use Order ........................................8

   C.  **FDIC-Receiver's New Argument on Appeal** ...............................................8

   D.  **The District Court Orders and Their Effect** ..............................................9

IV.  ARGUMENT AND CITATION OF AUTHORITY ...............................................10

   A.  **Summary of Grounds for Relief** ................................................................10

   B.  **Discussion** .................................................................................................12

      1.  By Its Payment of the Insured Deposits of the Debtor at Colonial Bank, FDIC-Corporate, as Subrogee, is the Sole Party With a Claim Against Colonial Bank and its Receivership Estate With Respect to the Deposits ...........................................12

      2.  The FDIC-Receiver Has No Right of Setoff Under 12 U.S.C. § 1822(d) .................16

      3.  The FDIC-Receiver Retained No Liability to the Debtor for the Deposit Accounts After Their Transfer to BB&T ....................................17

      4.  The Court Erred in Considering the FDIC-Receiver's New Arguments on Appeal ...........................................................................20

      5.  The Existence of a Novation is a Mixed Question of Law and Fact ...........................21

6.  The FDIC-Receiver Has Not Established the Existence of a Claim............................26

7.  The Transfer of Deposit Balances of the Debtor Back to the FDIC-Receiver is Subject to the Automatic Stay.......................................................................................27

8.  The P&A Agreement Does Not Create Any Liability on the Part of the FDIC-Receiver With Respect to the Deposit Accounts ...........................................................29

**V.  SUMMARY AND CONCLUSION** ....................................................................................32

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Access Now, Inc. v. Southwest Airlines Co.,
  385 F.3d 1324 (11th Cir. 2004) ...........................................................................................21

Aronowitz v. Health-Chem Corp.,
  513 F.3d 1229 (11th Cir. 2008) ...........................................................................................22

BCORP-HRT, LLC v Lobb (In re Lobb),
  66 Fed. Appx. 164 (10th Cir. 2003).......................................................................................3

Braniff Airways, Inc. v. Exxon Co.,
  814 F.2d 1030 (5th Cir. 1987) .............................................................................................30

Callejo v. Resolution Trust Corp.,
  17 F.3d 1497 (D.C. Cir. 1994)..............................................................................................24

Citizens Bank of Maryland v. Strumpf,
  516 U.S. 16 (1995)................................................................................................................28

Corona v. Southern Guaranty Ins. Co.,
  294 Ala. 184 (Ala. 1975) .....................................................................................................14

Cuddeback v. Florida Board of Education,
  381 F.3d 1230 (11th Cir. 2004) ...........................................................................................32

Ex Parte Cassidy,
  772 So. 2d 445 (Ala. 2000)...................................................................................................14

FDIC v. Bernstein,
  944 F.2d 101 (2d Cir. 1991)..................................................................................................10

FDIC v. Iowa Growthland Fin. Corp. (In re First Nat'l Bank, N.A.),
  523 N.W.2d 591 (Iowa 1994) ..............................................................................................15

FDIC v. Sumner Financial Corp.,
  602 F.2d 670 (5th Cir. 1979) ...............................................................................................14

Fin. Sec. Assur., Inc. v. Stephens, Inc.,
  500 F.3d 1276 (11th Cir. 2007) .....................................................................................13, 23

Glen Burnie Mut. Sav. Bank v. United States,
  733 F. Supp. 2d 623 (D. Md. 2010)......................................................................................14

Golden Pac. Bancorp v. FDIC,
  375 F.3d 196 (2d Cir. 2004)............................................................................................ 14-15

In re All Media Properties, Inc.,
    5 B.R. 126 (Bankr. S.D. Tex. 1980) ....................................................31

In re Big Idea Prods., Inc.,
    372 B.R. 388 (Bankr. N.D. Ill. 2007) ..................................................14

In re Bill Heard Enters., Inc.,
    423 B.R. 771 (Bankr. N.D. Ala. 2010) .................................................14

In re BuddyUSA, Inc.,
    2010 U.S. Dist. LEXIS 38134 (N.D.N.Y Apr. 19, 2010) ........................3

In re Chalk Line Mfg,
    181 B.R. 605 (Bankr. N.D. Ala. 1995) .................................................14

In re DaRosa,
    318 B.R. 871(BAP 9th Cir. 2004) ........................................................14

In re Dow Corning Corp.,,
    250 B.R. 298 (Bankr. E.D. Mich. 2000) ...............................................13

In re Eichelberger,
    943 F.2d 536 (5th Cir. 1991) ................................................................3

In re Elmira Litho, Inc.,
    174 B.R. 892 (Bankr. S.D.N.Y. 1994) ..................................................26

In re Flamingo 55, Inc.,
    378 B.R. 893 (Bankr. D. Nev. 2007) ....................................................13

In re Hamada,
    291 F.3d 645 (9th Cir. 2002) ...........................................................13-14

In re Lehman Brothers Holdings Inc.,
    433 B.R. 101 (Bankr. S.D.NY. 2009) ..............................................31-32

In re Lehman Brothers, Inc.,
    2011 WL 4553015 (Bankr. S.D.N.Y. Oct. 4, 2011) .............................31

In re Olson,
    355 B.R. 649 (Bankr. E.D. Tenn. 2006) ...............................................13

In re SemCrude, L.P.,
    399 B.R. 388 (Bankr. D. Del. 2009) .....................................................31

Johnson v. Pruitt,
    239 Ala. 44 (Ala. 1939) .......................................................................22

Jubber v. Ruiz (In re Ruiz),
    455 B.R. 745 (B.A.P. 10th Cir. 2011) ...................................................... 28-29

La Reunion Aerienne v. Socialist People's Libyan Arab Jamahiriya,
    533 F.3d 837 (D.C. Cir. 2008) ..................................................................14

Lawson v. FDIC,
    3 F.3d 11 (1st Cir. 1993) ..........................................................................15

Lucas v. W. W. Grainger, Inc.,
    257 F.3d 1249 (11th Cir. 2001) ................................................................32

Marvin's, Inc. v. Robertson,
    608 So. 2d 391 (Ala. 1992) .......................................................................22

National Railroad Passenger Corp. v. Rountree Transport and Rigging, Inc.,
    286 F.3d 1233 (11th Cir. 2002) ................................................................32

Neumont v. Florida,
    610 F.3d 1249 (11th Cir. 2010); ...............................................................32

Std. Fire Ins. Co. v. ICA, Inc.,
    2007 U.S. Dist. LEXIS 24442 (M.D. Ala. Mar. 21, 2007) .......................22

Texas American Bancshares, Inc. v. Clarke,
    954 F.2d 329 (5th Cir. 1992) .....................................................................10

Villafane-Neriz v. FDIC,
    75 F.3d 727 (1st Cir. 1996) ........................................................................24

Waterview Mgmt. Co. v. FDIC,
    105 F.3d 696 (D.C. Cir. 1997) ............................................................. 18-19

STATUTES

11 U.S.C. § 101(5), (12) ..................................................................................30

11 U.S.C. § 553(a) ...........................................................................................15

12 U.S.C. § 1821(d)(2)(A) ...............................................................................17

12 U.S.C. § 1821(d)(2)(G)(i) ...................................................................... 18-19

12 U.S.C. § 1821(d)(11)(A) ..............................................................................15

12 U.S.C. § 1821(f) .......................................................... 12-14, 16, 19, 23-24

12 U.S.C. § 1821(g) ................................................................ 12-13, 15, 25

12 U.S.C. § 1822(d) ........................................................................................... 16-17

**OTHER AUTHORITIES**

ALA. R. CIV. PRO 17(a) ...........................................................................................14

FED. R. APP. P. 40(a) ................................................................................................3

FED. R. BANKR. P. 8015 ....................................................................................... 2-3

FDIC.gov, Loss-Share Questions and Answers,
    http://www.fdic.gov/bank/individual/failed/lossshare/ ...........................................2

MANAGAING THE CRISIS: THE FDIC AND RTC EXPERIENCE (December 1997),
    http://www.fdic.gov/bank/historical/managing/ ............................................... 13-14

Scott Pelley. CBS. *Your Bank has Failed: What Happens Next?*, available at
    http://www.cbsnews.com/stories/2009/03/06/60minutes/main4848047_page2.shtml..............2

Pursuant to Rule 8015 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), The Colonial BancGroup, Inc. (the "<u>Debtor</u>") has moved for a rehearing (the "<u>Rehearing Motion</u>") of the Court's (i) opinion (the "<u>Opinion</u>") and judgment dated January 4, 2012, vacating certain rulings of the Bankruptcy Court and remanding this case to the Bankruptcy Court for further proceedings, (ii) order dated January 4, 2012, denying the Debtor's motion to strike, and (iii) order dated January 4, 2012, preserving the status quo (the "<u>District Court Orders</u>").

## I.  OVERVIEW

The District Court Orders vacated orders of the Bankruptcy Court that (i) denied the motion of the  Federal Deposit Insurance Corporation, as receiver for Colonial Bank (the "<u>FDIC-Receiver</u>"), for relief from the automatic stay and (ii) granted the Debtor's motion to use cash in its operating account at Branch Banking & Trust Company ("<u>BB&T</u>") in order to pay certain administrative expenses of its Chapter 11 case.[1]

The issues presented on this appeal are matters of first impression, not only in this Circuit, but the entire country.  As observed by this Court, a final determination of the FDIC-Receiver's setoff rights (if any) with respect to the deposit balances of the Debtor (now totaling approximately $30 million) in accounts with BB&T is a matter of great public concern as well.

---

[1]  The District Court Orders are more fully summarized as follows:

(1) An order denying the Debtor's motion to strike the FDIC-Receiver's argument, asserted by it for the first time on appeal, that the Debtor's bank accounts were only "delegated" to BB&T [Doc. No. 56];

(2) The Opinion vacating the Bankruptcy Court's opinion and orders of January 24 and 25, 2011, and remanding this matter to the Bankruptcy Court to reconsider and determine how the case should proceed, consistent with the Opinion [Doc. No. 57];

(3) A judgment consistent with the Opinion vacating the Bankruptcy Court's decisions and remanding the case [Doc. No. 58]; and

(4) An order preserving the status quo in the Debtor's bankruptcy case just prior to entry of the Bankruptcy Court's January 24, 2011 decision denying the FDIC-Receiver relief from the automatic stay, with the Debtor having no access to its deposit accounts at BB&T until the Bankruptcy Court reconsiders its January 24 and 25 opinion and orders [Doc. No. 59].

[Opinion at 16 n.5 (stating that this case has "much public importance")].[2]  Moreover, whether the Debtor is authorized to use cash in its deposit accounts to administer its bankruptcy case and implement its confirmed liquidation plan (the "Plan") will have a material impact on the Debtor's ability to realize a return for the Debtor's creditors holding claims in excess of $400 million.[3]

## II.   APPLICABLE LAW

The Rehearing Motion is governed by Bankruptcy Rule 8015.   Entitled "Motion for Rehearing," Bankruptcy Rule 8015 reads as follows:

Unless the district court or the bankruptcy appellate panel by local rule or by court order otherwise provides, a motion for rehearing may be filed within 14 days after entry of the judgment of the district court or the bankruptcy appellate panel.  If a timely motion for rehearing is filed, the time for appeal to the court of appeals for

---

[2]  The Court appears to suggest that this case is of public importance because the FDIC-Receiver has estimated that the failure of Colonial Bank will cost "the FDIC and American taxpayers approximately $5 billion."  [Opinion at 3]. Yet, according to the FDIC, *no taxpayer dollars* have been used in winding up the affairs of Colonial Bank (or, to the Debtor's knowledge, any other bank for which the FDIC has been appointed as receiver in this financial crisis). See  FDIC.gov, Loss-Share Questions and Answers,  http://www.fdic.gov/bank/individual/lossshare/  ("Any loss sharing payments are made from receivership funds from the specific failed bank or thrift or, if those are insufficient, from the FDIC's Deposit Insurance Fund (DIF).  *The DIF is funded by assessments paid by insured banks and thrifts.  It is not taxpayer funded*.") (last updated Nov. 28, 2011) (emphasis added). See also Bair, Sheila. Interview by Scott Pelley. CBS. *Your Bank has Failed: What Happens Next?*, available at http://www.cbsnews.com/stories/2009/03/06/60minutes/main4848047_page2.shtml (reporting response of FDIC's chairman, Sheila Bair, to the question:  "When the FDIC comes in and makes depositors whole at a bank that has failed, is that tax money?"  "No. It is money from our reserves which, and we are funded by insurance premiums that are assessed on banks. So, no it's not taxpayer money.") (last updated May 31, 2009).

[3]  Exclusive of the disputed claims asserted by the FDIC-Receiver, the claims that the Debtor acknowledges to be valid and allowable total approximately $400 million.  However, there are other claims that have been asserted against the Debtor by non-governmental entities (including Bank of America, N.A.) that are disputed by the Debtor and that, if allowed over the Debtor's objection, could total in excess of $1.75 billion.

While the FDIC-Receiver has repeatedly denigrated the non-governmental claimants as undeserving, vulture funds that purchased the Debtor's debentures at a discount (all aspersions without any evidentiary support), the truth of the matter is that the creditor body of the Debtor consists of a number of bondholders who are individuals (or organizations whose investments have been made at par or approximately par), employees of Colonial Bank who have claims resulting from non-payment of amounts owed to them under the Debtor's deferred compensation plan and separation agreements, the Alabama Department of Revenue with a sizeable tax claim (although the claim is disputed), the Pension Benefit Guaranty Corporation with a significant claim (although the claim is disputed), BB&T with a claim of lien against property of the Debtor (the Debtor's deposit accounts, other than its operating account, although the lien asserted is disputed), trade creditors and Bank of America, N.A. with a claim asserted in excess of $1.75 billion (likewise disputed).

all parties shall run from the entry of the order denying rehearing or the entry of subsequent judgment.

FED. R. BANKR. P. 8015.[4]  As recently noted by the Court of Appeals for the Tenth Circuit, Bankruptcy Rule 8015 is silent as to the standard for granting a rehearing, but granting a motion for rehearing is within the discretion of this Court.  BCORP-HRT, LLC v Lobb (In re Lobb), 66 Fed. Appx. 164, 167 (10th Cir. 2003) (internal citations and quotations omitted).

Because Bankruptcy Rule 8015 does not set forth a standard for granting such motions, courts have used the standard set forth in Federal Rule of Appellate Procedure 40(a) from which Bankruptcy Rule 8015 is derived.  In re BuddyUSA, Inc., 2010 U.S. Dist. LEXIS 38134 (N.D.N.Y Apr. 19, 2010) (collecting cases).  Appellate Rule 40(a)(2) states, in relevant part, that a petition for panel rehearing "must state with particularity each point of law or fact that the petitioner believes the court has overlooked or misapprehended and must argue in support of the petition."  FED. R. APP. P. 40(a).

## III.  BACKGROUND

### A.    Relevant Motions of the FDIC-Receiver and Debtor

#### 1.    The FDIC-Receiver's Original Stay Relief Motion

On October 5, 2009, the FDIC-Receiver filed an "emergency" motion for an order modifying the automatic stay [Doc. No. 2-2] (the "Original Stay Relief Motion"), which sought relief from the automatic stay to exercise purported setoff rights against the Debtor's deposit accounts at BB&T.  In support of the Original Stay Relief Motion, the FDIC-Receiver asserted that (i) it held a perfected security interest in the Debtor's deposit accounts pursuant to a security

---

[4]  Bankruptcy Rule 8015 provides the "sole mechanism for filing a motion for rehearing" from an order of a district court sitting as a bankruptcy appellate court.  In re Eichelberger, 943 F.2d 536, 538 (5th Cir. 1991).

agreement allegedly executed by the Debtor in favor of Colonial Bank[5] and (ii) the Debtor was obligated to Colonial Bank for approximately $1 billion under an alleged capital maintenance commitment pursuant to Sections 365(o) and 507(a)(9) of the Bankruptcy Code.  The FDIC-Receiver later filed a motion under Section 365(o) of the Bankruptcy Code with the Bankruptcy Court seeking an order requiring the Debtor to "immediately cure all outstanding deficiencies under its commitment to maintain the capital of Colonial Bank" or, in the alternative, "converting the Debtor's chapter 11 bankruptcy case to a case under Chapter 7" (the "Section 365(o) Motion")  [Bankr. Doc. No. 257 at 1].

### 2.    The FDIC-Receiver's Amended Stay Relief Motion

On January 22, 2010, the FDIC-Receiver filed an "amended" motion for an order modifying the automatic stay (the "Amended Stay Relief Motion") [Doc. No. 2-13].  In its brief in support of this motion, the FDIC-Receiver argued for the first time that it should be authorized to instruct BB&T to return the balances associated with the Debtor's deposit accounts at BB&T and thereupon the Debtor's deposit accounts would never be deemed to have been assumed by BB&T pursuant to the Purchase and Assumption Agreement dated August 14, 2009 (the "P&A Agreement").  [Bankr. Doc. No. 728].

After a hearing before the Bankruptcy Court on the Amended Stay Relief Motion and the Section 365(o) Motion, the Bankruptcy Court ruled that the Debtor did not make a commitment to maintain the capital of Colonial Bank.  The Bankruptcy Court concluded in its memorandum opinion that, to the extent the Amended Stay Relief Motion sought relief from the automatic stay

---

[5]  The FDIC later conceded that it did not have a security interest in the Debtor's bank accounts.  See *Agreed Order Amending Order Setting Hearing, January 20, 2010* [Doc. No. 486 at ¶ 1].

"predicated on a claim under § 365(o), the motion for relief from stay is. . . denied." [Doc. No. 2-49 at 42-43].[6]

### 3.   The FDIC-Receiver's Renewed Stay Relief Motion

On September 27, 2010, the FDIC-Receiver filed a "renewed" motion for relief from stay (the "Renewed Stay Relief Motion") [Doc. No. 2-34].  That motion, which is the subject of this appeal, sought to exercise purported setoff rights against the Debtor's deposit accounts at BB&T based upon certain claims asserted by the FDIC-Receiver other than pursuant to the Section 365(o) Motion.[7]

In the Renewed Stay Relief Motion, the FDIC-Receiver again reconfigured its theory -- arguing for the first that time that the P&A Agreement allowed the FDIC-Receiver to deem the transfer of the Debtor's deposit accounts and associated balances to BB&T as never having occurred, in its discretion and notwithstanding the Debtor's bankruptcy.  The FDIC-Receiver contended that "BB&T did not assume liability for *all* deposits of Colonial Bank but only for 'Assumed Deposits.'"  [Doc. No. 2-34 at 25, ¶ 73].  Accordingly, the FDIC-Receiver specifically requested modification of the stay:

> [T]o *permit the FDIC-Receiver to take such actions as shall be necessary*, whether under the P&A Agreement or otherwise, to exercise its setoff rights against the funds held in the Accounts in partial satisfaction of the FDIC-Receiver's various claims, subject to the final determination of the parties' respective claims against one another in pending district court proceedings. . .

---

[6]  The FDIC-Receiver has appealed the Bankruptcy Court's denial of the Section 365(o) Motion, and that appeal is fully briefed and pending before this Court.

[7]  It is noteworthy that the FDIC-Receiver has never established the validity of any such claims, all of which are disputed, contingent and unliquidated.  The Debtor's filed objection to these claims is pending before the Court in the contested matter styled In re The Colonial BancGroup, Inc., 2:10-cv-00409 (M.D. Ala.).

[Doc. No. 2-34 at 19, ¶ 57 (emphasis added)].  The FDIC-Receiver made clear in its pleadings, and at the hearing before the Bankruptcy Court, that the actions it sought permission to take included the giving of notices to BB&T under the P&A Agreement to call back the deposits and associated deposit balances.[8]

**4.     Debtor's First Motion to Use Cash in its Operating Account**

On November 23, 2010, the Debtor filed its first motion to use cash in its operating account at BB&T to pay the Debtor's operating expenses and court-approved fees and expenses of professionals.  [Doc. No. 2-42].  The FDIC-Receiver objected to this motion on the ground that the requested relief would adversely affect the FDIC-Receiver's purported setoff rights against the balances in the Debtor's operating account.  [Doc. No. 2-47].

**B.     Bankruptcy Court's Orders**

On January 24, 2011, the Bankruptcy Court entered an order denying the Renewed Stay Relief Motion and issued a 21-page memorandum opinion explaining its decision.  That order was based upon a record consisting of a stipulated set of facts and the submission of documents and deposition testimony.  On January 25, 2011, the Bankruptcy Court also entered an order granting the Debtor's first motion to use cash in its operating account (the "First Cash Use Order").

---

[8]  See December 14, 2011 Trans. at 6:24—7:2 (MR. CLARKE:  The reason that we asked for stay relief is because we need -- we wanted to make sure that we had the court's permission to give the instruction to BB&T that we are allowed to give under the P&A agreement[].) [Doc. No. 2-48 at 6-7].

It is now clear why the FDIC-Receiver felt that it was important to seek stay relief to call back the Debtor's deposit accounts from BB&T.  As discussed below, the liability of Colonial Bank (and the FDIC-Receiver) to the Debtor with respect to the Debtor's deposit accounts terminated upon payment by the FDIC, as insurer of those accounts, of the insurance with respect to those accounts.  Therefore, the FDIC-Receiver was left to argue that it could incur a liability for the deposit accounts by requiring BB&T to convey them back to the FDIC-Receiver and by so doing endeavor to establish a liability that in the absence of that conveyance did not exist.  However, such post-petition conveyance and attempted establishment of liability would have occurred *after* bankruptcy, thereby precluding mutuality on the date of bankruptcy for offset purposes under Section 553 of the Bankruptcy Code.

### 1.    Bankruptcy Court Order Denying Renewed Stay Relief Motion

In its memorandum opinion, the Bankruptcy Court ruled that, "[b]ased on the overwhelming evidentiary support":

> BB&T assumed liability for the debtor's accounts under the P&A Agreement. . . The court concludes that the FDIC has no right of setoff against the deposits because they are not a debt of the FDIC.  In other words, with respect to the deposits, the debts between the FDIC and the debtor are not mutual and cannot serve as the basis of a setoff under 11 U.S.C. § 553.

[Doc. No. 2-49 at 17].

In reaching its conclusion, the Bankruptcy Court also observed that the FDIC-Receiver had not requested BB&T to return the Debtor's deposits to the FDIC-Receiver, and that the purported purpose of the FDIC-Receiver's request for stay relief was to allow it to do so without violating the automatic stay.  [Doc. No. 2-49 at 18-19].  The Bankruptcy Court then explained that "the Bankruptcy Code preserves the right to setoff only where (i) the debts are mutual; and (ii) both debts arose pre-petition," and held that "[e]ven if the FDIC could achieve mutuality at this point in time by requesting a return of the debtor's accounts, the FDIC could not, within this universe of time and space, transform its prospective postpetition assumption of the accounts into prepetition debt."  [Doc. No. 2-49 at 19].  As the Bankruptcy Court properly found, "if the FDIC assumes liability at this time, the FDIC will necessarily incur that liability postpetition."  [Doc. No. 2-49 at 19 n.16].

### 2.    Bankruptcy Court's First Cash Use Order

In the First Cash Use Order, the Bankruptcy Court allowed the Debtor to use cash in its operating account.  The Bankruptcy Court overruled the FDIC-Receiver's objection that the use

of the money would undermine its setoff claims, inasmuch as the FDIC-Receiver had no right to set off the funds in the Debtor's deposit accounts.  [Doc. No. 2-51].[9]

### 3.      Bankruptcy Court's Second Cash Use Order

During the pendency of the instant appeals, the Debtor filed a motion requesting additional use of cash in its BB&T operating account.   In its order and accompanying memorandum opinion entered on December 1, 2011 (the "Second Cash Use Order"), the Bankruptcy Court overruled the FDIC-Receiver's objection to the motion.   The Bankruptcy Court again found that the FDIC-Receiver had no setoff rights with respect to the operating account, that the denial of access would seriously prejudice the Debtor's implementation of its Plan (particularly with respect to the prosecution and defense of pending litigation), and the FDIC-Receiver was adequately protected by a replacement lien in its favor in other assets of the Debtor's estate, including litigation recoveries.

### C.      FDIC-Receiver's New Argument on Appeal

After the filing of the FDIC-Receiver's brief on appeal and the Debtor's responsive brief, the FDIC-Receiver filed a reply brief wherein it asserted a new theory for setoff.  As conceded by the FDIC-Receiver, this argument was not raised prior to the appeal.  See, e.g., December 15, 2011 Trans. at 36:5-9 (THE COURT: Let me ask you this, Mr. Clarke.  What about Mr. Dobbs' argument that you never made these arguments to the Bankruptcy Court?  MR. CLARKE: Well, Your Honor, we did *not* make the argument about the restatement Section 318-3.  *That is correct*. . . .) (emphasis added).

---

[9]   The Bankruptcy Court disposed of the FDIC-Receiver's motion to stay the First Cash Use Order by entry of a separate order on January 28, 2011, with the consent of the parties, that allowed the Debtor to use up to $7 million in its BB&T operating account for purposes other than paying pre-petition creditor claims.

The gist of the new argument is that the Debtor's deposit accounts were only "delegated" to (and not transferred to and assumed by) BB&T; the FDIC-Receiver remained secondarily liable with respect to the deposit accounts as "surety"; and the FDIC-Receiver (as "surety") simply intends to "revoke its delegation" pursuant to the P&A Agreement.  [Doc. No. 30 at 1, 3-5].   In addition, the FDIC-Receiver asserted in its brief that the Debtor could not invoke "novation" in order to "escape" the contract law principle that a party cannot eliminate its liability on a contract by delegating performance to a third party.  [Doc. No. 30 at 4].  Not only was its new theory of the case never presented to the Bankruptcy Court for consideration, its conclusory dismissal of the possibility of a novation failed to take into account that the occurrence of a novation is a mixed question of law and fact.

The Debtor and the official committee of unsecured creditors (no longer constituted, following confirmation of the Plan) filed a motion to strike this new argument.  [Doc. No. 31].  This Court denied the motion to strike by its Order entered on January 4, 2012.

**D.    The District Court Orders and Their Effect**

The District Court Orders reversed the orders of the Bankruptcy Court based on the Court's conclusion that the FDIC-Receiver never ceased to be contingently liable for the Debtor's deposit accounts and the Bankruptcy Court erred in concluding that the P&A Agreement (and their transfer of the deposit accounts pursuant thereto) terminated mutuality.

The effect of the District Court Orders is to terminate the Debtor's access to funds in its operating account, thereby severely restricting the Debtor's ability to prosecute claims on behalf of its estate and defend claims asserted against it (including case determinative claims asserted by the FDIC-Receiver).  Of added significance, the District Court Orders dispose of a matter of first impression that will have far-reaching implications in bankruptcy cases throughout the

country, regardless of whether the debtor is an individual, operating entity or bank holding company.

## IV.  ARGUMENT AND CITATION OF AUTHORITY

### A.    Summary of Grounds for Relief

The Debtor respectfully submits that the Rehearing Motion should be granted because:

(1)    The Court did not consider that, as a result of the payment by the FDIC in its corporate capacity and as insurer of the Debtor's deposit accounts (in such capacity, "FDIC-Corporate"),[10] the liability of Colonial Bank (and the FDIC-Receiver as its successor) in respect of the deposit accounts is owed solely to FDIC-Corporate as subrogee;

(2)    The Court incorrectly determined that 12 U.S.C. § 1822(d) was applicable authority for the FDIC-Receiver's assertion of setoff rights with respect to deposit accounts that were transferred by the FDIC-Receiver to BB&T;

(3)    The Court incorrectly ruled that the FDIC-Receiver was not relieved of any liability that it may have had with respect to the deposit accounts of the Debtor that were transferred to BB&T prior to the commencement of the Debtor's Chapter 11 case;

(4)    The Court erred in denying the Debtor's motion to strike and in considering on appeal the FDIC-Receiver's newly-advanced arguments regarding delegation and

---

[10]   The FDIC's dual role as insurer and receiver arises by statutory design, and it is not uncommon for the FDIC to serve in both capacities with respect to a single bank liquidation.  See FDIC v. Bernstein, 944 F.2d 101, 106 (2d Cir. 1991).  The separateness of these dual identities of the FDIC has been well respected by the federal courts.  See Texas American Bancshares, Inc. v. Clarke, 954 F.2d 329, 335 (5th Cir. 1992).

novation, which were not presented to or considered by the Bankruptcy Court and for which no evidence was presented to the Bankruptcy Court;

(5) Even if the FDIC-Receiver remained liable on the deposit accounts as successor in interest to Colonial Bank despite the undisputed transfer of those accounts to BB&T, the Court did not have before it a complete record on the factual issue of whether the Debtor consented to the transfer of its accounts to BB&T and denied the Debtor an opportunity to present evidence to the Bankruptcy Court on the newly-asserted issue of novation;

(6) Because the Renewed Stay Relief Motion was predicated on the existence of a claim of the FDIC-Receiver against the Debtor (other than the alleged claim pursuant to Sections 365(o) and 507(a)(9) of the Bankruptcy Code), the Renewed Stay Relief Motion should have been denied for failure of the FDIC-Receiver to demonstrate the existence of any allowed claim against the Debtor; and

(7) The Court overlooked the fact that the P&A Agreement focuses upon the FDIC-Receiver's authority to call back the deposit balances, and not simply terminate the supposed delegation of deposit liability to BB&T, and the transfer of the deposit balances by BB&T back to the FDIC-Receiver is a transfer of property of the estate that is itself subject to the automatic stay set forth in Section 362(a) of the Bankruptcy Code.

(8) To the extent that the Court ruled in its Opinion that the P&A Agreement created a liability of the FDIC-Receiver or the receivership estate with respect to the deposit accounts, the Court erred in such a ruling.

**B.**    **Discussion**

     **1.**     **By Its Payment of the Insured Deposits of the Debtor at Colonial Bank, FDIC-Corporate, as Subrogee, is the Sole Party With a Claim Against Colonial Bank and its Receivership Estate With Respect to the Deposits**

The deposit accounts of the Debtor at Colonial Bank were fully insured by FDIC-Corporate.[11]  On August 14, 2009, the date that the receivership of Colonial Bank commenced, the FDIC-Receiver sold substantially all of the assets of Colonial Bank to BB&T, and, pursuant to 12 U.S.C. § 1821(f)(1), FDIC-Corporate honored its insurance obligations to the Debtor and thereby satisfied the Debtor's claims with respect to its deposit accounts at Colonial Bank.  As a result of FDIC-Corporate's satisfaction in full of the Debtor's claims against Colonial Bank with respect to the deposit accounts, which occurred prior to the Debtor's bankruptcy on August 25, 2009, (i) all liability of Colonial Bank (and the FDIC-Receiver) to the Debtor with respect to these deposit accounts ceased to exist, (ii) FDIC-Corporate, as subrogee pursuant to 12 U.S.C. § 1821(g)(1), held a claim against the receivership estate of Colonial Bank for the amount of the insurance paid in respect of the Debtor's insured deposit accounts, and (iii) mutuality for setoff purposes under Section 553 of the Bankruptcy Code ended.

Section 1821(f)(1) of Title 12 of the United States Code obligates FDIC-Corporate to make payment of insured deposits in a failed bank "as soon as possible."  Such a payment can be made by one of two means -- first, by payment of cash directly to the depositor; or secondly, by FDIC-Corporate "making available to each depositor a transferred deposit. . . in another insured

---

[11]  That the balances in the accounts were fully insured was a stipulated fact in the record.  [Doc. No. 2-39 at 4, ¶ 14 ("At all pertinent times, the full balance credited to each of the Accounts has constituted an "insured deposit" within the meaning of applicable federal law.")].  Undisputed testimony in the record, as summarized by the Bankruptcy Court in its opinion, also notes that the "FDIC would have paid BB&T an amount of money for assuming the deposits, and BB&T would have paid a deposit premium to FDIC.  Neither of these payments has been reversed. . . " [Doc. No. 2-49 at 8].

depository institution in an amount equal to the insured deposit of such depositor." 12 U.S.C. § 1821(f)(1).[12]  In this case, FDIC-Corporate opted to employ the second method and therefore made available to the Debtor at BB&T deposits equal to the balances in the Debtor's deposit accounts at Colonial Bank.

Having paid the insured amount of the Debtor's deposit accounts, FDIC-Corporate became subrogated to the rights that the Debtor had against Colonial Bank as a depositor immediately prior to that payment.  This right of subrogation in favor of FDIC-Corporate is set forth in 12 U.S.C. § 1821(g)(1), which reads as follows:

> Notwithstanding any other provision of Federal law, the law of any State, or the constitution of any State, the Corporation, upon the payment to any depositor as provided in subsection (f) of this section in connection with any insured depository institution or insured branch described in such subsection or the assumption of any deposit in such institution or branch by another insured depository institution pursuant to this section or section 1823 of this title, *shall be subrogated to all rights of the depositor against such institution* or branch to the extent of such payment or assumption.

(emphasis added).[13]  As observed by the FDIC in its own official publication, MANAGING THE CRISIS: THE FDIC AND RTC EXPERIENCE (December 1997), with respect to deposit liability claims:

---

[12]  The full text of Section 1821(f)(1) reads as follows:

> In case of the liquidation of, or other closing or winding up of the affairs of, any insured depository institution, payment of the insured deposits in such institution shall be made by the Corporation as soon as possible, subject to the provisions of subsection (g) of this section, either by cash or by making available to each depositor a transferred deposit in a new insured depository institution in the same community or in another insured depository institution in an amount equal to the insured deposit of such depositor.

[13]  There are various types of subrogation recognized by the courts -- conventional (or contractual), legal (or subrogation arising under equitable principles) and statutory subrogation.  See Fin. Sec. Assur., Inc. v. Stephens, Inc., 500 F.3d 1276 (11th Cir. 2007); In re Hamada, 291 F.3d 645 (9th Cir. 2002).  Conventional subrogation arises by virtue of a contract among the relevant parties, legal (or equitable) subrogation is a doctrine governed by applicable state law, and statutory subrogation is a creature of state or federal statute.  See Hamada, 291 F.3d 645; In re Flamingo 55, Inc., 378 B.R. 893 (Bankr. D. Nev. 2007); In re Olson, 355 B.R. 649 (Bankr. E.D. Tenn. 2006); In re Dow Corning Corp., 250 B.R. 298 (Bankr. E.D. Mich. 2000).

> Because the FDIC in its corporate capacity satisfies its deposit insurance obligations *and in doing so assumes the rights of the depositors to make a claim against the institution*, the FDIC is almost always the largest creditor of the receivership.[14]

See, e.g., Golden Pac. Bancorp v. FDIC, 375 F.3d 196 (2d Cir. 2004) (recognizing FDIC's subrogation rights).

Any liability that Colonial Bank (and the FDIC-Receiver as its successor) ever had in respect of these insured deposits to the Debtor has been satisfied and liability is now solely owed to FDIC-Corporate as subrogee.[15]   Indeed, as a result of FDIC-Corporate's rights of subrogation, the Debtor itself has no claim in the Colonial Bank receivership with respect to the deposit accounts[16] and FDIC-Corporate not only owns all of the substantive rights of the Debtor that have been paid[17] but also is authorized to accrue interest on its subrogation claim.[18]   FDIC-

---

[14]  A copy of this publication is available to the public at http://www.fdic.gov/bank/historical/managing/, and a copy of the page cited to above is annexed hereto as Exhibit A.

[15]  Subrogation requires satisfaction of the creditor's claim by the subrogee.  See In re DaRosa, 318 B.R. 871 (BAP 9th Cir. 2004); In re Chalk Line Mfg, 181 B.R. 605 (Bankr. N.D. Ala. 1995).  See also FDIC v. Sumner Financial Corp., 602 F.2d 670 (5th Cir. 1979) (holding that subrogation arises only when payment is made, although case preceded enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989).  It is a derivative right that is acquired by the subrogee through satisfaction of a claim that the creditor has against an obligor.  See Hamada, 291 F.3d 645.

[16]  To the extent that the laws of the State of Alabama have any application to subrogation issues in this context, an insurer is the real party in interest in litigation after the insured has recovered in full.  See Ex Parte Cassidy, 772 So. 2d 445 (Ala. 2000).  Under Rule 17(a) of the Alabama Rules of Civil Procedure, the insurer is the real party in interest in litigation when the insured no longer has any pecuniary interest in the action.  Corona v. Southern Guaranty Ins. Co., 294 Ala. 184 (Ala. 1975).  Here, all insured depositors, including the Debtor, have no pecuniary interest because "payment" in accordance with 12 U.S.C. § 1821(f)(1) has occurred with the transfer of the deposit accounts and deposit balances to BB&T and BB&T's agreement to be responsible therefor.

[17]  See La Reunion Aerienne v. Socialist People's Libyan Arab Jamahiriya, 533 F.3d 837 (D.C. Cir. 2008).

The doctrine of subrogation produces a legal fiction whereby an obligation that is extinguished by the subrogee's payment is treated as still subsisting for the benefit of the subrogee, so that by means of it the subrogee is substituted to the rights, remedies and securities of another.  In re Bill Heard Enters., Inc., 423 B.R. 771 (Bankr. N.D. Ala. 2010); In re Kline, 242 B.R. 306 (Bankr. W.D.N.C. 1999).  See also, Glen Burnie Mut. Sav. Bank v. United States, 733 F. Supp. 2d 623 (D. Md. 2010) (subrogee steps in shoes of creditor as if payment giving rise to subrogation was never paid); In re Big Idea Prods., Inc., 372 B.R. 388 (Bankr. N.D. Ill. 2007).

Corporate therefore is the holder of the claim, which is entitled to priority under federal regulatory law (12 U.S.C. § 1821(d)(11)(A)) and is payable solely to FDIC-Corporate.[19]

The FDIC-Receiver recognizes the absence of any ongoing liability to the Debtor as a depositor with respect to these accounts as (a) nowhere on its balance sheet in the receivership does the FDIC-Receiver list insured deposit accounts as liabilities; and (b) instead, the only deposit liabilities shown are those owed *to FDIC-Corporate* as subrogee to the rights of all insured depositors, including the Debtor, and are listed on the receivership balance sheet as the "FDIC Subrogated Deposit Claim."[20]

There can be no mutuality under Section 553 of the Bankruptcy Code unless on the date of bankruptcy the offsetting creditor holds a valid claim against the debtor and owes to the debtor a debt that arose before the commencement of the case.  11 U.S.C. § 553(a).  Mutuality did not exist on the date of the Debtor's bankruptcy for the simple reason that on that date the liability of Colonial Bank to the Debtor with respect to the deposit accounts had been satisfied in full by FDIC-Corporate, which succeeded to and became the sole owner of claims against Colonial Bank and the receivership estate with reference to that deposit account liability.

---

[18]  See Golden Pac. Bancorp v. FDIC, 375 F.3d 196 (2d Cir. 2004); FDIC v. Iowa Growthland Fin. Corp. (In re First Nat'l Bank, N.A.), 523 N.W.2d 591, 595 (Iowa 1994) (subrogation rights entitle FDIC to interest, not based on that accruing to depositors, but upon unpaid portion of its "own claim" as creditor in the receivership).

[19]  The FDIC certainly cannot claim to be surprised by this subrogation argument, as it is one that it has advanced before.  See Lawson v. FDIC, 3 F.3d 11, 16 (1st Cir. 1993) ("[T]he FDIC. . . urges one additional defense against the contractual claim made against it *as receiver*.  This argument relies upon 12 U.S.C. § 1821(g), which provides that when the FDIC has paid an insurance claim to a depositor or arranged for a healthy insured bank to take over the deposit, *then the FDIC in its corporate capacity is subrogated to -- i.e., takes over -- the depositor's claims against the failed bank that it has just paid.*") (emphasis added).

[20]  See http://www.fdic.gov/bank/individual/failed/colonial-al.html for a publicly available copy of the FDIC Balance Sheet (last updated Sept. 14, 2011), attached hereto as Exhibit B.  A cursory review of the liabilities listed on the balance sheet shows that the largest liability is for the "FDIC Subrogated Deposit Claim" in the amount of over $5.8 billion.

## 2.      The FDIC-Receiver Has No Right of Setoff Under 12 U.S.C. § 1822(d)

Both the FDIC-Receiver and the Court point to 12 U.S.C. § 1822(d) as authority for the FDIC-Receiver's offset rights under the facts of this case.

That section, however, only applies to an "insured deposit of any depositor *in a depository institution* in default." 12 U.S.C. § 1822(d) (emphasis added). Thus, while the receivership estate, and the FDIC-Receiver acting on its behalf, may withhold payment of an insured deposit that is held *in the failed depository institution*, and may apply the deposit balance to any liability of the depositor to the failed institution, that authority ceases and the right of offset terminates when the insured deposit is no longer maintained at the failed institution. Both the Bankruptcy Court and this Court found that the deposit accounts of the Debtor were transferred to BB&T [Opinion at 24 (noting that the Debtor's deposits were "physically transferred")] and it is clear that BB&T received the insured amount of the associated balances from FDIC-Corporate. As previously discussed, FDIC-Corporate is mandated by 12 U.S.C. § 1821(f)(1) to make payment of the insured deposits "as soon as possible," either by cash to the depositor or by making available to the depositor a transferred deposit in an insured depository institution in an amount equal to the insured deposit of the depositor. This is precisely what the FDIC, in both its receivership and corporate capacities, purported to accomplish pursuant to the P&A Agreement. As a result, at the commencement of the Debtor's bankruptcy, there were no deposit balances (or insured deposits) in Colonial Bank and Section 1822(d) is therefore inapposite.[21]

---

[21]   Moreover, the Bankruptcy Court correctly ruled as a matter of federal bankruptcy law that the P&A Agreement could not be used by the FDIC-Receiver to deem the *de facto* transfer of the deposit accounts and deposit balances never to have occurred by wording in an agreement to which the Debtor is not a party and that is at odds with the reality of the circumstances surrounding the actual transfer of the Debtor's deposit accounts and monies paid to BB&T in connection therewith by FDIC-Corporate.

Neither the FDIC-Receiver nor the Court's Opinion have cited any cases in which a court has sanctioned a right of offset under 12 U.S.C. § 1822(d) with respect to insured deposit accounts that have been transferred from a failed depository institution to an assuming financial institution.  That no cases have been located, despite the long history of financial institution failures in this country and the accompanying bankruptcy of their holding companies, is not surprising in light of the plain language of the statutory framework that allows FDIC-Corporate to satisfy its insurance obligation with respect to an insured deposit account by remitting the insurance proceeds to another federally insured depository institution and confers upon FDIC-Corporate (and not the depositor) a subrogated claim for the insurance payments that accompany the transferred deposit account.

> **3.     The FDIC-Receiver Retained No Liability to the Debtor for the Deposit Accounts After Their Transfer to BB&T**

On the date of the closing of Colonial Bank and the commencement of the receivership, the FDIC-Receiver became authorized under 12 U.S.C. § 1821(d)(2)(A) to exercise all of the rights and privileges of Colonial Bank.  On that date, and prior to the FDIC-Receiver's transfer of the deposit accounts to BB&T and FDIC-Corporate's payment of the insured amount in connection with that transfer, Colonial Bank remained liable for withdrawal demands by the Debtor with respect to its deposit accounts at Colonial Bank.  After those deposits accounts were transferred to BB&T and the insured balances paid by FDIC-Corporate, however, neither the receivership estate nor the FDIC-Receiver retained any liability to *the Debtor*.

It is true, as a matter of general contract law, that an obligor typically may not assign an obligation and thereby rid itself of liability to perform the obligation, absent the consent of the obligee.  However, there is no contract principle that requires an obligee's consent to a third party agreeing with an obligor to assume and be responsible for payment of the obligor's liability.

Accordingly, BB&T could, under general principles of contract law, assume responsibility for the deposit accounts and receive the associated balances from FDIC-Corporate, without the prior knowledge or consent of the Debtor.

The FDIC-Receiver points to 12 U.S.C. § 1821(d)(2)(G)(i) for the proposition that, in its receivership capacity, it may transfer liabilities of a failed bank to another financial institution, without the consent or approval of the obligee.[22]  This statutory provision would be unnecessary if its purpose and intent were not to allow the FDIC-Receiver to accomplish a transfer of deposit accounts of a failed financial institution to another financial institution, free from any further liability of the failed financial institution and the FDIC-Receiver to the insured depositor for those accounts.   This is especially the case where, as here, the deposit balances actually transferred to BB&T in conjunction with the insured deposit accounts were made from funds provided by FDIC-Corporate as insurer of those accounts.

As sole authority for its argument that Section 1821(d)(2)(G)(i) does not authorize a transfer of the Debtor's deposit accounts free of any further liability of the FDIC-Receiver to the Debtor, the FDIC-Receiver cites Waterview Mgmt. Co. v. FDIC, 105 F.3d 696 (D.C. Cir. 1997). That case, however, does not support the FDIC-Receiver's proposition that its rights under Section 1821(d)(2)(G)(i) are qualified by the common law.  In Waterview, the receiver attempted

---

[22]  This section provides as follows:

> (d) Powers and duties of Corporation as conservator or receiver.
>     (2) General powers.
>         (G) Merger; transfer of assets and liabilities.
>             (i) In general.  *The Corporation may*, as conservator or *receiver* --
>             *****
>                 (II) subject to clause (ii), transfer any asset or liability of the institution in default (including assets and liabilities associated with any trust business) *without any approva*l, *assignment, or consent* with respect to such transfer.

12 U.S.C. § 1821(d)(2)(G)(ii) (emphasis added).

to sell real estate that was the subject of a settlement agreement pursuant to which a borrower established a separate entity to market and sell the real estate and with an option to purchase it in exchange for the borrower's consent to the failed bank's foreclosure.

While noting that the receiver could have repudiated the settlement agreement (with the borrower's recourse being to file a claim for damages), the appeals court held that the receiver could not sell the real estate unencumbered by enforceable contractual rights relating to the disposition of the real estate.  The appellate court concluded that Section 1821(d)(2)(G)(i) "does not provide a blanket 'preemption' of all valid pre-receivership contracts," because to do so "would raise serious constitutional issues" under the takings clause of the United States Constitution. 105 F.3d at 699.

In the instant case, there is no contract that prohibits the FDIC-Receiver from assigning the Debtor's deposit accounts at Colonial Bank to BB&T, particularly when combined with a transfer of insurance payments equal to the deposit balances that enables BB&T to honor its assumed obligations.  Unlike the borrower in <u>Waterview</u>, which would have been victimized by the receiver's actions (and with no claim for repudiation of the contract), the Debtor's position in this case is improved by the transfers (combined with the insurance payments equal to the deposit balances) and no constitutional "takings clause" issues are implicated.  Furthermore, while <u>Waterview</u> involved the receiver's attempt to transfer an asset free of contractual restrictions, this case involves the assumption of a deposit liability by another insured depository institution (BB&T), that is provided cash equal in amount to the transferred deposit accounts, all as authorized by 12 U.S.C. § 1821(f)(1).

### 4.    The Court Erred in Considering the FDIC-Receiver's New Arguments on Appeal

The FDIC-Receiver does not deny that its arguments regarding delegation, retention of liability as surety and novation were not presented to the Bankruptcy Court for its consideration.[23] Indeed, nowhere in the record below is the Debtor able to find any reference to "delegation of authority," "retention of liability as surety" or "novation" -- all words or phrases used by the FDIC-Receiver for the first time in its reply brief on appeal.  [See Doc. No. 34 at 2-3].  These arguments were an afterthought and not even alluded to in any pleadings until after the FDIC-Receiver had filed its initial brief and the Debtor had filed its responsive appellate brief.  [See Doc. No. 31 at 2 ("This delegation theory is conspicuously absent from the FDIC's opening brief [Doc. No. 15] which does not so much as mention the words "delegate," "delegation," "surety" or "revocation.")].[24]

Inasmuch as the Court has determined to remand these motions for further consideration by the Bankruptcy Court, it would be appropriate and equitable to remand to the Bankruptcy Court these newly-advanced theories for a *de novo* factual and legal consideration of the issues,

---

[23]  The FDIC-Receiver's admissions cannot be squared with this Court's statement that the argument is not new on appeal.  [Opinion at 16 n.5 ("BancGroup argues that the court should treat this argument as new on appeal.  The court disagrees.  The contract-based argument responds to the reasoning of the Bankruptcy Court, which held that the P&A Agreement discharged the FDIC-Receiver's liability in the deposit accounts; in addition, the FDIC-Receiver has long maintained that the court should look to contract principles when addressing mutuality, which makes the point proper for consideration.")].

First, if the argument were truly a response to the Bankruptcy Court's holding, the FDIC-Receiver should have filed a motion for reconsideration, or, at least, raised the argument in its initial brief on appeal.  The FDIC-Receiver did neither.  Second, while the FDIC-Receiver may have argued that the Bankruptcy Court should look to its contract with BB&T when addressing mutuality, the FDIC-Receiver never raised a single principle of contract law (other than the purported "plain" meaning of this agreement) in support of its Renewed Stay Relief Motion.  Had the FDIC-Receiver raised this argument below, the Bankruptcy Court would have been given an opportunity to resolve at least one disputed issue of fact -- i.e., whether a novation occurred -- that the Opinion improperly dispensed with by characterizing as one of "law alone."  [Opinion at 16 n.5].

[24]  The Debtor is not aware of any published case in which these "delegation" and "retention of liability as surety" arguments have ever been advanced by the FDIC-Receiver or independently recognized by a court.

- 20 -

if the Court does not otherwise in response to the Rehearing Motion vacate the District Court Orders.   The novation issue in particular, as discussed below, warrants further factual development and consideration by the Bankruptcy Court because it is a mixed question of law and fact.  Given the importance of the Court's rulings, the record should be complete.  To render judgment on an incomplete record, and without the opportunity being afforded to the Debtor to marshal its evidence in response to new theories, would be a manifest injustice.  Access Now, Inc. v. Southwest Airlines Co., 385 F.3d 1324, 1331 (11th Cir. 2004) ("If we were to regularly address questions -- *particularly fact-bound issues* -- that district courts never had a chance to examine, we would not only waste our resources, but also deviate from the essential nature, purpose, and competence of an appellate court.") (emphasis added).[25]

<strong>5.      The Existence of a Novation is a Mixed Question of Law and Fact</strong>

Even assuming that Colonial Bank (and the FDIC-Receiver) remained liable to the Debtor on the deposit accounts notwithstanding their transfer to BB&T and notwithstanding FDIC-Corporate's rights as subrogee, the Court erred in ruling that no novation occurred.

In the first place, and as noted above, the Bankruptcy Court was not afforded an opportunity to receive any evidence on this issue and did not address the FDIC-Receiver's novation argument.  Secondly, the Court overlooked compelling evidence in the record that the

---

[25]   The Eleventh Circuit went on to comment in the Access Now case as follows:

> In Irving v. Mazda Motor Corp., 136 F.3d 764 (11th Cir. 1998), we expressed our concern that "*too often our colleagues on the district courts complain that the appellate cases about which they read were not the cases argued before them.*  We cannot allow Plaintiff to argue a different case from the case she presented to the district court."  Id. at 769.  We share that concern.  Plainly, as an appellate court with no fact finding mechanism, and, indeed, *without any factual averments made in the trial court*, we are naturally hesitant to consider this claim.  We also observe that the plaintiffs had every opportunity to raise the new theory in district court, whether in their initial complaint or in an effort to amend their complaint.  As best we can tell, at no time did the plaintiffs do so.

Access Now, 385 F.3d at 1331 (emphasis added).

Debtor never looked to the FDIC-Receiver as having any liability on the transferred deposits, always looked to BB&T as its depository bank, and by its conduct consented to the transfer of the deposit accounts to BB&T.

Whether or not a novation occurred is a mixed question of law and fact.  A novation is ultimately a matter determined from the intent of the parties and the conduct of the parties may be examined to ascertain their true intent.  Marvin's, Inc. v. Robertson, 608 So. 2d 391, 393 (Ala. 1992) ("Whether parties to a contract *intended* a novation may be deduced from the *facts and circumstances*.") (emphasis added).  See also Aronowitz v. Health-Chem Corp., 513 F.3d 1229, 1237 (11th Cir. 2008) ("The question of intent 'is generally a question of fact' for a jury.") (internal citations omitted); Std. Fire Ins. Co. v. ICA, Inc., 2007 U.S. Dist. LEXIS 24442, 10-11 (M.D. Ala. Mar. 21, 2007) ("Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact, where there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law.") (internal citations and quotations omitted).[26]  Similarly, the issue of whether the Debtor consented to the transaction is also a question of fact that is inappropriate to dispose of as a matter of law.  Johnson v. Pruitt, 239 Ala. 44, 46-47 (Ala. 1939).

As for the record, the following undisputed facts demonstrate that the Debtor looked solely to BB&T, and fully accepted BB&T, as its depository institution:

    (a)    The Debtor never made any demand upon the FDIC-Receiver for payment of any sum of money in respect of the deposit accounts and, in light of FDIC-Corporate's

---

[26]  As noted by the Court, the Debtor is not a party to the P&A Agreement.  [Opinion at 15].  The Court's statement that "it is unlikely that the P&A Agreement would have allowed such a discharge of liability to occur" is irrelevant as to whether a novation occurred.  Nothing in the P&A Agreement did or could prevent a novation.

unquestioned subrogation rights, the Debtor would not have had any right to make any such demand.[27]

(b)  All funds advanced to the Debtor from its deposit accounts at BB&T during the pendency of its bankruptcy case have been made by withdrawal requests addressed by the Debtor to BB&T and wire transfer remittances to the Debtor made by BB&T.[28]

(c)  In all of the pleadings that are embraced in this appeal, the Debtor consistently has taken the position that the FDIC-Receiver had no liability whatsoever with respect to the deposit accounts and that the only entity having any liability was BB&T (to which the FDIC-Corporate transmitted insurance payments as required by 12 U.S.C. § 1821(f)(1)).[29]

(d)  The Debtor's schedules and statement of financial affairs in the Chapter 11 case refer to BB&T as its depository bank and nowhere reference the FDIC-Receiver as having any liability with respect to the deposit accounts.

---

[27]  Subrogation substitutes one person who pays a lawful claim in the place of another with reference to that claim and the subrogee succeeds to all of the rights and remedies of the first party with respect to the claim.  Stephens, Inc., 500 F.3d 1276; Gearing v. Check Brokerage Corp., 233 F.3d 469 (7th Cir. 2000).

[28]  See, e.g., Doc. No. 2-39 at 5, ¶¶22-25.

[29]  See, e.g., Doc. No. 20 at 9 (As of August 14, 2009 "all liabilities relating to the Debtor Deposits were released by Colonial Bank and assumed by BB&T.  At no time since August 14, 2009 has Colonial Bank or the FDIC had any liability (fixed, contingent or otherwise) with respect to the Debtor Deposits. . .  BB&T has had such liability at all times since then."); Doc. No. 20 at 21 ("Regardless of what law applies, the FDIC must establish mutuality, and it cannot do so because the Debtor Deposits are liabilities of BB&T"); Doc. No. 34 at 7 ("The Debtor has never taken the position that the FDIC as receiver currently has any obligations with respect to the Debtor Deposits, as surety or otherwise.").

(e)     The Debtor's Bankruptcy Court-approved disclosure statement in connection with the Plan describes BB&T as the Debtor's depository bank and nowhere states that the FDIC-Receiver is liable on the deposit accounts.

(f)     The protective proof of claim filed by the Debtor in the receivership of Colonial Bank, which the FDIC-Receiver argues is evidence of an admission by the Debtor that the FDIC-Receiver was liable with respect to the Debtor's deposit accounts, sought recovery from the receivership estate *only* if the FDIC-Receiver was successful in calling back the deposits from BB&T.  That protective proof of claim[30] cannot fairly be construed as an admission by the Debtor that the FDIC-Receiver had any liability with respect to the accounts because:

i.      Any claim with respect to an insured deposit is not one that may be filed against the failed bank's receivership estate, but rather an insurance claim processed by FDIC-Corporate as required by 12 U.S.C. § 1821(f)(2).[31]

ii.     The Debtor had no cognizeable claim in the receivership case of Colonial Bank with respect to the Debtor's insured deposit accounts inasmuch as the full amount of those insured amounts was satisfied, prior to the Debtor's bankruptcy case, by FDIC-Corporate, which now holds

---

[30]  The fact that the Debtor characterized such claim explicitly as "protective" only evinces that the Debtor did not believe it had any claim against the receivership absent some contingent occurrence.

[31]  Section 1821(f)(2) states that "The Corporation, in its discretion, may require proof of claims to be filed and may approve or reject such claims for insured deposits."  If the subject deposits had not been insured, the Debtor would have been a general creditor in the receivership estate and the provisions of Section 1821(f)(1) would not have applied.  With respect to insured deposits, claims of depositors relating thereto are not processed through the receivership proceeding but rather through a separate claims process through FDIC-Corporate.  12 U.S.C. § 1821(f).  See also Callejo v. Resolution Trust Corp., 17 F.3d 1497, 1499 (D.C. Cir. 1994) (explaining process for filing deposit insurance claims against FDIC-Corporate under Section 1821(f)); Villafane-Neriz v. FDIC, 75 F.3d 727, 729 n.1 (1st Cir. 1996) (noting that, "[i]n its corporate capacity, the FDIC functions as a bank regulator and *insurer of bank deposits*") (emphasis added).

subrogation rights with respect to the amount of the insurance payment pursuant to 12 U.S.C. § 1821(g)(1).

iii.  Even if the Debtor's filing of the protective proof of claim could be construed as a demand for payment on the FDIC-Receiver with respect to the deposit accounts (a demand by law that only FDIC-Corporate could make as subrogee), then the FDIC-Receiver's *disallowance* in its entirety of the Debtor's protective proof of claim would constitute a compelling admission that the FDIC-Receiver denies any such liability.[32]

(g)  The FDIC-Receiver transferred all records related to the accounts to BB&T, where they remain to date, and since the date of the transfer only BB&T has provided to the Debtor monthly account statements and no statements have been provided by the FDIC-Receiver to (or been demanded from the FDIC-Receiver by) the Debtor.  [January 24, 2011 Bankruptcy Court Op., Doc. No. 2-49 at 16].

In footnote 6 on page 18 of the Court's Opinion, the Court notes that the Debtor's consent to an assignment of its accounts to BB&T "could have effected a novation and ended the FDIC-Receiver's liability in the deposit accounts," and that this is "another way mutuality might be destroyed."  The conduct discussed above indicates such consent was given.  In any event, since there does not appear to be any case imposing a time limitation by which such consent may be

---

[32]  The FDIC-Receiver's disallowance of the Debtor's proof of claim is included in the record in the case styled <u>The Colonial BancGroup, Inc. v. FDIC</u>, 2:10-cv-00198 (M.D. Ala.), cited to by the Court in its Opinion during a discussion of the Debtor's proof of claim.  [Opinion at 18 n.6].  The FDIC-Receiver's denial of liability with respect to that claim is only 12 pages later in the same document.

given, the Debtor hereby ratifies and reaffirms its consent to the extent that the record is not otherwise sufficiently clear that prior consent has been given.[33]

### 6.    The FDIC-Receiver Has Not Established the Existence of a Claim

To establish mutuality for setoff purposes, and to have standing to file a meritorious motion for stay relief in the first instance, a party must demonstrate that it has a claim against the debtor.  See, e.g., In re Elmira Litho, Inc., 174 B.R. 892, 900–02 (Bankr. S.D.N.Y. 1994).

As noted previously, the Renewed Stay Relief Motion is predicated upon the existence of a claim against the Debtor other than one arising pursuant to Sections 365(o) and 507(a)(9) of the Bankruptcy Code.  The only claims alleged by the FDIC-Receiver in the Renewed Stay Relief Motion are disputed and contingent as to liability and unliquidated in amount.  For the most part, those claims are ones that will arise only if the Debtor is successful in its litigation with the FDIC-Receiver over ownership of specific assets, as the FDIC-Receiver maintains that it will become a creditor for the amount of any successful litigation recovery by the Debtor in that litigation.[34]

---

[33]  Putting aside the issue of whether or not the Debtor consented to the assignment of its accounts to BB&T (which the Court at footnote 6 of its Opinion suggests may not have been effective by virtue of terms in the P&A Agreement), the Debtor is unaware of any law, rule or regulation that would prohibit it from releasing the FDIC-Receiver and the receivership estate from any liability with respect to the deposit accounts and looking solely to BB&T as the obligor with respect to those deposit accounts.

[34]  Examples of claims that the FDIC-Receiver argues will arise if the Debtor succeeds in litigation are ownership disputes with respect to tax refunds, allocation of fidelity policy insurance proceeds and ownership of the REIT preferred securities.  According to the FDIC-Receiver, for example, if this Court determines that the Debtor has a rightful claim to a refund under its tax return, the FDIC-Receiver will have a claim in the same amount against the Debtor.

The FDIC-Receiver does argue that if the Debtor proves that it was insolvent on relevant dates and is able to assert a claim against the receivership estate for alleged fraudulent transfers to Colonial Bank and also able to avoid any capital maintenance obligation as a fraudulently incurred obligation under Section 548 of the Bankruptcy Code, then the FDIC-Receiver will have a claim against the Debtor for alleged unlawful dividends that were made by Colonial Bank to the Debtor during the same time periods.  Unfortunately for the FDIC-Receiver, its ability to recover on any claim that it may have against the Debtor will be dependent upon its compliance with Section 502(d) of the Bankruptcy Code, pursuant to which the FDIC-Receiver would be obligated to pay the amount of any fraudulent conveyance judgment rendered against it as a condition to having an allowed claim in the Debtor's bankruptcy case.

Apart from the fact that the FDIC-Receiver has failed to establish the existence of any allowable claim, the FDIC-Receiver can be adequately protected with respect to any claim that is asserted to arise as a result of any such litigation recoveries by the Debtor by setting aside from any such recovery amounts up to the sum of the deposit balances in question in this litigation.  In other words, at the very moment that a valid claim owed to the FDIC-Receiver is established so as to create mutuality for offset purposes, the FDIC-Receiver can be protected from any loss by such set aside so that the FDIC-Receiver suffers no loss.  If, on the other hand, the Debtor ultimately prevails in its assertion that no offset rights exist or that any successful litigation with the FDIC-Receiver does not give rise to a claim in favor of the FDIC-Receiver, then the FDIC-Receiver will not have suffered a loss and the Debtor will not have been barred from access to its accounts.

In all events, rather than ruling that the FDIC-Receiver has established the requisite mutuality for offset purposes (which ruling is based almost entirely on the FDIC-Receiver's newly-advanced, and unmeritorious, arguments on appeal), the Court should deny the Renewed Stay Relief Motion, without prejudice, pending a final determination whether the FDIC-Receiver will have a valid claim against the Debtor's estate.[35]

### 7.     The Transfer of Deposit Balances of the Debtor Back to the FDIC-Receiver is Subject to the Automatic Stay

The reason the FDIC-Receiver has all along sought stay relief to take certain steps under the P&A Agreement to call back the deposits is because the assertion of a right of offset, without

---

[35]  In a proceeding before the Bankruptcy Court on estimating the FDIC-Receiver's claim for purposes of voting on the Plan, the FDIC-Receiver argued that it would prevail in all of its litigation with the Debtor and therefore that no claim would arise against the Debtor in any of this litigation.  [Bankr. Doc. No. 1136 at 2, ¶ 2 ("The FDIC-Receiver believes that the positions asserted by the Debtor in litigation with the FDIC-Receiver are *meritless*.") (emphasis added)].  The FDIC-Receiver has reinforced that position by moving for summary judgment in this Court on every matter of litigation with the Debtor.  [The Colonial BancGroup, Inc. v. FDIC, 2:10-cv-00198 (M.D. Ala.), Doc. No. 109, entitled "Motion of the FDIC-Receiver for Summary Judgment on All Claims"].

the deposit balances themselves in hand, would not be productive to its purposes.  Hence, the

FDIC-Receiver seeks stay relief to cause BB&T under the P&A Agreement to transfer back to

the FDIC-Receiver the deposit balances for the transferred deposit accounts.

While it is true that a deposit account creates a debtor-creditor relationship between the

depositor and the depository institution, most courts that have considered the matter have

concluded that the deposit balances associated with a bank account constitute property of a

debtor's estate and therefore any transfer or other disposition of those deposit balances, without

requisite bankruptcy court approval, is a violation of the automatic stay.  As stated by the

bankruptcy appellate panel in Jubber v. Ruiz (In re Ruiz), 455 B.R. 745, 749 (B.A.P. 10th Cir.

2011):

> Given the limited applicability of *Strumpf* to the facts of this case, and the broad
> scope the Court is required to use in applying § 541 [of the Bankruptcy Code], the
> Court adopts the prevailing view of nearly every court to consider this issue by
> holding that the funds in the. . . account, rather than merely the promise to pay
> over those funds, constituted property of the bankruptcy estate.[36]

---

[36]  In adopting this majority view, the Ruiz court aptly summarized the import of the Supreme Court's statement in Citizens Bank of Maryland v. Strumpf, 516 U.S. 16, 21 (1995) that a deposit account "consists of nothing more or less than a promise to pay, from the bank to the depositor."  There, the Supreme Court held that a bank's placement of an administrative hold on a deposit account did not constitute a setoff, and thus the bank had not violated the automatic stay.  As the Ruiz court observed, however, "Strumpf solely involved the automatic stay and the relationship between the bank and the debtor in that context. *The issue of what constituted property of the estate under § 541 was neither argued nor decided.*  For that reason, this language in Strumpf is not dispositive under the facts, or the issue presented, in this case."  Ruiz, 455 B.R. at 749.  The Ruiz court's opinion then includes the following citations in support of the proposition that funds associated with a deposit account constitute property of a debtor's bankruptcy estate:

> See, e.g., In re Pyatt, 486 F.3d 423, 427 (8th Cir. 2007) ("the funds transferred by the [pre-petition] checks are property of the estate"); In re Brubaker, 426 B.R. 902, 905 (Bankr. M.D. Fla. 2010), aff'd, 443 B.R. 176 (M.D. Fla. 2011) ("both schools [of thought] agree that the funds are property of the estate"); Yoon v. Minter-Higgins, 399 B.R. 34, 42-44 (N.D. Ind. 2008) (holding money in the debtors' bank account on the petition date became property of the estate); In re Parsons, No. 05-00321, 2006 Bankr. LEXIS 3184, 2006 WL 3354513, at *1 (S.D. Ind. Nov. 17, 2006) ("Funds on deposit in a debtor's checking account. . . on the petition date are property of the bankruptcy estate."); In re Schoonover, No. 05-43662-7, 2006 Bankr. LEXIS 2892, 2006 WL 3093649, at *2 (Bankr. D. Kan. Oct. 30, 2006) ("This Court has located eight decisions that address this issue.  As a threshold matter, all eight decisions agree that the money [in the checking account] is property of the estate."); In re Spencer, 362 B.R. 489, 491 (Bankr. D. Kan. 2006) ("the funds remained in [the debtors'] possession and control at the date of the petition, were property of the estate, and were therefore subject to turnover."); In re Sawyer, 324 B.R. 115, 121 (Bankr. D.

The foregoing argument was not necessary to be made before the Bankruptcy Court because the threshold and determinative issue was whether the FDIC-Receiver could, as it requested, establish mutuality post-petition by purporting to call back the deposit accounts and associated liabilities from BB&T.  The FDIC-Receiver in its pleadings below took the position that its ability to deem an "Assumed Deposit" never to have been transferred, by virtue of a contract (the P&A Agreement) to which the Debtor was not even a party, supplied the necessary linkage to liability owed to the Debtor at the time of the bankruptcy filing.  In light of the FDIC-Receiver's new arguments on appeal, the question regarding the transfer back from BB&T of the deposit balances is relevant and provides an additional basis for denying the Renewed Stay Relief Motion.  In all events, if the Court determines to proceed with a remand pursuant to the District Court Orders, the Debtor respectfully requests that the remand not preclude consideration of this argument.

### 8. The P&A Agreement Does Not Create Any Liability on the Part of the FDIC-Receiver With Respect to the Deposit Accounts

The Debtor understands the Court's Opinion to rule that the liability of Colonial Bank with respect to the Debtor's deposit accounts arose at the time the Debtor deposited funds with Colonial Bank, which deposits were made prior to the Debtor's bankruptcy; that liability continued with the FDIC-Receiver, as successor to Colonial Bank; and the P&A Agreement "did

---

Ariz. 2005) ("Indeed, a review of Section 541 provides that the collected funds in the Debtor's account became property of the bankruptcy estate either pursuant to Section 541(a)(1) or (a)(2)"); In re Taylor, 332 B.R. 609, 611(Bankr. W.D. Mo. 2005) ("property of the estate includes the funds in the account"); In re Dybalski, 316 B.R. 312, 316 (Bankr. S.D. Ind. 2004) ("the Funds are property of the estate").

Ruiz, 455 B.R. at 749 n.13.

not extinguish the FDIC-Receiver's liability" with respect to the deposit accounts.  [Opinion at 24].

To the extent that certain portions of the Opinion can be read to say that the P&A Agreement *created* liability of the FDIC-Receiver with respect to the deposit accounts, the Debtor respectfully notes that, first, there is simply no wording in the P&A Agreement to that effect and, second, the P&A Agreement (the parties to which include BB&T, the FDIC-Receiver and FDIC-Corporate, and not the Debtor), could not create a depository obligation of the FDIC-Receiver to the Debtor, especially in light of the Debtor's receipt of payment of that liability from FDIC-Corporate.

It may be true, as argued by the FDIC-Receiver, that a contingent obligation owed by a creditor to a debtor in bankruptcy may constitute a "debt" of the creditor to the debtor for setoff purposes under Section 553 of the Bankruptcy Code.  However, the FDIC-Receiver did not owe any such debt on a contingent basis with respect to the deposit accounts on the date of the Debtor's Chapter 11 filing.  To constitute a pre-petition "debt," even if merely contingent, within the meaning of the Bankruptcy Code, the debt must be "absolutely owed" as of the commencement of the bankruptcy case.  Braniff Airways, Inc. v. Exxon Co., 814 F.2d 1030, 1036 (5th Cir. 1987) (noting that while debt need not be "calculated," it must be "absolutely owed" as of the petition date to be deemed prepetition).[37]  Here, the FDIC-Receiver's asserted liability (although it is clear that no such liability existed at bankruptcy) was not absolutely owed on the date of bankruptcy.  Rather, the FDIC-Receiver contends that, pursuant to Section 9.5 of the P&A Agreement, its liability was "triggered" when it elected in the exercise of its "sole

---

[37]  Section 101(12) of the Bankruptcy Code defines "debts" to mean "liability on a claim," and the term "claim" is defined in Section 101(5) to include contingent rights to payment.

discretion" to deem a deposit account never to have been assumed and therefore never to have been transferred to BB&T.  Electing post-petition to incur a debt is the polar opposite of a debt that is absolutely owed from the FDIC-Receiver to the Debtor as of the commencement of the Debtor's bankruptcy case.  See In re All Media Properties, Inc., 5 B.R. 126, 133 (Bankr. S. D. Tex. 1980), aff'd, 646 F.2d 193 (5th Cir. 1981) (per curiam) (noting that "claims are contingent as to liability if the debt is one which the debtor will be called upon to pay only upon the occurrence or happening of an *extrinsic* event which will trigger the liability of the debtor to the alleged creditor. . . .") (emphasis added).

The P&A Agreement, therefore, purports to allow the parties to create the illusion of account retention that is at odds with the undisputed factual record in this case and the Court's own finding that all of the Debtor deposit accounts were transferred to BB&T, where they remain today.  This positing of a counter-factual world, by agreement between parties that do not include the Debtor, is precisely what the Bankruptcy Court found to be an impermissible circumvention of the mutuality requirement in Section 553 of the Bankruptcy Code, which requires that mutual debts and credits be in existence and *owed* as of the commencement of the bankruptcy case.  Courts have uniformly rejected the efforts of parties to private contracts to create mutuality when doing so is at odds with the specific requirements set forth by Congress in Section 553.  In re SemCrude, L.P., 399 B.R. 388, 398 (Bankr. Del. 2009) (discussing disjointed history of contractual exception to mutual debt requirement and holding that private agreements cannot confer mutuality on non-mutual debts); In re Lehman Brothers, Inc., 2011 WL 4553015 (Bankr. S.D.N.Y. Oct. 4, 2011) (provision in pre-petition swap agreement authorizing the setoff of amounts owed to affiliates of counterparty, a so-called triangular setoff, was unenforceable in bankruptcy).  See also In re Lehman Brothers Holdings Inc., 433 B.R. 101 (Bankr. S.D.NY.

2009) ("safe harbor" exceptions to automatic stay, that provide for exercise of contractual right of offset in connection with swap agreements notwithstanding the operation of any provision of the Bankruptcy Code that could operate to stay, avoid or otherwise limit that right, could not be interpreted as implicitly, and without specific reference to setoff provision of the Bankruptcy Code, doing away with one of the bedrock requirements for exercise of right of setoff in bankruptcy, i.e., that debts and claims be mutual).

## V.   SUMMARY AND CONCLUSION

The Bankruptcy Court was not afforded the opportunity to consider and rule upon the arguments made by the FDIC-Receiver for the first time on appeal.  This Court considered those arguments and ultimately ruled in favor of the FDIC-Receiver on mutuality, but without the FDIC-Receiver's acknowledging the statutory framework that confers subrogation rights upon FDIC-Corporate as a result of its payment of the amount of the Debtor's insured deposits. Accordingly, the Court should grant a rehearing and, following such a rehearing, vacate the District Court Orders and enter orders affirming the Bankruptcy Court's orders.[38]

If the Court does not vacate the District Court Orders and enter an affirmance of the Bankruptcy Court's orders, the Debtor respectfully requests that the entire matter be remanded to the Bankruptcy Court to consider all of the issues, including those raised by the FDIC-Receiver for the first time on appeal and the evidence in support or opposition thereof as well as

---

[38]  Although the Bankruptcy Court's decision addressed only the arguments raised by the FDIC-Receiver below, this Court can affirm the Bankruptcy Court's ruling on any legal grounds, regardless of the grounds addressed, relied upon, or rejected by the Bankruptcy Court in reaching its decision.  Lucas v. W. W. Grainger, Inc., 257 F.3d 1249 (11th Cir. 2001) ("We need not decide whether the district court properly resolved that issue if there is another basis for affirming its judgment, because we may affirm its judgment 'on any ground that finds support in the record.'") (internal citations omitted).  Accord,  Neumont v. Florida, 610F.3d 1249, 1250 n.1 (11th Cir. 2010); Cuddeback v. Florida Board of Education, 381 F.3d 1230, 1235-36 (11th Cir. 2004); National Railroad Passenger Corp. v. Rountree Transport and Rigging, Inc., 286 F.3d 1233, 1263 (11th Cir. 2002).

application of the subrogation principles created by the regulatory regime under which the FDIC-

Receiver operates daily.

DATED:  January 16, 2012

Respectfully submitted,

/s/ Rufus T. Dorsey, IV
C. Edward Dobbs
Rufus T. Dorsey, IV
J. David Freedman
**PARKER, HUDSON, RAINER & DOBBS LLP**
1500 Marquis Two Tower
285 Peachtree Center Avenue, N.E.
Atlanta, Georgia  30303
Telephone:  404-523-5300
Facsimile:  404-522-8409

*Attorneys for the Debtor*

## Exhibit A

## Excerpt from *Managing the Crisis: The FDIC and RTC Experience*

The UDAA, which applies to all receiverships established after its enactment, allows the FDIC to make insurance payments available to depositors for 18 months, after which time all remaining unclaimed funds are offered to the appropriate state. The state can attempt to locate the depositors for 10 years before the funds revert to the FDIC in its corporate capacity.

### Classes of Creditors (Post-National Depositor Preference Amendment)

The National Depositor Preference Amendment set forth the priority that claims against the receivership would be paid. This section describes those priorities.

*Administrative Expenses of the Receiver*

Administrative expenses, the category given first priority of payment, include post-appointment obligations incurred by a receiver as part of the liquidation of an institution. It may also include certain expenses incurred before the appointment of the receiver but determined necessary to facilitate the smooth and orderly transfer of banking operations to a purchasing institution or to obtain an orderly accounting and disposition of the assets of the institution. The expenses may include, but are not limited to, payments for the institution's last payroll, guard services, data processing services, utilities, and expenses for leased facilities. Administrative expenses usually do not include expenses such as severance claims, "golden parachute" claims, and claims arising from contract repudiations. An interim final regulation (12 *C.F.R.* 360.4), promulgated in August 1993, limits the inclusion of expenses within the scope of "administrative expenses" to those that the receiver determines are "necessary and appropriate" for the orderly liquidation or other resolution of the institution.

*Deposit Liability Claims*

The category given second priority applies to any deposit liability of the institution, including both the insured depositors and the uninsured depositors. Insured deposit claims are claims by depositors for insured amounts of their accounts at the time of the appointment of the receiver. Because the FDIC in its corporate capacity satisfies its deposit insurance obligations and in doing so assumes the rights of the depositors to make a claim against the institution, the FDIC is almost always the largest creditor of the receivership.

Uninsured deposit claims are claims filed by depositors whose accounts exceeded the federally insured limit. These claims are paid on par with the FDIC corporate claim for the insured depositors.

Depositors with uninsured funds can be classified into one of two broad categories: (1) depositors unfamiliar with the deposit insurance rules and the financial condition of

**<u>Exhibit B</u>**


**<u>FDIC Balance Sheet</u>**

**FDIC** | **Federal Deposit Insurance Corporation**
Each depositor insured to at least $250,000 per insured bank

Advanced Search

## Failed Bank Information

### COLONIAL BANK - Receivership Balance Sheet Summary (Unaudited)

Fund Code: 10103
Failure Date: 08/14/2009

**For Period Ending June 30, 2011**
**(in $000's)**

| Assets | Current Balance | Proven Deposit Claims | Claim Balance | % |
|---|---|---|---|---|
| Cash / Investments | $ 6,874 | FDIC Subrogated Claim | $ 19,219,465 | 100% |
| Assets in Liquidation | 1,151,703 | Uninsured Depositors | 0 | 0% |
| Estimated Loss on Assets in Liquidation (1) | (588,339) | | | |
| **Total Assets** | **$ 570,238** | **SubTotal - Proven Deposit Claims** | **$ 19,219,465** | **100%** |
| | | Less: Dividends Paid to Date | 13,392,652 | 70% |
| | | **Total Unpaid Deposit Claims** | **$ 5,826,813** | **30%** |

| Liabilities | Current Balance | | | |
|---|---|---|---|---|
| Administrative Liabilities | $ (794,890) | Other Claimants | Claim Balance | % |
| FDIC Subrogated Deposit Claim | 5,826,813 | General Creditor | $ 50,938 | 100% |
| Uninsured Deposit Claims | 0 | Senior Debt Holders | 0 | 0% |
| Other Claimants | 50,938 | Subordinated Debt Holders | 0 | 0% |
| Liabilities at Inception - Unproven | 293,019 | | | |
| **Total Liabilities (2)** | **$ 5,375,880** | **SubTotal - Other Claimants** | **$ 50,938** | **100%** |
| **Net Worth (Deficit)** | **(4,805,642)** | Less: Dividends Paid to Date | 5 | 0% |
| **Total Liabilities and Net Worth** | **$ 570,238** | **Total Unpaid Other Claimants** | **$ 50,933** | **100%** |

(1) Valuation of Assets/Loss Allowances: Assets of the receivership are shown at values representing cash on deposit or the book value of amounts invested; the principal balance of loans, notes, other debt instruments or receivables (note that interest on these assets is not accrued after failure but is recognized when received); the foreclosed value of real and/or personal property or the book value of assets (cost less depreciation or amortization through date of the institution's failure); and the historical cost of the net investment in subsidiaries, partnerships or joint ventures, adjusted where appropriate to reflect the receivership's portion of the underlying net earnings or losses. An Estimated Loss on Assets is provided when anticipated future asset disposition proceeds, including associated expenses, are less than recorded amounts. Future asset disposition proceeds are generally estimated by determining, via sampling or recent disposition activity, the recovery rates for similar assets across all receiverships. However, actual recovery rates for this receivership may differ according to the quality and type of individual asset, as well as over time with changing market conditions. Accordingly, the gains or losses ultimately realized for this receivership will likely vary from amounts estimated.

(2) The Total Liabilities line item reflects those actual and accrued liabilities recorded on the accounting records of this receivership as of the date of this report. The Total Liabilities line item may not include other liabilities arising from Estimated Interest on Claims and Income Taxes, as these liabilities may not be recognized as of the report date, in accordance with current receivership accounting practices.

Back to Failed Bank Page

Back to Failed Bank Information Page

General Disclaimer

Customer Service

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was electronically served on January 16, 2012, by transmission of Notices of Electronic Filing generated by CM/ECF to persons registered as of issuance of filing, addressed as follows:

John J. Clarke, Jr. (john.clarke@dlapiper.com)

Mark D. Griffin (mark.griffin@revenue.alabama.gov)

Michael A. Fritz, Sr. (bankruptcy@fritzandhughes.com)

N. Christian Glenos (cglenos@ba-boult.com)

Spencer D. Stiefel  (spencer.stiefel@dlapiper.com)

T. Parker Griffin, Jr. (pgriffin@babc.com)

Thomas R. Califano (thomas.califano@dlapiper.com)

/s/ Rufus T. Dorsey, IV
Rufus T. Dorsey, IV

*Attorney for the Debtor*

2242375_1